**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| J.M., S.C., A.N., and P.T. individually and on behalf of all other persons similarly situated<br><br>        Plaintiffs,<br>    v.<br><br>SHEREEF M. ELNAHAL, M.D.,<br>Commissioner, New Jersey Department of Health, in his official capacity;<br><br>CAROLE JOHNSON,<br>Commissioner, New Jersey Department of Human Services, in her official capacity;<br><br>ELIZABETH CONNOLLY,<br>Acting Commissioner, New Jersey Department of Human Services, in her official capacity;<br><br>VALERIE L. MIELKE,<br>Assistant Commissioner, New Jersey Division of Mental Health and Addiction Services, as an individual and in her official capacity;<br><br>TOMIKA CARTER,<br>CEO, Greystone Park Psychiatric Hospital, as an individual and in her official capacity;<br><br>TERESA A. McQUAIDE,<br>Former Acting CEO, Greystone Park Psychiatric Hospital, as an individual and in her official capacity;<br><br>ROBERT EILERS, M.D.,<br>Medical Director, New Jersey Division of Mental Health and Addiction Services, as an individual and in his official capacity; | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: |

HARLAN M. MELLK, M.D.,
Chief of Medicine, Greystone Park Psychiatric Hospital, as an individual and in his official capacity;

EVARISTO O. AKERELE, M.D.,
Medical Director, Greystone Park Psychiatric Hospital, as an individual and in his official capacity;

LISA CIASTON, ESQ.,
Legal Liaison, New Jersey Division of Mental Health and Addiction Services, as an individual and in her official capacity;

SWANG S. OO, ESQ.,
Deputy Attorney General, State of New Jersey, as an individual and in her official capacity;

GURBIR GREWAL, ESQ.,
Attorney General, State of New Jersey, in his official capacity; and

PHILIP D. MURPHY,
Governor, State of New Jersey, in his official capacity

Defendants.

Plaintiffs J.M., S.C., A.N., and P.T., by their undersigned attorneys, bring this suit against defendants, as individuals and acting on behalf of all persons similarly situated who have been, are presently, or will be hospitalized at Greystone Park Psychiatric Hospital whose constitutional and statutory rights continue to be violated on a daily basis.

- 2 -

**PRELIMINARY STATEMENT**

1. Greystone Park Psychiatric Hospital (hereinafter "Greystone") is a state-run psychiatric hospital located in Morris Plains, New Jersey. Greystone originally opened in 1876, and by 1895, it was serving patients from nine northern New Jersey counties. Over the years, additional buildings were added to the campus. In the 1920s, Greystone undertook an ambitious ten-year construction plan. By 1954, the Hospital reached its highest residential census: 6,719 patients.

2. From the late 1950s to the mid-1970s, Greystone experienced a long decline, characterized by dwindling patient population, aging buildings, and recurrent scandals. In 1974, in response to public complaints, law enforcement convened a grand jury investigation into the management and operation of Greystone. The initial focus of the investigation was allegations that patients had been beaten and otherwise mistreated by Greystone employees. Instead, the Grand Jury, which met for six months, examined over 300 exhibits and heard from 83 witnesses. It returned a lengthy presentment against many aspects of the hospital management, including deficiency in the administration, the lack of effective personnel policies, professional nonfeasance on the part of staff psychiatrists, physical assaults on patients by nursing personnel, and the failure to respect the statutory mandate of adequate and humane care and treatment, as required by N.J.S.A. 30:4-24.1. Five individuals were eventually indicted for criminal conduct, which included charges of drug distribution, sodomy, attempted sodomy, and Medicaid fraud.

3. In the mid-1970s, a class action lawsuit was instituted on behalf of the patients at Greystone to enjoin the Greystone administration from directing treatment and maintaining conditions in a manner in violation of the constitutional and statutory rights of the plaintiffs. See Doe v. Klein, 143 N.J. Super. 134, (App. Div. 1976). In 1977, the Attorney General and the Public Advocate agreed to a lengthy Stipulation of Settlement, which terminated the litigation and outlined a

detailed recitation of standards and services to ensure the rights of the patients.  The settlement agreement included the establishment of a court-appointed oversight committee.

4. The oversight committee met for over forty years and issued numerous scathing reports of conditions at the hospital.  In 2000, the oversight committee found deplorable conditions existed at Greystone: patients were forced to use dirty bathrooms, forced to sleep in overcrowded rooms, forced to sleep on bare floors, were unsupervised, and were involved in serious physical altercations.

5. The reports prompted then-Governor Christine Whitman to call for the closing of the old Greystone and the creation of a new, state-of-the art hospital, which opened in July 2008 at a cost of $200 million.  A judge disbanded the oversight committee one year later.

6. The "new" Greystone replaced five aging treatment buildings and a 131-year-old administration building with a 450-bed facility in a single, self-contained building.  The new hospital included a treatment mall with over 21 rooms for various activities and a large auditorium.  There were also on-site residential cottages for 60 additional patients transitioning to more independent community living.  Accordingly, the facility was designed to house a maximum of 510 patients.

7. Despite the physical transformation of Greystone, history is now repeating itself as the prior tragic conditions have since resurfaced.

8. Since the opening of the rebuilt Greystone Hospital in 2008, there have been several developments which have caused the population level to swell far beyond its capacity.  In June 2012, as part of a budget-saving decision by then-Governor Chris Christie, the State closed Hagedorn Psychiatric Hospital, a State facility located in Glen Gardner and which housed approximately 285 geriatric patients.  While some of those patients were released to community

placements, such as nursing homes, many were transferred to Greystone and were often placed on units with younger, more assaultive patients.

9. Overcrowding at Greystone was further exacerbated by Governor Christie's decision to close two New Jersey institutions, which housed 415 people with developmental disabilities. The North Jersey Developmental Center in Totowa was closed in the summer of 2014, and the Woodbridge Developmental Center was closed six months later, requiring the State to find placements for hundreds of individuals with serious cognitive disabilities. Many of these developmentally disabled patients were transferred to Greystone, a psychiatric hospital neither designed nor intended to accommodate individuals with developmental disabilities. Likewise, many staff members, who were solely trained to care for developmentally disabled patients, were transferred to Greystone and were ill-equipped to provide psychiatric care.

10. Greystone patient admissions increased from 393 admissions in 2009 to 580 admissions in 2013, a total increase of 47%. The total patient census increased from 460 patients in 2009 to 570 patients in 2014, a total increase of 24%. At that same time, due to administrative mismanagement, the number of experienced staff, including psychiatrists, nurses, and mental health workers, plummeted. For example, although the hospital was designed to utilize at least 29 staff psychiatrists to treat a maximum of 510 patients, the failure to replace psychiatrists who had resigned or retired resulted in only approximately less than one-fourth of the positions being filled. This shortage resulted in drastically increased caseloads and, coupled with other numerous administrative failures that will be described below, dramatically decreased the opportunity for patients to receive appropriate psychiatric care.

11. Chronic administrative failures, the increased daily patient census, the inability of the doctors to spend sufficient time with the patients, and overall insufficient staffing levels of

competent staff have resulted in a drastic increase in assaults, suicide attempts, drug overdoses, and fatal medication mismanagement.

12. Defendants, rather than working with doctors and staff to better the conditions at the hospital, created an "atmosphere of terror and retaliation" to intimidate doctors and staff who dared to speak out against its grossly negligent conduct.  Rather than trying to save lives, Defendants exacerbated these harmful, life-threatening conditions, and also engaged in fraudulent and reckless conduct, much of which was hidden from their staff, the courts, and the public.

13. At the time of this filing, there is a mass exodus of staff psychiatrists.  Of the minimum twenty-nine required positions, only approximately six full-time psychiatrists remain.  More will leave before the end of this year.

**JURISDICTION**

14. This action is brought pursuant to the Constitution of the United States and pursuant to 42 U.S.C. 1983.  Jurisdiction is conferred upon this court by 42 U.S.C. 1983 and 28 U.S.C 1331 and 1343(a)(3) and (4), this being an action seeking redress for the violation of constitutional and civil rights.

15. Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

16. Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. 1391 (a) because it is the district in which Plaintiffs' claims arose.

## RELEVANT LAWS

### THE FIFTH AND FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

17. The Fifth and Fourteenth Amendment prevent any State from the depriving "any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

### TITLE II, AMERICANS WITH DISABILITIES ACT

18. 42 U.S.C. Section 12132 and the regulations promulgated thereto, 28 C.F.R. 35, state that "a public entity may not, through its methods of administration, deny public benefits or subject individuals with disabilities to discrimination on the basis of such disabilities."

### SECTION 504 OF THE REHABILITATION ACT

19. Section 504 of the Rehabilitation Act of 1973, which is codified as 29 U.S.C. Section 794, and the regulations promulgated thereto, 28 C.F.R. Part 41, state that "no public entity receiving federal funds shall deny any person the benefits of a public service, or otherwise subject a disabled person to discrimination, on the basis of that person's disability."

### NEW JERSEY CONSTITUTION ARTICLE 1, PARAGRAPHS 1 & 14

20. New Jersey Constitution Article 1, Paragraph 1 states that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

21. New Jersey Constitution Article 1, Paragraph 14 states that "[t]he privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety may require it."

## PATIENT BILL OF RIGHTS

22. Under N.J.S.A. 30:4-24.2, the Patients' Bill of Rights protects patients' rights in two categories: those that may not be denied under any circumstances (subpart "f") and those that can be denied for "good cause" (subpart "e").

23. In relevant part, the following rights cannot be denied under any circumstances: 1) to be free from unnecessary or excessive medication; and 2) to be free from physical restraint and isolation except for emergency situations. In relevant part, the following rights can be denied for "good cause": 1) right to privacy and dignity; 2) right to the least restrictive conditions necessary to achieve the purposes of treatment; and 3) right to receive prompt and adequate medical treatment for any physical ailment.

24. Under N.J.S.A. 30:4-24.2(g), for a right to be denied for "good cause," the following must take place: 1) a program director determines that it is imperative to deny these rights; 2) a written notice of denial of rights must be filed in the patient's treatment record; and 3) the patient and attorney must be provided written notice of the denial of rights.

## INVOLUNTARY COMMITMENT TO TREATMENT

25. Pursuant to N.J.S.A. 30:4-27.1 to 27.23, the State of New Jersey is responsible for providing care, treatment and rehabilitation to mentally ill persons who are disabled and cannot provide basic care for themselves or who are dangerous to themselves, others, or property. N.J.S.A. 30:4-27.1(a). It is the policy of the State that persons in the public mental health system are required to receive inpatient treatment and rehabilitation services in the least restrictive environment in accordance with the highest professional standards and which will enable those persons committed to treatment to return to full autonomy in their community as soon as it is clinically appropriate.

## PARTIES

### A. PLAINTIFFS

Plaintiff J.M. was born on August 13, 1939. She was admitted to Greystone on September 3, 2014. She was discharged from Greystone on March 28, 2018.

Plaintiff S.C. was born on May 26, 1960. She was admitted to Greystone on April 20, 2018. She has not been discharged from Greystone.

Plaintiff A.N. was born on August 15, 1993. He was admitted to Greystone on March 23, 2017. He has not been discharged from Greystone.

Plaintiff P.T. was born on October 1, 1959. He was admitted to Greystone on January 14, 1992. He has not been discharged from Greystone.

### B. DEFENDANTS

Defendant Shereef M. Elnahal, M.D., is the Commissioner of the New Jersey Department of Health.

Defendant Carole Johnson is the Commissioner of the New Jersey Department of Human Services.

Valerie L. Mielke, is the Assistant Commissioner of the New Jersey Division of Mental Health and Addiction Services.

Tomika Carter, is the CEO at Greystone Park Psychiatric Hospital.

Teresa A. McQuaide is the Former Interim CEO at Greystone Park Psychiatric Hospital.

Robert Eilers, M.D., is the Medical Director of the New Jersey Division of Mental Health and Addiction Services.

Harlan M. Mellk, M.D., is the Chief of Medicine at Greystone Park Psychiatric Hospital.

Evaristo O. Akerele, M.D., is the Medical Director at Greystone Park Psychiatric Hospital.

Lisa Ciaston, Esq., is the Legal Liaison of the New Jersey Division of Mental Health and Addiction Services.

Swang S. Oo, Esq., is a Deputy Attorney General for the State of New Jersey.

Gurbir Grewal, Esq., is the Attorney General of the State of New Jersey.

Philip D. Murphy, is the Governor of the State of New Jersey.

**CLASS ACTION ALLEGATIONS**

26. Pursuant to R. 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other individuals with serious mental health illnesses currently confined to Greystone Park Psychiatric Hospital (hereinafter "Greystone"), previously confined to Greystone, or at serious risk of being confined at Greystone.  In order to remedy the violations alleged herein, Plaintiffs seek declaratory and injunctive relief individually and on behalf of the following class:

> All current and former patients of Greystone Park Psychiatric Hospital, at any time during the applicable limitations period

27. Plaintiffs seek class certification because:

a. The composition of the putative class is so numerous that joinder of all individual members is impracticable;

b. There are questions of law and fact common to the members of the class.  These common questions include, for example:

i. Whether the actions and inactions of the Defendants, including the deliberate indifference to medical needs, denial of the right to a safe and humane physical and psychological environment, the denial of the right to be safe from State-created danger, and the denial of the right to be protected from patient-on-patient assaults, constitute violations of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 1, Paragraphs 1 and 14 of the New Jersey Constitution;

ii. Whether the Defendants' failure to administer services, programs and activities in such a way that patients can enjoy these services free from harm from other

- 10 -

recipients constitutes a violation of the Americans With Disabilities Act and the Rehabilitation Act of 1973; and

 iii. Whether the Defendants' failure to provide sufficient staffing of psychiatrists to testify at scheduled court review hearings constitutes a violation of New Jersey's Involuntary Psychiatric Commitment Laws

C. Claims of Plaintiffs are typical of the class as a whole;

D. Plaintiffs will fairly and adequately protect the interests of the class;

E. The defendants have acted and/or refused to act on grounds generally applicable to the class, such as consistently failing to comply with the state and federal laws in the care and treatment of patients confined at Greystone so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; and

F. Counsel for Plaintiffs is qualified, experienced, and able to conduct this litigation, and will fairly and adequately protect the interest of the class.

<strong><u>STATEMENT OF FACTS</u></strong>

I. <strong><u>ESCALATING RATE OF ASSAULTS</u></strong>

28. From approximately 2012 to 2017, there were an average of 4.71 assaults per day at Greystone.

29. In 2012, the total number of reported assaults at Greystone was 1,832; of those reported assaults, 549 were with injury.

30. In 2013, 1,966 assaults were reported; of those, 674 were with injury.

31. In 2014, 1,509 assaults were reported; of those, 532 were with injury.

32. In 2015, 1,486 assaults were reported; of those, 530 were with injury.

33. In 2016, 1,816 assaults were reported; of those, 654 were with injury.

34. In or around August 2017, before the Director of Performance Improvement and Utilization Management was suspended for threatening to disclose the actual data, 908 assaults were reported; 322 were with injury. The number of assaults and injury in 2017 was on track to surpass the highest number of reported assaults and injuries since the opening of the "new" Greystone.

35. Defendants intentionally kept multiple sets of books regarding the rate of assaults: one set for the public, one set for regulatory agencies, and one set for internal use only. The internal set is the only one with an accurate picture of the astronomical rate of violence at Greystone. Multiple whistleblowers have lost their careers and reputations when they attempted to disclose or refused to unlawfully manipulate this information against the direct orders of Defendants.

36. On or around February 27, 2014, an Ad Hoc Committee on Safety and Staffing Issues (hereinafter "Ad Hoc Committee") was established. The reason for establishing the Ad Hoc Committee was an increasing number of complaints from Greystone staff members related to the escalating safety issues on the units, inappropriate staffing levels, and overcrowding of patients. The Ad Hoc Committee consisted of psychiatrists and medical doctors employed by Greystone. The Ad Hoc Committee presented their findings to Defendants in a report dated April 25, 2014.

37. The Ad Hoc Committee found that between 2009 and 2013, the number of admissions increased 47% from 393 to 580. From 2010 to 2013, the increase of patient-to-patient assaults increased 40%, with 970 assaults in 2010 to 1,367 in 2013. From 2010 to 2013, the patient-to-staff assaults increased 40%, with 413 assaults in 2011 to 582 in 2013. From 2009 to 2014, the mortality rate increased by 60%, from 5 deaths in 2010 to 8 in 2013. This report and its recommendations were sent to the Division of Mental Health and Addiction Services.

38. The grave conditions are best summarized in this complaint by Greystone's own Medical Staff Organization. The Medical Staff Organization is theoretically a self-governing body whose primary purpose is to hold physicians collectively accountable for patient safety and clinical performance. On or around October 5, 2017, the Medical Staff Organization met to discuss safety issues, staffing issues, and the collective work environment at Greystone under the mismanagement of Defendants. The Medical Staff Organization consisted of the majority of the staff psychiatrists and medical doctors, who were out of options in the face of the growing crisis at Greystone. During the meeting, the doctors discussed Greystone being over census, staff and patients being assaulted on a near-constant basis, and Defendants' fraudulent misrepresentation of the level of assaults. The Medical Staff Organization stated that the number of assaults being reported was significantly lower than the number of assaults they reviewed. The Medical Staff Organization also looked at the severity of the assaults. An example they discussed included a patient who assaulted staff members at least twenty times before being transferred to Ann Klein Forensic Center. The doctors also discussed Defendants' chronic understaffing of Greystone's psychiatric units, thus compounding the dangers to staff and patients. The number of psychiatrists has been below requirements for a very long time because of resignations and retirements as well as Defendants' deliberate failure to fill the vacancies. The critical positions of Chief of Psychiatry and Medical Director, which are required for Greystone to remain licensed and properly operate, remained vacant. Defendants, to save expenditure, purposefully delayed the hiring of available psychiatrists by prolonging the onboarding process by up to eleven months, despite the dire need for their assistance. The multitude of shortages caused the workload of the remaining psychiatrists to skyrocket, and when coupled with the over census of Greystone, compounded tragic consequences.

39. After the meeting, the Medical Staff Organization unanimously passed a No Confidence Resolution against Defendants for their complete failure to address the safety, staffing, and emergency response issues that had been raised repeatedly by dozens of personnel over the past three years.

40. The No Confidence Resolution was necessitated by the rapidly deteriorating conditions that eventually precluded Greystone staff from providing an adequate standard of medical and psychiatric care to the patients. Doctors agree that the baseline medical and psychiatric standard of care cannot currently be met for Greystone's patients.

41. An example of the Defendants' disregard of its staff is illustrated by the Medical Director, Defendant Evaristo O. Akerele, who does not respond to "all-available calls" for help. All-available calls for help are hospital-wide calls over the loud speaker requesting all available hands to a specific unit for emergencies, usually of a life-threatening nature that the staff at the scene cannot safely resolve.

42. In or around February 2018, when a fellow doctor was severely assaulted by a patient, Defendant Akerele did not check on him, though he lay on the ground with a concussion, unconscious while waiting for an ambulance. Virtually every doctor who was on duty that day came to see their injured colleague, who could not get up, and had blood covering his face and torso. When Defendant Akerele was informed of this incident in his office, he refused to check on the injured doctor, and responded that he was "too busy."

43. Virtually every doctor at Greystone has been assaulted. Some examples include:

- Dr. Marek Belz was assaulted on several occasions in the forensic unit, including a time when he was punched in the head. He subsequently resigned in 2016, having only worked at Greystone for fewer than five months.

- Dr. Seung Lee, an evening on-call psychiatrist, was severely assaulted by two patients when responding to an on-call request.  Dr. Lee was subsequently hospitalized.
- Dr. Mohammad Ghazi, another evening on-call psychiatrist, was assaulted several times by patients on an evening shift; he elected to retire in 2017.
- Dr. Joselito Domingo was assaulted on several occasions.
- Dr. Aldonia Swamy was assaulted on several occasions.
- Dr. Walter Bakun was assaulted on several occasions.
- Dr. Anthony Gotay was assaulted on several occasions.
- Dr. Ravi Baliga was lifted off the ground, pushed against the wall, and thrown to the floor by a patient and robbed.
- Dr. Michael Stewart was assaulted several times in an Admissions Unit.
- Dr. Gerry Gaviola was assaulted and had his nose broken.
- Dr. Danijela Ivelja-Hill was assaulted and had her ACL torn.
- Dr. Robert Becker, the former Chief of Psychiatry, was assaulted.

44. From approximately August 1, 2017, to August 13, 2017, one patient assaulted six staff members and three other patients.

45. The level of assaults has caused significant problems with staff retention. For example:

- Dr. Grogan resigned from Greystone due to concerns regarding the assaults.
- Dr. Verdi did not accept a full-time position, citing safety concerns regarding the assaults.
- Dr. Drew Tepper, who subsequently accepted a position in the New Jersey prison system, did not accept a full-time position at Greystone, citing safety concerns regarding the assaults.

46. Doctors and staff are afraid that they will lose their jobs if they disclose the extent and nature of the violence.  Therefore, many incidents go unreported.

47. Due to the mismanagement of staff, Greystone is short of nurses, necessitating circumstances where nurses are forced to work sixteen-hour shifts in an attempt to cover the shortages.  On multiple occasions, nurses were told they were not allowed to go home at the end of their shift, even when they had been assaulted.

48. In or around September 2017, two nurses were crying at their work station after having huge clumps of their hair ripped from their scalps.  Despite their visible injuries, they were not sent home because there were no nurses available to replace them.  As a result of this incident, the

- 15 -

responding Medical Officer of the Day asked Defendant McQuaide if she considered these incidents assaults. Defendant McQuaide responded "no." When asked what Defendant McQuaide considered an assault, she responded "broken bones." The Medical Officer of the Day is the medical doctor responsible for overseeing the safety of all patients and responding to all medical incidents for any designated day. Defendants do not consider having a large clump of hair ripped from one's scalp as constituting an "assault with injury."

49. On or around December 21, 2017, the New Jersey Department of Labor and Workforce Development Office of Public Employees and Occupational Safety and Health (hereinafter "PEOSH") served Pamela Tye-Harlan, Assistant Director at Greystone, a Notice of Order to Comply. PEOSH inspected Greystone from July 14, 2017, to November 30, 2017. Resulting from its investigation, PEOSH issued a "serious violation" under N.J.S.A. 36:6A-33(A), asserting that Greystone did not "provide each employee with employment and a place of employment, which is free from recognized hazards, which cause serious injury, physical harm, or death to the employee." PEOSH also determined that Greystone's Violence Prevention Program, which is required by the Violence Prevention in Healthcare Facilities Act and was produced for PEOSH during the inspection, showed the year 2017 on the title cover page. However, a review of the plan's details and supporting information reflect that the employer's violence prevention plan was not an active, living document that was being maintained, updated, and assessed annually. PEOSH further determined during the inspection that the elements of the Violence Prevention in Healthcare Facilities Act were not being adhered to by Defendants, thus exposing employees to serious workplace hazards. This finding was supported through a review of the injury and illness OSHA forms 300 and 300A data from the previous three years, 2014, 2015, and 2016, which established a consistent, substantial number of incidents on a rising pattern of patient-inflicted violent acts

against employees. Greystone was required to abate the violation by March 26, 2018, or suffer a per diem penalty of $7,000.

## II. INABILITY OF DEFENDANTS TO PROTECT PATIENTS AND STAFF

50. The Greystone Violence Prevention Committee is ineffective. Although all examples of patient-on-staff assaults are impossible to list, the following are a sampling of the patient-on-staff assaults that occurred between August 2017 and June 2018.

51. In or around August 2017, a patient in Unit B1 jumped over the Patient Information Center (hereinafter "PIC") and assaulted a nurse. The PIC is a centralized area on every unit that cordons off the patients from the staff. It also serves as the central location where the staff and patients can interact through a partition that includes a waist-high counter and a lower counter that is staff-facing only.

52. On or around August 16, 2017, one unit made three all-available calls for help when a patient climbed over the PIC and assaulted two nurses. Both nurses subsequently sought medical treatment.

53. In or around August 2017, a patient on Unit A1 jumped over the PIC and threw a chair at the pay phone.

54. On or around December 29, 2017, a doctor was assaulted on Unit F3 when a patient punched her in the face.

55. In or around January 2018, a patient punched a staff member in the eye thereby requiring an emergency room visit, and a different patient bit a nursing supervisor, who then required off-site care.

56. In or around January 2018, a female psychiatrist was chased down the hall by a patient who then cornered her and punched her in the face.

57. In or around January 2018, calls for all-available assistance sounded four times on Unit G3 in quick succession to deal with a violent patient because adequate help was not arriving. Frequently, doctors have witnessed other staff members responding to all-available calls not as if someone's life or well-being depended on it, but as if they were "out for a stroll."

58. On or around January 16, 2018, a patient on Unit G3 assaulted three different staff members, one of whom subsequently required a wheelchair for transportation to receive treatment. An all-available call for help had to be sounded four times before help arrived. On that same date, the same patient also assaulted three other nurses.

59. On or about January 16, 2018, a patient on Unit F3 repeatedly assaulted a female psychologist by pushing her to the floor and subsequently picking her up and throwing her back down to the floor. The patient then climbed on a table, jumped on the psychologist, and proceeded to stomp on her, despite the presence of other staff members. The patient then pushed multiple staff members out of his way. A fellow patient was the only person who tried to stop him as he attempted to hurt more people, but the interceding patient was thrown to the floor and also stomped on. Other patients and staff members then tried to control the aggressor, but he picked up the nursing supervisor and threw her against the wall and picked up another patient and started to choke him. At the end of the assault, three staff members lay injured on the floor. A doctor, along with other staff, was among the first to witness the three staff members lying injured on the floor, severely beaten with help arriving too late.

60. On or around the evening of January 19, 2018, a patient of Unit B1 repeatedly punched a nurse in the head.

61. In or around February 2018, a patient on Unit F3 assaulted approximately twenty employees while waiting for transfer to Ann Klein Forensic Center.

62. In or around February 2018, the then-Chief of Psychiatry, Dr. Hilary Hanchuk, was assaulted. When he went to Employee Health Services for his injury, he was denied treatment by the Employee Health Services Nurse.

63. On or around February 7, 2018, a patient punched a psychiatrist and knocked him to the floor. He then repeatedly punched him in the head while the psychiatrist lay on the floor unconscious. The assaulted psychiatrist was taken by ambulance to Morristown Medical Center.

64. On or around February 21, 2018, a patient on Unit A3 struck a doctor in the face and knocked his eyeglasses to the ground, breaking them.

65. On or around February 22, 2018, a male patient on Unit F1 punched a female social worker in the face.

66. On or around June 9, 2018, a nurse on Unit B1 was severely beaten by a patient and was subsequently rushed to Morristown Medical Center. On the same day, another nurse was assaulted on Unit G2 but remained on duty.

67. In or around September 2018, a patient on Unit G3, who had been stable for months, decompensated because he did not have an assigned psychiatrist. Due to the frequent change of covering psychiatrists, his prescribed medications were repeatedly changed, which caused his decompensation. As a result, he became agitated and paranoid, and struck his psychiatrist in the face.

68. From approximately January 2018 through August of 2018, about 105 employees were assaulted by patients and injured significantly enough to necessitate a report to Greystone's human resources. Of those 105 staff members who filed with human resources, at least one-quarter required multiple days off because of their injuries.

### III.    DEFENDANTS' FAILURE TO HIRE AND MAINTAIN CAPABLE STAFF

69. Patients who are violent and assaultive and require intramuscular injections for sedation are routinely allowed to continue their violent rampages because Defendants do not provide sufficient capable staff to physically intervene.

70. Patients live in a constant state of fear, knowing that staff cannot protect them. Patients report that they cannot sleep at night due to the increase in patient-on-patient assaults that occur in the evening when there are fewer staff members on duty.

71. Doctors and patients report that patients have psychiatrically decompensated due to the constant stress from knowing that staff cannot protect them.

72. In or around October 2016, a physician in his sixties came to the aid of a Health Services Technician physically struggling with a violent patient on the outside of a third-floor unit while many staff members stood by and did nothing. When this physician intervened, the patient gouged out the flesh from the physician's face, causing blood to stream on the floor. He required subsequent medical treatment.

73. On or around August 29, 2017, a patient in Unit D3 jumped over the PIC and threatened the staff members present, who were forced to barricade themselves in the chart room and make an all-available call for help.

74. In or around October 2017, an assault occurred between two patients where one sustained a four-inch left forehead hematoma, and the other had her hair ripped from her scalp. Prior to the Medical Officer of the Day's arrival, the staff who were present did not physically intervene to stop the assault.

75. On or around October 22, 2017, the Medical Officer of the Day responded to three separate all-available calls for help regarding a patient inflicting physical harm to self. The doctor had to

physically restrain the significantly younger male patient, who weighed well over two-hundred pounds, because he was banging his head on the floor. Prior to the doctor's arrival, the staff on the scene did very little, if anything, to stop these repeated episodes of self-harm. The patient now suffers from a non-healing abrasion on his forehead because the staff continues to be unable to stop these episodes.

76. On or around November 4, 2017, a patient in Unit B2 became violent, broke off a three-foot long piece of a wooden bed frame, and attempted to assault staff. The initial response by staff members was unsuccessful, and staff resorted to calling the police because they were either unable or unwilling to subdue the violent patient.

77. On or around December 17, 2017, a patient on Unit E2 smashed a wooden chair in half and carried one half in each hand, using them as clubs to bat down parts of the ceiling and an exit sign while yelling and screaming. This volatile situation drove all the other patients into their rooms out of terror. The staff could not control the patient's behavior, and the only option they were left with was to allow the patient to deescalate on his own without staff intervention. The other patients and the staff were seemingly helpless, as they cowered away from him.

78. On or around January 28, 2018, a female employee was punched in the right eye by a patient on Unit B2 and was taken to Morristown Medical Center. As a result of this attack, three calls for all-available help was sounded on three different units, demonstrating that staff on those units were unable to handle the violence on their own.

### IV. DANGEROUS OVERCROWDING

79. Units at Greystone are chronically and unlawfully overcrowded. Due to this dangerous overcrowding, geriatric patients have been forced to sleep on thin mattresses on the floor outside the designated sleeping areas, often in common areas. Defendants, in an effort to conceal these

- 21 -

unlawful accommodations, have created "rooms" that do not exist and which violate the fire and building codes. To conceal this practice, Defendants order their staff to attach fake room numbers to common areas during the evening, and remove them every morning.

80. The Fire Chief at Greystone has repeatedly informed Defendants that they were violating the fire code, but this practice has continued unabated.

81. On or around July 19, 2017, a census for overcrowding was conducted and found that numerous units were over census. Fire plans and building codes allow for twenty-five patients per unit. Units A2, A3, B1, D3, E2, F1, F2, and G3 were all over census at twenty-seven patients. Some units have had as many as thirty patients.

82. Some cottages, meant to hold eight patients, in practice housed up to fourteen patients. Defendants repeatedly ignored the pleas of the doctors and the staff for a response to rectify the overcrowding situation.

83. An investigator with Disability Rights New Jersey witnessed and documented patients who were sleeping on the floor despite the Defendants' denial that patients were without beds and that the units were overcrowded.

84. On or around June 23, 2017, the Centers for Medicare and Medicaid Services completed a sixty-one-page report titled "Summary Statement of Deficiencies." The Centers for Medicare and Medicaid Services is an agency under the federal Department of Health and Human Services that oversees state hospitals to ensure the delivery of high quality healthcare to patients.

85. The Centers for Medicare and Medicaid Services found that Greystone failed to ensure each of its patients' right to personal privacy. When Greystone receives a new patient and no bed is available, Defendants use the units' study rooms to house patients. To accommodate overflow patients in the study rooms, staff merely provide them with a privacy divider from 8:00 p.m. to

- 22 -

8:00 a.m.  To hide this practice, Greystone covers its security cameras while overflow patients are sleeping in the study rooms.  The study rooms do not have accessible bathrooms, and these patients are required to use bathrooms in the hallways.  Overflow patients who sleep in the study rooms store their belongings in storage rooms.

86. The Centers for Medicare and Medicaid Services found that Greystone "failed to provide all patients with a wardrobe, bedside table, and plastic storage container to secure their belongings."  Greystone also "failed to maintain the comfort and dignity of all patients by ensuring that all patients receive and have access to personal care items."  These findings were based on the Centers for Medicare and Medicaid Services' observations at Greystone, review of Greystone policies and procedures, review of Greystone documents, and staff interviews.

87. On or around June 21, 2017, the Centers for Medicare and Medicaid Services surveyed Greystone and observed overflow patients in various units.  In Unit A2, an overflow patient was observed sleeping on a sofa in the study room with two pillowcases filled with personal belongings next to her.  This patient's personal belongings did not include toiletries or personal care items.  This patient was not provided a toothbrush or toothpaste.  The Centers for Medicare and Medicaid Services interviewed another patient who slept in a study room in Unit F3.  This patient's belongings were also kept in the storage room, but he was not provided a plastic storage container or wooden dresser to house them.  The Centers for Medicare and Medicaid Services also observed a patient lying on a bed in the study room on Unit D2 with a privacy divider and the security camera covered.  A search of this patient's belongings revealed clothing, but no personal care items.  When asked, staff could not confirm whether this patient received personal care items, specifically a toothbrush or toothpaste.  Additionally, this patient was not provided a plastic storage

- 23 -

container or wooden dresser for use.  Unlike other units, a staff member indicated that the beds and privacy dividers remain set up in the study room on Unit D2 at all times.

88. Per Greystone's "Locked Storage Areas for Patient Belongings" policy, patients, including overflow patients, are supposed to be provided a locked storage area for their personal belongings. This locked storage area should include a wardrobe, bedside table, and up to one plastic storage container.  The nursing staff is responsible for educating patients on retaining their locker keys and accessing their lockers.  Unlike patients with designated bedrooms, overflow patients do not have access to their personal belongings, wardrobes, or lockers from 8:00 a.m. to 8:00 p.m.  To retrieve any personal items during these hours, they must request them from the staff.  The Centers for Medicare and Medicaid Services toured the storage rooms in Units A1 and D2.  The Centers for Medicare and Medicaid Services categorized the shared patient storage areas in these units as locked closets.  Both storage rooms were cluttered with patient belongings and were not sanitary. Some of the belongings in these storage rooms were not labeled with the owner's identification. Lastly, contrary to Greystone's storage policy, patient belongings were stored in bags on the floor.

89. There are myriad studies that show that overcrowding at inpatient psychiatric hospitals dramatically increases the rate of falls, assaults, and suicides.

90. Because of overcrowding, Defendants pressure doctors to prematurely discharge patients. These patients do not receive appropriate care and treatment and are thus more likely to be readmitted in the future.

### V.    FAILURE OF THE ONE-TO-ONE OBSERVATION SYSTEM

91. Staff psychiatrists are constantly pressured by Defendants to ignore the requirement for one-to-one observation when patients are imminently dangerous.  One-to-one observation is implemented when a Mental Health Technician is ordered by a doctor to continuously observe an

individual patient for a period of time during acute physical or mental illness, such as during periods of severe aggression, physical violence, or suicidal ideation. The Mental Health Technician performing one-to-one observation duty is mandated to deescalate and intervene when the assigned patient becomes aggressive or suicidal. One-to-one observation is standard operating procedure across virtually all psychiatric facilities in the country.

92. Defendant Akerele orders that patients be taken off one-to-one observation prematurely, with no regard for patient safety. He has required staff psychiatrists to justify their positions of keeping patients on one-to-one observation in a calculated and systematic attempt to pressure the doctors to take patients off. The motivation of this is to advance Defendants' agenda to reduce the costs involved with one-to-one observation care at the expense of employee and patient safety. Defendant Akerele burdens already-overworked doctors with an additional average of five hours a week to defend their position of keeping patients safe.

93. For example, on or around February 24, 2018, an employee was punched in the head by a patient after the patient was taken off one-to-one observation that day. Later that same day, another employee was punched in the right temple by another patient after that patient was also prematurely taken off one-to-one observation. That staff member was taken to Morristown Medical Center because of the assault.

94. Defendants are aware of the dangerous consequences of prematurely taking violent patients off one-to-one observation. For example, on or around August 30, 2013, an order came "from Trenton" to stop all one-to-one observation and treatment for all patients on a holiday weekend, citing cost. Immediately, on the implementation of this order, a patient, who was scheduled for transfer to Ann Klein Forensic Center for assaulting seven other patients and multiple staff members previously, severely assaulted another patient. This assault prompted the then-CEO to

implement an emergency order restoring one-to-one observations. Just prior to that incident, another patient whose one-to-one status was discontinued exposed himself to a newly admitted female patient by waving his penis in front of her face as she lay on the transferring ambulance stretcher. He then ran over to two other female patients and danced in circles around them with his penis exposed.

95. In or around September 2018, Defendant Akerele ordered a patient who has history of pica (a condition of chronically ingesting foreign bodies that are often indigestible) and assaultive behavior off one-to-one observation, despite the repeated protest of the treating psychiatrist. Defendant Akerele, in a cavalier fashion, dismissed the treating psychiatrist's concern that the patient was far too unstable to be off one-to-one. Defendant Akerele wrote an order discontinuing the patient from one-to-one observation. This patient then subsequently ingested a dangerous substance, necessitating her admission to the ER and possibly surgery.

96. Defendants are also aware of numerous incidents where a patient, rather than staff, saved an individual from death or disability. In circumstances where a Mental Health Technician was assigned to one-to-one observation, oftentimes the technician's lack of training and ability rendered the technician ineffective. On or around November 18, 2017, a patient attacked his mother while on one-to-one observation. He punched her in the mouth, lacerating her lower lip, and impaling it on her lower incisors. Then he tossed her to the floor and repeatedly stomped on her chest, fracturing multiple ribs. Fortunately, a patient came to her rescue by physically intervening, thus saving this elderly woman's life. The staff present at the scene, including the assigned one-to-one Mental Health Technician, stood by and watched. This victim was admitted to ICU for an intracranial hemorrhage, chest trauma with multiple fractured ribs, as well as other injuries. She suffered permanent brain damage as a result of this assault. Just earlier that week,

that same patient severely assaulted a developmentally disabled patient. This victim was rushed to Morristown Medical Center, having suffered massive soft tissue damage. A physician who treated him observed that after the assault, it was impossible to part the patient's eyelid to examine the eyeball underneath.

97. On or around January 8, 2018, two patients were about to engage in a physical altercation on Unit B1. One of the patients had a one-to-one Mental Health Technician who never called for help or tried to separate or assist in the de-escalation of the altercation, but merely watched as a doctor in his sixties with a fractured wrist attempted to separate the participants.

98. On or around February 21, 2018, on Unit B3, a patient assaulted a nurse, fracturing her thumb and inflicting extensive soft tissue injuries that mandated surgery. The patient was on one-to-one observation, but the assigned one-to-one Mental Health Technician did not stop the assault.

99. On or around March 2, 2018, on Unit G1, a seventy-one-year-old geriatric patient with a deformed spine from osteoporosis was pushed to the ground by another patient, who subsequently began to stomp on the geriatric patient's head as he lay on the floor. The staff who witnessed the attack indicated that the assailant stomped on the geriatric patient's head six times. The geriatric patient was then unresponsive, and staff called a code "BLUE" (an emergency situation in which a patient is in cardiopulmonary arrest, requiring a team of providers to begin immediate resuscitative efforts). The geriatric patient was taken to Morristown Medical Center and was diagnosed with a subdural hematoma (intracranial bleeding). In the days leading up to the assault, the assailant was throwing chairs at staff, slamming doors, throwing trash cans and food trays at people, and breaking the toilet in his room. Defendants' systemic pressuring of doctors to keep patients off one-to-one observation for fiscal reasons directly contributed to this violence, as the assailant should have been on one-to-one observation.

100. On or around March 2, 2018, the then-President of the Medical Staff Organization approached Defendant Akerele concerning the need to stop taking patients off one-to-one observation prematurely. Defendant Akerele's response was that one-to-one staff are largely "incapable, accomplish nothing, get bored on the job, and sometimes sleep while on duty." Doctors have repeatedly complained throughout the years that many of the staff members are physically incapable of assisting or are too afraid to assist with all-available calls to restrain and deescalate violent patients. This has been confirmed via testimony in the Greystone Park Psychiatric Hospital - Board of Trustees Public meetings, where doctors, staff, members of the Greystone administration, and the public discuss issues surrounding the hospital. The Board of Trustees is a voluntary advisory board whose members are appointed by the governor.

101. Despite Defendants being placed on notice of the assaults that were occurring on a daily basis, they never implemented a dedicated emergency response team.

## VI. THE INFLUX OF ILLEGAL DRUGS

102. One of the long-standing concerns at Greystone has been the influx of illegal drugs. There have been multiple cases of drug overdoses from 2015 to the present. On an alarming number of occasions, physicians had to resuscitate patients using Narcan, a medication used in life-or-death situations to combat narcotics overdoses. Numerous patients have overdosed and died. There is suspicion that Greystone staff are involved in this drug trade.

103. Doctors have stated that Defendants purposefully ignore the drug trafficking, including possible staff involvement therein, because of fear regarding what may be uncovered.

104. For example, in or around 2007, a patient at Greystone was involved in major drug trafficking on the hospital campus. He was caught on camera making large hand-to-hand transactions in the cafeteria during visits with an ex-patient, a convicted drug trafficker. When

one doctor was finally able to convince Defendants of the illegal activity, the patient was scheduled to be transferred to Ann Klein Forensic Center.  Unfortunately for this patient, he died of a heroin overdose the night Greystone approved the transfer.

105. On or around June 2, 2018, a patient on Unit E2 overdosed on heroin and required two doses of Narcan and was rushed to the emergency room at Morristown Medical Center.

## VII.    INADEQUATE MEDICAL CARE TO MONITOR DANGEROUS MEDICATIONS

106. In addition to the influx of illegal drugs, patients have died at Greystone and at emergency rooms from the cardiotoxic effects of psychiatric medications administered at Greystone, most notably clozapine.  Clozapine is an antipsychotic medication used predominately to treat schizophrenia, which can lower the risks of suicidal behavior in patients with schizophrenia and schizoaffective disorder.  Multiple deaths and life-threatening emergencies at Greystone have been attributed to clozapine toxicity by an authorized medical examiner, but such conclusions are routinely discounted by the Chief of Medicine, Defendant Harlan Mellk.

107. In or around 2015, a doctor at Greystone responded to a twenty-seven-year-old female patient in cardiac arrest.  The responding doctor suspected that the cardiac arrest was related to clozapine, but the Morbidity and Mortality Committee at Greystone determined the cardiac arrest resulted from congenitally abnormal coronary arteries.  However, doctors maintain that abnormal coronary arteries can be caused by clozapine.

108. At least one Greystone physician is aware of sudden unexpected deaths in at least four other patients aged twenty-seven to forty-five.  Two of these deaths occurred in the presence of the physician, who was delayed in offering aid because the "code cart" did not arrive in a timely fashion.  The code cart is a set of trays/drawers/shelves on wheels used for transportation and dispensing of emergency medication and equipment at the site of an emergency for life support

protocols.  These deaths were never reported to the Food and Drug Administration as possible clozapine-related deaths.  Despite doctors' suspicions and the Medical Examiner's conclusions, Defendants ignored the dangers of clozapine and effectively prohibited the Food and Drug Administration from further investigation into potential clozapine-related cardiac arrests.

109. In or around the time of this filing, crippled by the shortage of doctors, Defendants elected to stop prescribing critical antipsychotic medications to patients in several units because there are not enough physicians to monitor the side effects or perform the necessary lab work. A psychiatric hospital is now no longer prescribing psychiatric medication to many of its patients who desperately need it.

### VIII.    PREVENTABLE DEATHS AND SUICIDE ATTEMPTS

110. Defendants have largely failed to remedy the inherent dangers and the physical infrastructure, which have contributed to the increasingly dangerous conditions at Greystone.

111. For example, in or around Spring 2017, a patient on Unit D2 dove off the Patient Information Center (hereinafter "PIC") counter head first and fractured his neck in what was apparently a suicide attempt.

112. In or around October 2017, a patient attempted to hang herself.  In full view of staff, she sat on the counter of the PIC, popped a ceiling tile from the ceiling, reached a computer cable wire and twirled it six times around her neck.  Her suicide attempt was nearly successful until a staff member inserted his fingers within the noose to relieve pressure, and a police officer used a utility knife to cut the cable.  The officer's knife inadvertently cut a hand tendon of that staff member, necessitating surgery.  Three weeks later, the same patient attempted to commit suicide in the same manner.  This was the fourth time that this patient attempted the same act.  Defendants did not prevent and remedy this dangerous condition.

113. A few weeks later, another patient jumped on the counter to attempt suicide in the same way.

114. On or around February 10, 2018, a patient on Unit A3 knocked out two ceiling tiles to use the cables located above the tiles to hang herself.

115. Doctors have informed Defendants that the computer cables near the ceiling should be suspended out of reach of patients to prevent suicide attempts by hanging.  Doctors also suggested that the PIC be elevated or fixed with Plexiglas to protect patients and staff from harm.  Defendants did not implement a solution which would have cost less than two dollars per unit.  These foreseeable suicide attempts due to unsafe conditions continue to the present.

116. On or around March 31, 2018, an employee suffered cardiac arrest and subsequently died while on duty at Greystone.  Critical lifesaving equipment had been removed from the code carts, and as a result, no Advanced Cardiac Life Support could be administered.  The psychiatrist first on the scene stated that the emergency response rendered to this employee was "a complete travesty."

117. Defendant Mellk repeatedly stated to the staff doctors that the code cart was of no value, contrary to this being the universal standard of care for emergency rooms, hospitals, and paramedics responding to out-of-hospital cardiac arrests in this country.  Despite widespread condemnation and disapproval, Defendant Mellk eliminated the Advanced Cardiac Life Support course after being in place since at least 2008 as a part of Defendants' agenda to avoid liability.

118. All the cardiac medications, including epinephrine, had been removed.  Epinephrine is used intravenously to restore blood pressure, make the heart more amenable to defibrillation during cardiac arrest, or when severe hypotension is present.

- 31 -

119. Many Greystone patients are on medications that can cause sudden cardiac arrest from lethal arrhythmias, and the means of which to increase their chances of survival are being systematically dismantled by Defendants.

120. For example, in or around 2017, a patient suffered from cardiac arrest, and there was no epinephrine in the code cart. The patient may have been saved if epinephrine were available during the narrow window of opportunity as the patient's blood pressure could have been restored. Furthermore, equipment for advanced airway management, such as the King tube, which can be inserted safely within seconds, had been removed from the code cart. The Kelly clamp and scalpel that would have allowed an emergency procedure in the event of a respiratory arrest from complete airway obstruction had been removed. For the purpose of saving only $60 per code cart, Defendants forfeited the opportunity to save someone who is choking.

121. In or around May 2016, a patient on Unit F2 smuggled a razor into Greystone and slit her wrist during the night. When she was discovered in the morning by staff, she was unresponsive, completely pale from blood loss, and her blood had seeped through her mattress and formed a pool on the floor. She was dying. Defendant Mellk, first on the scene in response to the code "BLUE," did nothing but wait for the paramedics to arrive and continued to allow the patient to die. When another doctor arrived and attempted to give life-saving aid, Defendant Mellk initially physically obstructed that doctor to forward his own agenda of non-intervention. Defendant Mellk wanted to wait for the paramedics in order to avoid liability. The other doctor, fortunately, elected to push past Defendant Mellk and saved this patient's life.

122. In or around September 2017, a geriatric male patient on Unit E1 had a code "BLUE" as he was diaphoretic, was confused, and had a blood pressure of 200/90 and a heart rate of 160. This life-threatening event was interpreted by the responding physician as supraventricular tachycardia.

Defendants eliminated intravenous adenosine from the code cart, which may have prevented the patient from going into full-blown cardiac arrest.

123. On or around January 22, 2018, a code "BLUE" was called on Unit E1 wherein an elderly diabetic female patient was having severe symptomatic hypoglycemia. She was unresponsive. When the responding medical doctor attempted to administer life-saving intravenous medication, he discovered that the code cart had no intravenous catheters, and one had to be brought from a different unit.

124. On or around March 4, 2018, a patient on the second floor of Greystone was suffering from symptomatic bradycardia (a heart rate of about thirty). The responding medical doctor discovered that the code cart did not have intravenous atropine as it did in the past, which would have allowed the physician to bring the heart rate up to normal. The patient's life was in jeopardy, and he had to be rushed to Morristown Medical Center.

125. In or around May 2018, Defendant McQuaide attempted to decrease the evening medical staffing from two Medical Officers of the Day to one, who would be responsible for an excess of five hundred patients. The plan required covering doctors to work sixteen-hour weekend days as a part of their regular work week, in a cost-saving measure. The practice of requiring doctors to work sixteen-hour shifts is a strategy to preclude them from earning overtime hours, thus saving in overhead costs. This reckless practice disregarded the quality of care and created an untenable schedule for most staff doctors.

126. On or around November 19, 2018, a patient on Unit F3 died of an apparent pulmonary embolus with a deep vein thrombosis.

127. On or around November 20, 2018, Defendant Mellk announced at the Department of Medicine meeting that he would seek to block a Root Cause Analysis of the patient's death.

According to one physician present at the Department of Medicine meeting, the Root Cause Analysis would serve to fully investigate the patient's death, the quality control of the hospital, and the use of Basic Life Support over Advanced Cardiac Life Support.

128. This patient's death should have been prevented with timely transfer to an emergency room or with stabilization with Advanced Cardiac Life Support. The patient should have been put on the cardiac monitor for rhythm analysis and monitoring.

129. Following a proper emergency room evaluation, the patient should have been admitted for observation, placed in a 24-hour observation unit in the emergency room, or even discharged with an ambulatory heart monitor. In this case, however, the responding doctors used only Basic Life Support, never placed the patient on a cardiac monitor, and never considered transfer to an emergency room until it was too late.

130. On or around December 5, 2018, Defendant Mellk, unsuccessful in blocking the Root Cause Analysis, announced that the Analysis had taken place and determined that all life-saving measures were taken to save this patient's life. The Analysis also concluded that the patient did not need transfer to the emergency room because his vital signs were stable despite documentation showing that the patient presented with anxiety, agitation, dizziness, light headedness, altered mental status, and near syncope. These symptoms are characteristic of pulmonary emboli, and the physicians would have recognized them as such had Greystone continued use of Advanced Cardiac Life Support.

131. On arrival to this patient, the attending paramedics intubated him, gave intravenous epinephrine, performed CPR at a higher compression and ventilation rate, and performed Advanced Cardiac Life Support. These interventions should have taken place by Greystone staff

had the hospital still mandated Advanced Cardiac Life Support over Basic Life Support and had the code cart been supplied with the necessary materials.

132. The measures taken by the attending paramedics demonstrate the standard of care for emergency response. Greystone's failure to provide this standard of care not only cost this patient his life, but also continues to place the health and safety of other patients at risk.

## IX.     FAILURE TO PROVIDE NECESSARY MEDICAL CARE AND SECURITY

133. Defendants sought to avoid liability by removing life-saving equipment from the code carts. Defendants also failed to provide critical life-saving training for staff. Further, Defendants implemented new policies below the standard of care and recklessly endangered the patients and staff. Defendants ordered the dismantling of Greystone's Emergency Medical Response to reduce medical liability. Since the opening of the "new" Greystone in 2008, the emergency medical response protocol has paralleled the paramedic's standard of care.

134. Defendants have never provided adequate life-saving training to its staff. Prior, when Defendants provided an in-house Advanced Cardiac Life Support and CPR Course that all nurses and doctors were required to take, the instructor provided the answers to the examination questions by projecting them on the screen. Everyone received a score of 100. On or around November 24, 2013, Defendants did not provide the requisite CPR course. Rather, the participants merely watched a video, and the instructor gave a demonstration. No written material was provided. Participants received an American Heart Association CPR card without performing CPR.

135. As of 2017, Defendants formally implemented basic CPR without Advanced Cardiac Life Support, despite the obvious risk to patient safety. On or around March 17, 2017, Defendant Valerie Mielke, Assistant Commissioner of the Division of Mental Health and Addiction Services, issued Administrative Bulletin 3:42 requiring that all staff be certified in Basic Life Support and

stating that Advanced Cardiac Life Support would no longer be required. After eight years of Advanced Cardiac Life Support training, this protocol and educational support for doctors and nurses was eliminated. Per Defendant Robert Eilers, Medical Director for the Division of Mental Health and Addiction Services, the State wanted to reduce its potential liability in life-threatening scenarios. Defendant Eilers also expressed a lack of confidence in Greystone doctors and nurses to adequately perform Advanced Cardiac Life Support and noted that Basic Life Support is more accessible to a layperson.

136. Defendant Akerele routinely orders psychiatrists to work multiple adjoining shifts. For example, psychiatrists are forced to work night shifts from midnight to 8 am, and then subsequently mandated to work the consecutive day shift unless they use their own leave time. Defendant Akerele forced doctors to work sixteen-hour shifts on a regular basis to compensate for the shortage at the expense of patient safety.

137. In addition to overworked doctors, Defendants have also failed to remedy security issues that have resulted in multiple patient escapes. For example, in or around Spring 2017, a patient kicked open the unit exit door and subsequently kicked open the rear exit door and fled. The person who chased him down an eighth of a mile was a physician in his sixties and not security personnel. The patient was returned to the same exact hazard with the same unit and room.

138. The security flaw that security doors, if kicked hard enough, will open was not addressed. Subsequently, a few months later, the same patient once again kicked open his unit exit doors and two more security doors before exiting the building. He then left Greystone, took a bus to Morris Plains, and then a train to his mother's home in Hudson County. He was returned to Greystone two days later when the patient's mother called for him to be picked up.

- 36 -

139. On or around September 3, 2018, a patient on Unit G3 managed to push his way out of the unit and all the way to the lobby. He was bought back to his unit by the police, but there was no doctor to treat him or to write an order for emergency medication. Staff on Unit G3, prior to his escape, called a psychiatrist for medication, but no doctor was available.

140. On or around June 23, 2017, the aforementioned Centers for Medicare and Medicaid Services (an agency under the federal Department of Health and Human Services) issued a sixty-one-page "Summary Statement of Deficiencies," which concluded that Greystone was out of compliance in the following areas:

- Structure of its Governing Body: "The Governing Body failed to demonstrate it is effective in carrying out the responsibilities for the operation and management of the Hospital."

- Patient Rights: "It was determined that the facility failed to protect and promote the rights of each patient" including "fail[ing] to ensure the safety for all patients."

- Medical Staff: "The facility failed to ensure that adequate Medical Staff is provided."

- Food and Dietetic Services: "The governing authority failed to ensure the daily management of Food and Dietetic Services. Also the governing authority failed to ensure that the nutritional needs of the patients are met in accordance with practitioners' orders" and that the food service equipment was cleaned and sanitized in accordance with New Jersey state sanitary codes.

- Physical Environment: "The facility failed to ensure the overall hospital environment is maintained for the safety and wellbeing [of] patients," including proper storage and removal of trash, proper water drainage and adherence to proper structural guidelines.

- Infection Control: "Based on staff interview and document review conducted on 6/22/17 and 6/23/17, it was determined that the facility failed to ensure that staff are screened for tuberculosis (TB) annually according to the CDC guidelines," "ensure that it follows the manufacturer's instructions for the germicidal wipes," and "ensure an Infection Control program for identifying, reporting, investigating, and controlling infections and communicable diseases of patients and personnel."

## X.  INTENTIONAL MISDIAGNOSES OF THE DEVELOPMENTALLY DISABLED

141. Developmentally disabled patients at Greystone are not receiving the appropriate treatment or standard of care due to intentional misdiagnoses and the removal of their Division of Developmental Disability (hereinafter "DDD") eligibility and services.

142. Defendants implemented a scheme to eliminate DDD eligibility for Greystone patients to decrease DDD's fiscal responsibility.

143. Prior to February 2014, Defendants refused to approve a patient for DDD services even though that patient: (1) met the criteria to be DDD-eligible; (2) had been previously deemed DDD-eligible; (3) had an IQ of 48, which is the lowest score on the IQ scale; (4) was to found to meet the criteria for application for DDD services by various treating clinicians; and (5) was believed to be DDD-eligible by a court.

144. On or around February 26, 2014, Defendants were apprised that eleven of the twelve DDD-eligible patients remained involuntarily committed in the highly restrictive environment of Greystone after being clinically deemed no longer needing inpatient hospitalization.  These individuals remained committed for a time frame ranging from 163 days to 1,948 days, with an average of 505 days.

145.  Another example occurred when a patient who was committed at Greystone and who already had lived in an apartment as part of her DDD benefits lost her apartment during the course of her commitment.  After the civil commitment court confirmed that she was eligible for release, the loss of her housing caused her to remain at Greystone for a year longer than necessary.

146. Defendants falsely diagnosed patients with mental illness to preclude DDD eligibility, notwithstanding the fact that patients had previously been receiving DDD services.

147. On or around July 20, 2017, Defendant Lisa Ciaston, Legal Liaison for the Department of Human Services, Division of Mental Health and Addiction Services, was informed that DDD patients were being inappropriately diagnosed with mental illness so that those patients could be controlled through medication, even though they did not suffer from mental illness.

148. On or around August 11, 2017, Defendants were placed on notice that DDD patients were subjected to unconstitutional conditions during their long civil commitments at Greystone.  These conditions included DDD patients being targeted and "taken advantage of," both sexually and to transport contraband, including drugs.

149. On or around August 21, 2017, Defendants were placed on notice regarding the failure of Greystone to properly insulate DDD patients from harm at the hands of aggressive patients.

### XI.    EMPLOYEE RETALIATION RATHER THAN REMEDIATION

150. Defendants have engaged in a plan to eliminate all voices of dissent within Greystone and have proactively sought out vocal employees to eliminate them from the workforce.  High-ranking officials have been removed as part of Defendant McQuaide's effort to purge anyone who spoke out against her conduct. Defendants misrepresent the psychiatric staffing levels to give the false impression that they complied with the report of the Centers for Medicare and Medicaid Services and to silence concerns expressed by advocacy groups.

151. In or around August 2017, the Acting Medical Director and the Medical Staff Organization President, who were both outspoken about the conditions at Greystone, were forced off the Executive Management Committee by Defendants.  Simultaneously, the Committee was expanded with non-physicians, leaving Defendant Mellk as the only physician on the Committee. Despite being a psychiatric facility, no psychiatrists remained on the Committee.

152. In or around March 2018, a high-ranking doctor voiced opposition and was suspended. On or around April 11, 2018, an Ad Hoc Committee appointed to review the doctor's suspension found that there was no justification for the suspension, characterizing it as pretextual and retaliatory.

153. In or around 2017, Defendants requested Greystone's Director of Performance Improvement and Utilization Management to compile the Greystone assaults since 2013. The director accessed the internal Unusual Incident Reporting and Management System and was alarmed by the number of assaults he found. He subsequently provided those figures to Defendants and his direct supervisor, Dr. Dorothea Josephs-Spaulding, Director of Quality Management. Defendants instructed the director, "do not share these numbers with anyone, especially the doctors and the public." When the director continued to express his concerns regarding the high rate of assault, he was suspended by Defendants and accused of falsifying data.

154. On or around February 12, 2018, the Director of Safety and Operations refused Defendant McQuaide's instructions to change the data with regard to assaults. He was subsequently reassigned to be supervised by Dr. Dorothea Josephs-Spaulding, the same individual who suspended the Director of Performance Improvement and Utilization Management. The Director of Safety and Operations was thereafter relieved of duties that had been specific to his role for eight years.

155. Less than two weeks later, this director was suspended and escorted out of the building for refusing another order to falsify data from Defendant McQuaide.

156. In or around March 2018, the Acting President of Medical Staff Organization filed a request for a meeting with Defendant Mielke regarding a doctor being unjustly removed from duty.

Members of the medical staff viewed this as retaliation against the doctor for reporting the malfeasance of Defendants and the "No Confidence" vote in the current hospital leadership.

157. At the time of this filing, the Medical Staff Organization's grievance is currently being heard.  Staff psychiatrists are requesting the closure of units and cessation of new admissions as a solution to the current crisis, the epidemic of violence, and the failure of the medical system.  The psychiatrists, in their joint grievance, state that "there is compromised patient care which could easily lead to increased morbidity and mortality for the patients . . . and [the current understaffing of psychiatrists at Greystone] precludes the ability to provide adequate quality of care and thus leads to unnecessarily unstable patients and an unsafety [sic] work environment."

## XII.    INTENTIONAL MISREPRESENTATION OF INFORMATION TO THE COURTS

158. Defendants instruct witnesses at civil commitment hearings to materially misrepresent their testimony to the court and its officers.

159. Virtually every patient is committed to Greystone Hospital pursuant to a court order.

160. Civil commitment hearings are formal court proceedings held by a judge at psychiatric institutions to determine whether a patient requires involuntary commitment, or whether a less restrictive alternative is appropriate.  Pursuant to each patient's liberty and due process rights, the law mandates the State to ensure that patients are in the least restrictive environment where they can live safely.  All civil commitment proceedings require the sworn testimony of the treating psychiatrist.

161. On or around December 4, 2017, the Chair of the Board of Trustees provided Defendant Elizabeth Connolly, Acting Commissioner of the Department of Human Services, with a report and recommendations of the Board of Trustees, stating, "it has become apparent that the current administration is failing the patients and staff, requiring the board, and all unpaid volunteers to

raise these issues." The detailed report concluded, *inter alia,* the intentional misinformation provided to the courts.

162. Due to the mass departure of psychiatrists at Greystone, the remaining psychiatrists have been forced by Defendant Akerele and other Defendants to "cover" civil commitment hearings for dozens of patients the psychiatrists had never previously evaluated. These psychiatrists are not members of the patients' treatment team. Many times, psychiatrists have examined the patient for a mere matter of minutes yet are expected to testify as an expert and proffer an expert report. These brief examinations often take place the night before or even the morning of the court hearing. Staff psychiatrists find this practice, which continues to this day, to be reckless and unethical. Staff psychiatrists have repeatedly and openly protested Defendants' unreasonable demands.

163. Since 2017, Defendants have explicitly instructed "covering" psychiatrists that they are prohibited from testifying that they are unfamiliar with the patients, patients' medical history, and the specific facts of the patient's case. The psychiatrists are also explicitly instructed to conceal the fact that they are "temporarily covering" these patients and that they are in fact not part of the patient's treatment team.

164. Defendants justify their unlawful instructions by stating that the psychiatrists would "make the hospital look bad" if they informed the court about their insufficient basis of knowledge to testify.

165. Defendant Akerele and Defendant Oo are systematically engaged in the practice of pressuring doctors to conceal material information from the civil commitment court, and punishing doctors who refuse to lie.

166. For instance, in or around August 2018, a psychiatrist testified in court regarding his lack of knowledge of a patient and how little time he had to prepare. Defendant Oo, who was present

during the sealed hearing, informed Defendant Akerele, who subsequently summoned the psychiatrist into his office. Defendants yelled at that psychiatrist and instructed him never to testify and offer that kind of information to the courts again.

167. In or around September 2018, Defendant Akerele again required a psychiatrist to testify regarding a patient who the psychiatrist had never evaluated until the morning of the hearing. When the psychiatrist told Defendant Akerele that s/he had no basis of knowledge to testify and that s/he had not seen the patient or reviewed the chart, Defendant Akerele stated, "I don't care," and implied that there would be disciplinary action if his order was not adhered to.

168. On or around September 12, 2018, in a court calendar of nineteen patients, five cases had no assigned psychiatrists, and the State could not proceed, thus violating the due process rights of the patients. This establishes that at least five patients out of nineteen were at Greystone for an extended period without psychiatric care.

169. Since in or around January 2017, most court calendars have had multiple adjournment requests from the State due to the unavailability of a statutorily required treating psychiatrist. Further, at virtually every hearing, psychiatrists either testify in court or report that they have little basis of knowledge to testify about patients in court. Many cases cannot proceed for months because of the unavailability of a treating psychiatrist.

### NAMED PLAINTIFF J.M.

170. On or around September 3, 2014, J.M. was admitted as a patient to Greystone Park Psychiatric Hospital. She was seventy-five years old at the time.

171. J.M. resided on an overcrowded unit.

172. J.M.'s psychiatric diagnosis included bipolar disorder, post-traumatic stress disorder, and obsessive-compulsive disorder. J.M. also had, and continues to have, a medical diagnosis of celiac disease.

173. While at Greystone, due to the lack of proper medical and psychiatric care, J.M.'s health deteriorated significantly. She lost a dangerous amount of weight. Her medical condition worsened. Her psychiatric condition deteriorated to the worst it had been in her life, eventually causing her to become selectively deaf and self-isolative.

174. J.M. was subject to multiple unprovoked assaults. In or around November 2014, while residing in Unit E1, J.M. was punched in her face by another patient and suffered bruising on her eye and cheekbone.

175. Between 2015 to December of 2017, J.M. was assaulted on multiple other occasions by aggressive patients. On or around March 20, 2018, J.M. was forced to shower, and then she was kicked in the head by a Greystone employee.

176. On or around December 13, 2017, a patient violently kicked J.M. in her back. Defendants did not respond to her family's pleas to transfer this assaultive patient. J.M.'s family requested that J.M.'s attacker to be transferred to a different unit, but Defendants denied their requests and stated that it was too difficult to transfer a violent patient. One Greystone employee even went as far as stating, "this is a mental ward after all, what do you expect?"

177. It was only when a private attorney retained on J.M.'s behalf submitted a Notice of Intent to Sue to the Greystone administration demanding the immediate transfer of J.M.'s attacker and asking what measures Greystone would take to ensure J.M.'s safety that she was transferred on December 14, 2017, after the 4:00 p.m. shift change.

178. Defendants do not have any effective policies or procedures to keep patients safe from other assaultive patients.  A member of the administration even conceded to J.M.'s family that they do not have any implemented policies and procedures to combat patient-to-patient violence.

179. On or around December 18, 2017, J.M.'s private attorney sent a letter to Greystone requesting a copy of their policies and procedures for addressing attacks on patients by fellow patients and all security procedures implemented to prevent attacks.  He also requested a copy of the incident reports prepared because of prior attacks on J.M.  Defendants did not respond or provide any of the requested documentation.

180. On or around January 13 and 14, 2018, J.M. was sexually assaulted by a male patient, who grabbed her genitalia.  J.M.'s family was informed that when an incident such as this occurs, the attacker is usually transferred to another unit.  However, Defendants indicated that because Unit E1 discharged so many patients, they were comparable to an admissions unit and their patients were more likely to be agitated and act out.  Defendants also stated that they were hesitant to transfer J.M.'s attacker because there was a possibility that they would receive another patient who would also put the patients at risk.  Instead, J.M. was transferred to Unit F1.

181. Defendants do not make the appropriate efforts to find community placement for patients who are no longer clinically dangerous and who have been ordered by a court to be discharged or placed on Continued Extension Pending Placement (hereinafter "CEPP") status.  Due to their failure to seek new placements, CEPP patients are often subject to being recommitted when they decompensate due to the poor quality of care and unnecessarily long hospital stays.  For example, a Greystone employee threatened J.M.'s family and stated that if the family did not find a new residence by J.M.'s release date, Defendants would find a facility for J.M. that the staff "guarantee the family would not like."  During this time, Defendants purposefully refused to provide critical

requested paperwork to potential discharge facilities, almost precluding her discharge entirely. Further, Defendants' policy and gross negligence regarding something as simple as completing basic paperwork for its patients forced J.M. to miss out on available discharge placements. J.M.'s family was extremely involved and provided a list of at least five potential placements and deposited thousands of dollars to the various facilities to secure placement. Even with the family's proactive efforts, Defendants continued to hinder placement by failing to provide the facilities with the necessary admissions documents to assess J.M. When a facility was finally secured, Defendants failed in their duty to J.M. by refusing to complete paperwork necessary to obtain Veterans Affairs benefits.

182. On or around March 28, 2018, J.M. was finally discharged to the community. Almost immediately, her psychiatric conditions improved, and she began to communicate again. The lasting damage and the toll on her physical condition from years of chronic, abusive treatment at Greystone, however, will forever remain.

### NAMED PLAINTIFF S.C.

183. On or around April 20, 2018, S.C. was admitted to Greystone. At the time of admission, S.C. was 57 years old; her date of birth is May 26, 1960. S.C. was diagnosed with bipolar disorder, post-traumatic stress disorder, and anorexia.

184. S.C. was initially treated on Unit B1, an admissions unit, under the care of psychiatrist Dr. Young.

185. Upon admission, a medical doctor examined S.C. and found that her musculoskeletal system was "all normal," with no abnormal gait. S.C. was initially treated with Abilify five mg for depression, Depakote 500 mg for mood, Zoloft 200 mg, Ativan, and a nicotine patch.

186. In or around June 2018, S.C.'s lithium levels were tested at Greystone.

187. On or around June 22, 2018, S.C. was transferred to Unit E3. Around that same time, Dr. Young informed her that he could remain as her treating psychiatrist. However, on or around June 24, 2018, S.C. met with a different psychiatrist.

188. On or around June 29, 2018, Dr. Ravi Baliga's Psychiatric Progress Note indicates that S.C. was given Depakote 500 mg twice daily for mood, lithium carbonate 450 mg twice daily for mood, Zoloft 200 mg daily for depression, Geodon 40 mg bid for augmentation of antidepressants, and Vistaril 100 mg twice daily for anxiety. This same note ordered, "check serum lithium and Depakote levels."

189. Prescribing Depakote requires monitoring blood levels for valproic acid after one week of treatment, again one to two months later, and then every six to twelve months. The reason for this monitoring is that there is a therapeutic range at which Depakote operates optimally. Additionally, failure to monitor Depakote levels can induce Depakote toxicity, symptoms of which can include coma, confusion, dizziness, hallucinations, and irritability.

190. Prescribing lithium also requires monitoring blood levels to establish therapeutic effectiveness and to avoid lithium toxicity. A safe blood level of lithium is between 0.6 and 1.2 milliequivalents per liter. The toxic concentrations for lithium ($\geq 1.5$ mEq/L) are close to the therapeutic range. Some patients abnormally sensitive to lithium may exhibit toxic signs at serum concentrations that are considered within the therapeutic range, therefore close monitoring of a patient prescribed lithium is the community standard. lithium toxicity can cause coma, delirium, confusion, seizures, muscle weakness, agitation, and low blood pressure.

191. Despite Dr. Baliga's June 29, 2018, progress note ordering the "check serum lithium and Depakote levels," her levels were not tested again until September 12, 2018, although S.C. made

repeated requests for the same. S.C.'s levels were not tested for seventy-five days, which amounts to malpractice. In that amount of time, a fatal amount of blood toxicity could have accumulated.

192. S.C. also made repeated requests to see a psychiatrist but was not seen by a psychiatrist until a brief meeting in preparation of the July 17, 2018, court hearing and a short interview on July 25, 2018.

193. S.C. was eventually assigned to psychiatrist Dr. Stewart, who saw her approximately once per month.

194. On or around July 24, 2018, medical physician Dr. Amy Steinhardt ordered physical therapy and an evaluation for S.C. due to "generalized weakness" related to "prolonged bed rest," "poor eating habits," and "medication sedation."

195. On numerous occasions, such as on or around July 25, 2018, and July 26, 2018, S.C. complained of dizziness when ambulating. On or around July 25, 2018, Dr. Steinhardt was made aware of the complaint. Despite concerns regarding S.C.'s equilibrium, no lumbar tests were ordered.

196. On or around August 15, 2018, S.C. lost her balance, fell, and suffered an injury to her right wrist. Dr. Steinhardt ordered an X-ray.

197. On or around August 20, 2018, orthopedic surgeon Dr. Christian J. Zaino of the Orthopedic Institute of New Jersey examined S.C. for the wrist injury. On or around September 4, 2018, Dr. Zaino again examined S.C. for pain in her right wrist and determined the cause as "most likely an old distal radius fracture" that was "exacerbated" by the fall on August 15, 2018. On or around September 5, 2018, a "marked balance deficit" was noted, yet still, S.C. did not receive testing to determine whether lithium and Depakote might have been the cause of her loss of equilibrium.

198. The cause of S.C.'s fall is likely due to the side effects from her prescribed psychiatric medications. Greystone did not test S.C.'s blood levels until on or around September 12, 2018, despite numerous pleadings with staff to see a doctor, S.C.'s own request for blood testing, and a doctor's order to test her blood levels. Further, S.C. complained of dizziness on numerous occasions during this time, but they were all ignored. S.C. was not placed on a "fall precaution," a protocol that is standard operating procedure for staff to undergo when patients are at risk for falling due to physical condition or medication side effects.

199. Moreover, in or around the months of August and September 2018, S.C. was physically assaulted by the same patient on Unit E3 on four separate occasions. Staff failed to keep her safe from the cycle of continuing assaults.

200. On or around September 6, 2018, S.C. reported that she was physically restrained and assaulted by her one-to-one observation Mental Health Technician.

### NAMED PLAINTIFF A.N.

201. A.N. was born on August 15, 1993.

202. On or around July 26, 2007, the Hackensack University Medical Center Institute for Child Development Interdisciplinary Evaluation Team diagnosed A.N. with Autism Spectrum Disorder.

203. On or around March 23, 2017, A.N. was admitted to Greystone.

204. On or around March 14, 2018, A.N. was diagnosed with schizoaffective disorder, bipolar type.

205. On or around April 11, 2017, and again, on or around May 11, 2017, DDD Intake Worker Trevor Wilson (hereinafter, "Mr. Wilson") sent letters to A.N. at his home requesting documentation to complete A.N.'s application for eligibility.

206. On or around September 13, 2017, a patient assaulted A.N by kicking him in the head.

207. On or around September 18, 2017, Dr. Maria E. Xiques, Psy.D. (hereinafter "Dr. Xiques") completed a psychological assessment to determine whether A.N. has Autism Spectrum Disorder. Dr. Xiques' report includes a review of an EEG Report dated January 12, 2013, from the Neuroscience Institute in Guayaquil, Ecuador, which noted epileptic activity.

208. On or around September 22, 2017, A.N.'s treating psychiatrist, Dr. Aleksandar Micevski, (hereinafter "Dr. Micevski") included "Autistic Disorder" as a primary diagnosis in the Psychiatric Commitment Hearing Report.

209. On or around September 26, 2017, the civil commitment court entered an Order requiring a report from the Division of Developmental Disabilities (hereinafter "DDD") regarding A.N.'s eligibility for services to be presented to the Court by November 14, 2017.

210. On or around November 17, 2017, Dr. Micevski's hearing report again listed "Autistic Disorder" as a primary diagnosis.

211. On or around November 21, 2017, the court entered another Order referring to the September 26, 2017, court Order for a DDD eligibility determination.

212. On or about January 6, 2018, January 7, 2018, and January 8, 2018, A.N. was medicated for agitation with PRN lorazepam and haloperidol, at times more than twice per day.   Haloperidol, like many antipsychotic medications, is associated with a risk of epileptic seizure provocation. PRN medication was routinely administered to A.N. for the duration of his hospitalization, often leaving A.N. overmedicated, as evidenced by drooling and inability to maintain eye contact.

213. On or around January 12, 2018, Dr. Micevski included Autistic Disorder as a primary diagnosis for A.N.

214. On or around January 16, 2018, the court entered an Order instructing Greystone to notify DDD of the prior orders for a report regarding A.N.'s eligibility for DDD services.

215. On or around January 30, 2018, Dr. Yaser Daramna stated in a transcriptions report that A.N. had a medical history of autism and that he suffered a seizure, tonoclonic, at Greystone.

216. On or around February 23, 2018, Autistic Disorder was not included as a primary diagnosis in the hearing report for A.N.  The Autistic Disorder diagnosis was excluded from all Dr. Micevski's subsequent hearing reports.

217. On or around March 27, 2018, the court entered an order approving A.N. for Conditional Extension Pending Placement status.

218. On or around April 23, 2018, a Greystone social worker submitted a hearing report stating that A.N.'s application for DDD services was incomplete and no placement efforts were made, despite the Orders dated September 27, 2017 and March 27, 2018.

219. On or around May 4, 2018, the social worker indicated that he completed the DDD application for A.N., almost eight months after the original Order.

220. On or around May 17, 2018, the social worker's hearing report stated that the DDD application was submitted to DDD on May 7, 2018.

221. On or around May 22, 2018, the court entered an order of Conditional Discharge, as A.N. was still not linked with DDD services.

222. On or around June 4, 2018, A.N. was recommitted to Greystone.

223. On or around June 19, 2018, A.N.'s commitment hearing at Greystone could not be held due to the lack of treating psychiatrist.  A.N.'s commitment hearing was adjourned to July 3, 2018, a date beyond 20 days from the June 4, 2018, commitment.  On that date, A.N. was still without DDD services.

**NAMED PLAINTIFF P.T.**

224. P.T. was born on October 1, 1959.

225. In or around March 1988, P.T. was admitted to Camden County Health Service Center and transferred to the West Borough State Hospital in Massachusetts.

226. On or around August 8, 1991, P.T. was admitted to Camden County Hospital as a transfer from West Borough State Hospital in Massachusetts.

227. On or around January 14, 1992, P.T. was admitted to Greystone as a transfer from Camden County Hospital.

228. P.T. has been hospitalized continuously since 1988.

229. From 1982 to 1984, P.T. was hospitalized at Ancora Hospital.

230. P.T. is deaf and mute.

231. P.T. uses American Sign Language to communicate.

232. P.T. is diagnosed with schizoaffective disorder-bipolar type and borderline intellectual functioning.

233. P.T. resides on Unit A2, which is designated as a statewide specialized in-patient program for deaf and speech-impaired patients, and P.T. receives accommodation services.

234. In or around 2017, P.T. was attacked by a staff member at Greystone Cottage 14. That staff member kicked P.T. in the shin. P.T. was severely injured and required the assistance of a cane to walk after the attack.

235. On or around May 1, 2018, July 27, 2018, August 15, 2018, and August 17, 2018, P.T. was a victim of four separate physical attacks by the same patient on Unit A2. The August 15, 2018, attack caused a scrape and bleeding from his mouth and nose.

236. On or around August 28, 2018, the civil commitment hearing for P.T. was adjourned to September 25, 2018, due to the treating psychiatrist's absence.  On or around September 25, 2018, P.T.'s hearing was adjourned again, due to the failure to secure an American Sign Language interpreter for the hearing.  At the time of this filing, P.T.'s hearing remains adjourned.

**FIRST CLAIM FOR RELIEF**

**(AGAINST ALL DEFENDANTS)**

**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

237. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

238. At all relevant times herein, the conduct of all Defendants was subject to 42 U.S.C. Section 1983.

239. The action and inaction of Defendants complained of herein, individually and collectively, constitute policies and practices maintained by Defendants.

240. Defendants have violated the rights of Plaintiffs and all other similarly situated Greystone patients secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

241. Such violations include, but are not limited to, the denial of the right to a safe and humane physical and psychological environment, the right to be free from State-created danger and from the deliberate indifference to medical needs, and the right to be protected from patient-on-patient assaults through proper patient supervision and staff training addressed to reducing the incidence of hospital violence.

## SECOND CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

### VIOLATIONS OF THE NEW JERSEY CONSTITUTION, ARTICLE 1, PARAGRAPHS 1 AND 14

242. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

243. The actions and inactions of Defendants complained of herein individually and collectively constitute policies and practices maintained by Defendants.

244. Defendants have violated the rights of Plaintiffs and all other similarly-situated Greystone patients secured by the New Jersey Constitution, Article 1, Paragraphs 1 and 14.

245. Such violations include, but are not limited to, the denial of the right to a safe and humane physical and psychological environment, the right to be free from State-created danger and from the deliberate indifference to medical needs, and the right to be protected from patient-on-patient assaults through proper patient supervision and staff training addressed to reducing the incidence of hospital violence.

## THIRD CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

246. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

247. Title II of the Americans With Disabilities Act prohibits discrimination against people with disabilities by "public entities."  For the purpose of Title II of the ADA, the term public entity includes "(A) any state or local government; [or] (B) any department, agency, special purpose

district, or other instrumentality of a state or states or local government ….” 42 U.S. C. Section 12131 (1) (A) and (B) (1990).

248. Greystone Park Psychiatric Hospital is a public entity within the meaning of 42 U.S.C Section 12131 (1) (A) and (B).

249. Plaintiffs and all other similarly-situated Greystone patients have mental disabilities within the meaning of 42 U.S.C. Section12102(2) and are qualified individuals with disabilities within the meaning of 42 U.S. C. Section 12131(2).

250. Defendants have violated the rights of Plaintiffs and all other similarly situated Greystone patients secured by Title II of the Americans with Disabilities Act, 42 U. S. C Section 12132 and the regulations promulgated thereto, 28 C.F.R. Part 35., by  but not limited to, the failure to administer services programs and activities in the most integrated settings appropriate and by needlessly placing them in institutional settings, and by failing to monitor such programs, services and activities so that Greystone patients can enjoy these services free from harm from other recipients. 28 C.F.R. Section 35. 130(b)(iv).

## FOURTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

### VIOLATIONS OF THE REHABILITATION ACT

251. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

252. Section 504 of the Rehabilitation Act of 1973 provides, “[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

- 55 -

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. Section 794(a)(2002).

253. A "program or activity" is defined, in pertinent part as "a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other…local government entity) to which the assistance is extended, in the case of assistance to a State or local government; [or] an entire corporation, partnership, or other private organization… which is principally engaged in the business of providing…heath care."  29 U.S.C. Sections 794(b)(1)(A), 794(b)(3)(A)(ii).

254. Greystone Park Psychiatric Hospital is a "program or activity" as defined by 29 U.S.C. Section 794(b)(1).

255. Plaintiffs and all similarly-situated Greystone patients have mental disabilities within the meaning of 29 U.S.C. Section 705(20).

256. Defendants, by their actions and inactions complained of herein, have violated and continue to violate the rights of Plaintiffs secured by the Rehabilitation Act, 29 U.S.C. Section 794 and the regulations promulgated thereto, 28 C.F.R. Pt. 41.51 and 45 C.F.R. Pt. 84, by limiting and continuing to limit their enjoyment in the rights, privileges, advantages, and opportunities that are enjoyed by other recipients of public programs when receiving aid, benefit or service.

**FIFTH CLAIM FOR RELIEF**

**(AGAINST ALL DEFENDANTS)**

**VIOLATION OF THE PATIENT'S BILL OF RIGHTS**

257. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

258. Pursuant to N.J.S.A. 30:4-24.2 every patient in treatment has the following rights, which cannot be denied under any circumstances: 1) to be free from unnecessary or excessive medication; and 2) to be free from physical restraint and isolation except for emergency situations. Every patient in treatment also is entitled to the following rights, which may only be denied for "good cause": 1) The right to privacy and dignity; 2) the right to the least restrictive conditions necessary to achieve the purposes of treatment; and 3) the right to receive prompt and adequate medical treatment for any physical ailment.

259. Plaintiffs and all other similarly-situated Greystone patients are "patients" or "patients in treatment" for the purposes of N.J.S.A. 30:4-24.2.

260. Defendants have violated the rights of Plaintiffs and all other similarly-situated Greystone patients secured by the Patient's Bill of Rights, which violations include, but are not limited to: denial of the right to privacy and dignity; denial of the right to keep and use personal possessions; denial of the right to receive prompt and adequate medical treatment for any physical ailment; and denial of the right to have individual storage space for private use.

### SIXTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

**VIOLATIONS OF NEW JERSEY INVOLUNTARY PSYCHIATRIC COMMITMENT LAWS, N.J.S.A. 30:4-27.1 TO 27.23 AND R. 4:74-7.**

261. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

262. Pursuant to N.J.S.A. 30:4-27.1 to 27.23, the State of New Jersey is responsible for providing care, treatment and rehabilitation to mentally ill persons who are disabled and cannot provide basic care for themselves or who are dangerous to themselves, others, or property. N.J.S.A. 30:4-27.1 (a).  It is the policy of the State that persons in the public mental health system are

required to receive inpatient treatment and rehabilitation services in the least restrictive environment in accordance with the highest professional standards and which will enable those in committed to treatment to return to full autonomy in their community as soon as it is clinically appropriate.

263. Plaintiffs and all other similarly-situated Greystone patients are persons subject to civil commitment pursuant to N.J.S.A. 30:4-27m and therefore entitled to certain statutory rights, including the right to a hearing within 20 days from initial commitment (N.J.S.A. 30:4-27.12), and the right to periodic court review hearings of the need for involuntary commitment to treatment and of the least restrictive environment for that treatment (N.J.S.A. 30:4-27.16).  In all instances, a psychiatrist on the patient's treatment team who has conducted a personal examination as close to the court hearing as possible but in no event more than five calendar days prior to the court hearing shall testify at the hearing. N.J.S.A. 30:4-27-13b.

264. Defendants have violated the statutory rights of Plaintiffs and all other similarly situated Greystone patients by failing to provide sufficient staffing of psychiatrists to testify at scheduled court review hearings, thereby resulting in prolonged hospital stays and violation of the right to periodic review hearings.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Certify this case as a class action pursuant to Federal Rule of civil Procedure 23;

B. Declare that Defendants' failures to comply with the mandates of the Fifth and Fourteenth Amendments of the United States Constitution, Title II of the American's With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, New Jersey

Constitution Article 1, Paragraphs 1 and 14, Patient Bill of Rights, and New Jersey involuntary psychiatric commitment laws are unlawful.

C.  Enter a permanent injunction enjoining Defendants from subjecting the named individual Plaintiffs and members of the Plaintiff class to policies and practices that violate their rights under the Fifth and Fourteenth Amendments of the United States Constitution, Title II of the American's With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, New Jersey Constitution Article 1, Paragraphs 1 and 14, Patient Bill of Rights, and New Jersey involuntary psychiatric commitment laws.

D.  Require Defendants to provide Notice to all class members that if they suffered any damages as a result of the Defendants' violation of their rights under the Fifth and Fourteenth Amendments of the United States Constitution, Title II of the American's With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, New Jersey Constitution Article 1, Paragraphs 1 and 14, Patient Bill of Rights, and New Jersey involuntary psychiatric commitment laws, that they may bring an individual lawsuit to recover those damages.

E.  Award Plaintiffs their reasonable costs and attorney's fees incurred in the prosecution of this action; and

F.  Award such other equitable and further relief as the Court deems just and proper.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.  I certify under penalty of perjury that the foregoing is true and correct.

RESPECTFULLY SUBMITTED this 17 day of December, 2018.

Joseph E. Krakora
Public Defender of the State of New Jersey
Richard J. Hughes Justice Complex
25 Market Street, 2nd Floor, North Wing
Trenton, NJ 08625
(609) 292-7087

By: s/ Carl J. Herman, Director, Division of Mental Health Advocacy
     (N.J. Bar No. 016901)
     carl.herman@opd.nj.gov

By: s/ Nora R. Locke, Deputy Public Defender
     (N.J. Bar No. 016411997)
     nora.locke@opd.nj.gov

By: s/ Rihua Xu, Asst. Deputy Public Defender
     (N.J. Bar No. 122232014)
     rihua.xu@opd.nj.gov

By: s/ Eric J. Sarraga, Asst. Deputy Public Defender
     (N.J. Bar No. 245642017)
     eric.sarraga@opd.nj.gov


The Wolf Law Firm, LLC
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
(732) 545-7900

By: s/ Andrew R. Wolf, Esq.
     (N.J. Bar No. 018621995)
     awolf@wolflawfirm.net

By: s/ David J. DiSabato, Esq.
     (NJ Bar No.: 012641997)
     ddisabato@wolflawfirm.net

BY: s/ Lisa R. Bouckenooghe, Esq.
     (NJ Bar No. 015172004)
     lbouckenooghe@wolflawfirm.net


*Attorneys for Plaintiffs*