1

2

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

3

4

J.M., S.C., A.N., P.T., J.L., R.H., "JOHN DOE", "ROBERT DOE", T.W., M.K., and E.A. individually and on behalf of all other persons similarly situated

5

6

Plaintiffs,

v.

7

8

9

SHEREEF M. ELNAHAL M.D., M.B.A., Commissioner, New Jersey Department of Health, as an individual and in his official capacity;

10

11

12

CAROLE JOHNSON,
Commissioner, New Jersey
Department of Human Services, in her official capacity;

13

14

15

ELIZABETH CONNOLLY,
Acting Commissioner, New Jersey
Department of Human Services, as an individual and in her official capacity;

16

17

18

19

VALERIE L. MIELKE, M.S.W.,
Assistant Commissioner, New Jersey Division of Mental Health and Addiction Services, as an individual and in her official capacity;

20

21

TOMIKA CARTER, M.S.W.
CEO, Greystone Park Psychiatric Hospital, as an individual and in her official capacity;

22

23

24

TERESA A. McQUAIDE,
Former Acting CEO, Greystone Park Psychiatric Hospital, as an individual and in her official capacity;

25

26

27

ROBERT EILERS, M.D.,
Medical Director, New Jersey Division of Mental Health and Addiction Services, as an individual and in his official capacity;

28

**FIRST AMENDED CLASS
ACTION COMPLAINT FOR
EQUITABLE RELIEF**

HON. ESTHER SALAS, U.S.D.J.

HON. CATHY L. WALDOR, U.S.M.J

**CIVIL ACTION No.:** 2:18-cv-17303

**JURY TRIAL DEMANDED**

(ELECTRONICALLY FILED)

1

2    HARLAN M. MELLK, M.D.,
     Chief of Medicine, Greystone Park
3    Psychiatric Hospital, as an individual and in
     his official capacity;
4

5    EVARISTO O. AKERELE, M.D.,
     Medical Director, Greystone Park
6    Psychiatric Hospital, as an individual and in
     his official capacity;
7

8    LISA CIASTON, ESQ.,
     Legal Liaison, New Jersey Division of
9    Mental Health and Addiction Services, as an
     individual and in her official capacity;
10

11   SWANG S. OO, ESQ.,
     Deputy Attorney General, State of New
12   Jersey, as an individual and in her official
     capacity;
13

14   JAMES L. FREY,
     Employee Relations Officer, Greystone
15   Park Psychiatric Hospital, as an individual
     and in his official capacity
16

17   GURBIR GREWAL, ESQ.,
     Attorney General, State of New Jersey, as an
     individual and in his official capacity; and
18

19   PHILIP D. MURPHY, M.B.A.,
     Governor, State of New Jersey, as an
20   individual and in his official capacity

21                        Defendants.

22

23          Plaintiffs J.M., S.C., A.N., P.T., J.L., R.H., "John Doe", "Robert Doe", T.W., M.K., and

24   E.A. by their undersigned attorneys, bring this suit against Defendants, as individuals and acting

25   on behalf of all persons similarly situated who have been, are presently, or will be hospitalized at

26   Greystone Park Psychiatric Hospital whose constitutional and statutory rights continue to be

27   violated daily.

28

1

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................- 5 -

JURISDICTION ......................................................................................- 8 -

RELEVANT LAWS ................................................................................- 8 -

PARTIES .............................................................................................. - 11 -

CLASS ACTION ALLEGATIONS ......................................................... 12 -

STATEMENT OF FACTS ...................................................................... 14 -
   I.     INADEQUATE PSYCHIATRIC COVERAGE ......................... 14 -
   II.    ESCALATING RATE OF ASSAULTS ........................................ 24 -
   III.   INABILITY OF DEFENDANTS TO PROTECT PATIENTS AND STAFF......- 30 -
   IV.   DEFENDANTS' FAILURE TO HIRE AND MAINTAIN CAPABLE STAFF ..- 35 -
   V.    DANGEROUS OVERCROWDING......................................- 38 -
   VI.   FAILURE OF THE ONE-TO-ONE OBSERVATION SYSTEM ........................ 41 -
   VII.  THE INFLUX OF ILLEGAL DRUGS ...................................... - 50 -
   VIII. INADEQUATE MEDICAL CARE TO MONITOR DANGEROUS
         MEDICATIONS ...................................................................... 51 -
   IX.   PREVENTABLE DEATHS AND SUICIDE ATTEMPTS ................... 53 -
   X.    FAILURE TO PROVIDE NECESSARY MEDICAL CARE AND SECURITY - 60 -
   XI.   INTENTIONAL MISDIAGNOSES OF THE DEVELOPMENTALLY
         DISABLED ............................................................................... 65 -
   XII.  EMPLOYEE RETALIATION RATHER THAN REMEDIATION.................... 67 -
   XIII. INTENTIONAL MISREPRESENTATION OF MATERIAL INFORMATION TO
         THE COURTS ......................................................................- 70 -

NAMED PLAINTIFF J.M. ................................................................- 74 -

NAMED PLAINTIFF S.C. ................................................................- 76 -

NAMED PLAINTIFF A.N. ................................................................- 79 -

NAMED PLAINTIFF P.T. ................................................................- 82 -

NAMED PLAINTIFF J.L ..................................................................- 83 -

NAMED PLAINTIFF "JOHN DOE" .................................................- 84 -

NAMED PLAINTIFF "ROBERT DOE" .............................................- 85 -

NAMED PLAINTIFF T.W. ...............................................................- 86 -

NAMED PLAINTIFF M.K. ...............................................................- 87 -

NAMED PLAINTIFF E.A. ................................................................- 89 -

FIRST CLAIM FOR RELIEF .............................................................- 90 -

SECOND CLAIM FOR RELIEF .........................................................- 90 -

THIRD CLAIM FOR RELIEF ............................................................- 93 -

FOURTH CLAIM FOR RELIEF .........................................................- 93 -

1

**FIFTH CLAIM FOR RELIEF** ........................................................................ **- 95 -**

2

**SIXTH CLAIM FOR RELIEF** ........................................................................ **- 96 -**

3

**REQUEST FOR RELIEF** ............................................................................. **- 97 -**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

1. Greystone Park Psychiatric Hospital (hereinafter "Greystone") is a state-run psychiatric hospital located in Morris Plains, New Jersey. Greystone originally opened in 1876, and by 1895, it was serving patients from nine northern New Jersey counties. Over the years, additional buildings were added to the campus. In the 1920's, Greystone undertook an ambitious ten-year construction plan. By 1954, the Hospital reached its highest residential census: 6,719 patients.

2. From the late 1950's to the mid-1970's, Greystone experienced a long decline, characterized by dwindling patient population, aging buildings, and recurrent scandals. In 1974, in response to public complaints, law enforcement convened a grand jury investigation into the management and operation of Greystone. The initial focus of the investigation was allegations that patients had been beaten and otherwise mistreated by Greystone employees. Instead, the Grand Jury, which met for six months, examined over 300 exhibits and heard from eighty-three witnesses. It returned a lengthy presentment against many aspects of the hospital management, including deficiency in the administration, the lack of effective personnel policies, professional nonfeasance on the part of staff psychiatrists, physical assaults on patients by nursing personnel, and the failure to respect the statutory mandate of adequate and humane care and treatment, as required by N.J.S.A. 30:4-24.1. Five individuals were eventually indicted for criminal conduct, which included charges of drug distribution, sodomy, attempted sodomy, and Medicaid fraud.

3. In the mid-1970's, a class action lawsuit was instituted on behalf of the patients at Greystone to enjoin the Greystone Administration from directing treatment and maintaining conditions in a manner in violation of the constitutional and statutory rights of the plaintiffs. See Doe v. Klein, 143 N.J. Super. 134, (App. Div. 1976). In 1977, the Attorney General and the Public Advocate agreed to a lengthy Stipulation of Settlement, which terminated the litigation and outlined a

detailed recitation of standards and services to ensure the rights of the patients.  The settlement agreement included the establishment of a court-appointed oversight committee.

4. The oversight committee met for over forty years and issued numerous scathing reports of conditions at the hospital.  In 2000, the oversight committee found deplorable conditions existed at Greystone: patients were forced to use dirty bathrooms, forced to sleep in overcrowded rooms, forced to sleep on bare floors, were unsupervised, and were involved in serious physical altercations.

5. The reports prompted then-Governor Christine Whitman to call for the closing of the old Greystone and the creation of a new, state-of-the art hospital, which opened in July 2008 at a cost of $200 million.  A judge disbanded the oversight committee one year later.

6. The "new" Greystone replaced five aging treatment buildings and a 131-year-old administration building with a 450-bed facility in a single, self-contained building.  The new hospital included a treatment mall with over twenty-one rooms for various activities and a large auditorium.  There were also on-site residential cottages for sixty additional patients transitioning to more independent community living.  Accordingly, the facility was designed to house a maximum of 510 patients.

7. Despite the physical transformation of Greystone, history is now repeating itself as the prior tragic conditions have since resurfaced.

8. Since the opening of the rebuilt Greystone Hospital in 2008, there have been several developments which have caused the population level to swell far beyond its capacity.  In June 2012, as part of a budget-saving decision by then-Governor Chris Christie, the State closed Hagedorn Psychiatric Hospital, a State facility located in Glen Gardner and which housed approximately 285 geriatric patients.  While some of those patients were released to community

placements, such as nursing homes, many were transferred to Greystone and were often placed on units with younger, more assaultive patients.

9. Overcrowding at Greystone was further exacerbated by Governor Christie's decision to close two New Jersey institutions, which housed 415 people with developmental disabilities. The North Jersey Developmental Center in Totowa was closed in the summer of 2014, and the Woodbridge Developmental Center was closed six months later, requiring the State to find placements for hundreds of individuals with serious cognitive disabilities. Many of these developmentally disabled patients were transferred to Greystone, a psychiatric hospital neither designed nor intended to accommodate individuals with developmental disabilities. Likewise, many staff members, who were solely trained to care for developmentally disabled patients, were transferred to Greystone and were ill-equipped to provide psychiatric care.

10. Greystone patient admissions increased from 393 admissions in 2009 to 580 admissions in 2013, a total increase of 47%. The total patient census increased from 460 patients in 2009 to 570 patients in 2014, a total increase of 24%. At that same time, due to administrative mismanagement, the number of experienced staff, including psychiatrists, nurses, and mental health workers, plummeted. For example, although the hospital was designed to utilize at least 29 staff psychiatrists to treat a maximum of 510 patients, the failure to replace psychiatrists who had resigned or retired resulted in only approximately less than one-fourth of the positions being filled. This shortage resulted in drastically increased caseloads and, coupled with other numerous administrative failures that will be described below, dramatically decreased the opportunity for patients to receive appropriate psychiatric care.

11. Chronic administrative failures, the increased daily patient census, the inability of the doctors to spend sufficient time with the patients, and overall insufficient staffing levels of

competent staff have resulted in a drastic increase in assaults, suicide attempts, drug overdoses, and fatal medication mismanagement.

12. Defendants, rather than working with doctors and staff to better the conditions at the hospital, created an "atmosphere of terror and retaliation" to intimidate doctors and staff who dared to speak out against its conduct. Rather than trying to save lives, Defendants exacerbated these harmful, life-threatening conditions, and also engaged in fraudulent and reckless conduct, much of which was hidden from their staff, the courts, and the public.

## JURISDICTION

13. This action is brought pursuant to the Constitution of the United States and pursuant to 42 U.S.C. 1983 and 42 U.S.C. 1985. Jurisdiction is conferred upon this court by 42 U.S.C. 1983, 42 U.S.C. 1985, and 28 U.S.C. 1331 and 1343(a)(3) and (4), this being an action seeking redress for the violation of constitutional and civil rights.

14. Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

15. Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. 1391 (a) because it is the district in which the Plaintiffs' claims arose.

## RELEVANT LAWS

### THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

16. The Fifth and Fourteenth Amendment prevent any State from the depriving "any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Eighth Amendment prohibits "cruel and unusual punishment."

## TITLE II, AMERICANS WITH DISABILITIES ACT

17. 42 U.S.C. Section 12132 and the regulations promulgated thereto, 28 C.F.R. 35, state that "a public entity may not, through its methods of administration, deny public benefits or subject individuals with disabilities to discrimination on the basis of such disabilities."

## SECTION 504 OF THE REHABILITATION ACT

18. Section 504 of the Rehabilitation Act of 1973, which is codified as 29 U.S.C. Section 794, and the regulations promulgated thereto, 28 C.F.R. Part 41, state that "no public entity receiving federal funds shall deny any person the benefits of a public service, or otherwise subject a disabled person to discrimination, on the basis of that person's disability."

## NEW JERSEY CONSTITUTION ARTICLE 1, PARAGRAPHS 1 & 14

19. New Jersey Constitution Article 1, Paragraph 1 states that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

20. New Jersey Constitution Article 1, Paragraph 14 states that "[t]he privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety may require it."

## PATIENT BILL OF RIGHTS

21. Under N.J.S.A. 30:4-24.2, the Patients' Bill of Rights protects patients' rights in two categories: those that may not be denied under any circumstances (subpart "f") and those that can be denied for "good cause" (subpart "e").

22. In relevant part, the following rights cannot be denied under any circumstances: 1) to be free from unnecessary or excessive medication; and 2) to be free from physical restraint and

isolation except for emergency situations.  In relevant part, the following rights can be denied for "good cause": 1) right to privacy and dignity; 2) right to the least restrictive conditions necessary to achieve the purposes of treatment; and 3) right to receive prompt and adequate medical treatment for any physical ailment.

23. Under <u>N.J.S.A.</u> 30:4-24.2(g), for a right to be denied for "good cause," the following must take place: 1) a program director determines that it is imperative to deny these rights; 2) a written notice of denial of rights must be filed in the patient's treatment record; and 3) the patient and attorney must be provided written notice of the denial of rights.

## INVOLUNTARY COMMITMENT TO TREATMENT

24. Pursuant to <u>N.J.S.A.</u> 30:4-27.1 to 27.23, the State of New Jersey is responsible for providing care, treatment, and rehabilitation to mentally ill persons who are disabled and cannot provide basic care for themselves or who are dangerous to themselves, others, or property. <u>N.J.S.A.</u> 30:4-27.1(a).  It is the policy of the State that persons in the public mental health system are required to receive inpatient treatment and rehabilitation services in the least restrictive environment in accordance with the highest professional standards and which will enable those persons committed to treatment to return to full autonomy in their community as soon as it is clinically appropriate.  <u>N.J.S.A</u>. 30:4-24.2(h) states "any individual subject to his Title shall be entitled to a writ of habeas corpus upon proper petition by himself, by a relative, or a friend to any court of competent jurisdiction in the county in which he is detailed and shall further be entitled to enforce any of the rights herein stated by civil action or other remedies otherwise available by common law or statute."

1

## PARTIES

2

3
A. **PLAINTIFFS**

4
Plaintiff J.M. was born on August 13, 1939.  She was admitted to Greystone on September

5
3, 2014.  She was discharged from Greystone on March 28, 2018.

6
Plaintiff S.C. was born on May 26, 1960.  She was admitted to Greystone on April 20,
2018.  She was discharged from Greystone on April 24, 2019.

7

8
Plaintiff A.N. was born on August 15, 1993. He was admitted to Greystone on March 23,
2017.  He has not been discharged from Greystone.

9
Plaintiff P.T. was born on October 1, 1959. He was admitted to Greystone on January 14,
1992.  He has not been discharged from Greystone.

10

11
J.L. is currently a patient at Greystone.

12
R.H. was born on November 29, 1958.  He was admitted to Greystone on July 18, 2015.
He has not been discharged from Greystone.

13

14
"John Doe" is currently a patient at Greystone.  His identity is known to counsel, but will
not be disclosed for his own protection.

15
"Robert Doe" is currently a patient at Greystone.  His identity is known to counsel, but will
not be disclosed for his own protection.

16

17
T.W. was born on August 18, 1992.  She was admitted to Greystone on September 17,
2016.  She has not been discharged from Greystone.

18

19
M.K. was born on May 6, 1992.  He was admitted to Greystone on May 17, 2018.  He has
not been discharged from Greystone.

20
E.A. was born on June 1, 1994.  She was admitted to Greystone on September 27, 2018.
She has not been discharged from Greystone.

21

22
B. **DEFENDANTS**

23
Shereef M. Elnahal, M.D., M.B.A., is the Commissioner of the New Jersey Department
of Health.

24

25
Carole Johnson is the Commissioner of the New Jersey Department of Human Services.

26
Valerie L. Mielke, M.S.W., is the Assistant Commissioner of the New Jersey Division of
Mental Health and Addiction Services.

27
Tomika Carter, M.S.W., is the CEO at Greystone Park Psychiatric Hospital.

28

Teresa A. McQuaide is the Former Interim CEO at Greystone Park Psychiatric Hospital.

Robert Eilers, M.D., is the Medical Director of the New Jersey Division of Mental Health and Addiction Services.

Harlan M. Mellk, M.D., is the Chief of Medicine at Greystone Park Psychiatric Hospital.

Evaristo O. Akerele, M.D., is the Medical Director at Greystone Park Psychiatric Hospital.

Lisa Ciaston, Esq., is the Legal Liaison of the New Jersey Division of Mental Health and Addiction Services.

Swang S. Oo, Esq., is a Deputy Attorney General for the State of New Jersey.

James L. Frey is the Employee Relations Officer at Greystone Park Psychiatric Hospital.

Gurbir Grewal, Esq., is the Attorney General of the State of New Jersey.

Philip D. Murphy, M.B.A., is the Governor of the State of New Jersey.

## CLASS ACTION ALLEGATIONS

25. Pursuant to <u>R</u>. 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other individuals with serious mental health illnesses currently confined to Greystone Park Psychiatric Hospital (hereinafter "Greystone"), previously confined to Greystone, or at serious risk of being confined at Greystone.  In order to remedy the violations alleged herein, Plaintiffs seek declaratory and injunctive relief individually and on behalf of the following class:

> All current and former patients of Greystone Park Psychiatric Hospital, at any time during the applicable limitations period.

26. Plaintiffs seek class certification because:

    a.  The composition of the putative class is so numerous that, joinder of all individual members is impracticable;

    b.  There are questions of law and fact common to the members of the class. These common questions include, for example

i.    Whether the actions and inactions of Defendants, including the denial of the right to a safe and humane physical and psychological environment, the denial of the right to be safe from State-created danger, and the denial of the right to be protected from patient-on-patient assaults, constitute violations of the Due Process and Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article 1, Paragraphs 1 and 14 of the New Jersey Constitution;

ii.    Whether Defendants' failure to administer services, programs and activities in such a way that patients can enjoy these services free from harm from other recipients constitutes a violation of the Americans With Disabilities Act and the Rehabilitation Act of 1973; and

iii.    Whether Defendants' failure to provide sufficient staffing of psychiatrists to testify at scheduled court review hearings constitutes a violation of New Jersey's Involuntary Psychiatric Commitment Laws

c.    The claims of the named Plaintiffs are typical of the class as a whole;

d.    The named Plaintiffs will fairly and adequately protect the interests of the class; Defendants have acted and/or refused to act on grounds generally applicable to the class, such as consistently failing to comply with the state and federal laws in the care and treatment of patients confined at Greystone so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; and

e.    Counsel for the named plaintiffs is qualified, experienced, and able to conduct this litigation, and will fairly and adequately protect the interest of the class.

**STATEMENT OF FACTS**

**I.    INADEQUATE PSYCHIATRIC COVERAGE**

27. The Greystone psychiatric department is significantly understaffed and does not have enough full-time psychiatrists to safely operate the hospital and provide an adequate standard of care.  Twenty-nine full-time psychiatrists are required for each Greystone patient to receive appropriate psychiatric care.  As of May 22, 2019, there are only thirteen full-time psychiatrists at Greystone.  One of the thirteen is Defendant Evaristo O. Akerele, M.D. (hereinafter "Defendant Akerele"), Medical Director at Greystone Park Psychiatric Hospital, who is an administrative psychiatrist who refuses to take on a clinical caseload, even during a staffing crisis.  There are also eleven part-time psychiatrists and Advanced Practice Nurses (hereinafter "APNs") working at Greystone.  However, the treatment provided by part-time psychiatrists and APNs is substandard.  Therefore, the already overworked full-time psychiatrists are left to compensate.  Most part-time psychiatrists work one to three days a week, are not available to testify in court, and cannot provide continuous treatment to their patients.  Furthermore, one part-time psychiatrist is currently ineligible to prescribe psychiatric medications and another is not credentialed with the Center for Medicare and Medicaid Services, which prevents Greystone from billing for the services she provides to patients with Medicaid or Medicare. The psychiatric care provided by the Greystone APNs is also limited.  APNs are not psychiatrists, and their technical expertise is incomparable to a psychiatrist.  They are not permitted to testify at court or complete expert court reports for their patients' involuntary commitment hearings. Therefore, the full-time psychiatrists are required to complete both tasks for them.

28. There are currently multiple units with no assigned full-time psychiatrists, resulting in many patients not receiving treatment.  As of May 22, 2019, Units F1, A1, B1, and Cottage 20

have no assigned full-time or part-time psychiatrists.  Units G1, G3, and Cottages 13, 14, and 16 have no assigned full-time psychiatrists, but are being covered by APNs.  Units E3 and F3 also have no assigned full-time psychiatrists and are being covered by part-time psychiatrists who work a maximum of three days a week.  Because of these assignments, the quality of care at Greystone is constitutionally inadequate, often resulting in dangerous conditions for patients and staff.

29. Despite the current composition and caseloads of the Greystone psychiatric staff, Tomika Carter, M.S.W., (hereinafter "Defendant Carter") CEO at Greystone Park Psychiatric Hospital, often misrepresents to the public that the Greystone psychiatric department is fully staffed with twenty-nine psychiatrists.

30. The problems resulting from the understaffed psychiatric department are compounded when coupled with each psychiatrist's impossible caseload.  Defendant Akerele, the Greystone Medical Director, is responsible for assigning each psychiatrist his or her caseload.  As a direct result of his policies, psychiatrists do not have enough time to adequately treat each patient, often resulting in psychiatric decompensation, medication noncompliance, dangerous behavior, violence, and exacerbation of medical conditions.

31. For example, on or around December 5, 2018, one psychiatrist had a caseload of thirty-two patients, another had a caseload of thirty-five patients, and the remaining six psychiatrists had an average caseload of sixty-three patients per psychiatrist.

32. On or around December 20, 2018, only six psychiatrists worked the day shift and they each averaged seventy-three patients.

33. On or around January 7, 2019, the average psychiatric caseload was forty-eight patients per psychiatrist.

34. On or around January 17, 2019, the average psychiatric caseload was fifty-three patients per psychiatrist.

35. On or around February 1, 2019, the average psychiatric caseload was fifty-two patients per psychiatrist.

36. On or around February 19, 2019, the average psychiatric caseload was forty-two patients per psychiatrist.

37. On or around March 11, 2019, one psychiatrist had a caseload of seventy-six patients and an APN was covering sixty-four patients.

38. On or around March 28, 2019, the average psychiatric caseload was fifty-seven patients per psychiatrist.

39. The assignment of Greystone patients to psychiatrists is significantly disproportionate. Defendant Carter and Defendant Akerele intimidate, pressure, and retaliate against particular psychiatrists by forcing them to carry excessive caseloads.  Defendants also intentionally assign very small caseloads to "administrative favorites:" the psychiatrists that comply with the Greystone Administration's unlawful policies and practices.  The administrative favorites are offered lighter caseloads, easier hours, the ability to select their patients, and patients who are easier to treat.  Meanwhile, the other psychiatrists who question the Greystone Administration's compromised quality of care are punished.  The Greystone Administration has not only created barriers for these psychiatrists who aim to provide an adequate standard of care, but they have made their lives and some of their patients' lives "a living hell."

40. For example, one psychiatrist has maintained a caseload between 43 and 48 patients for an extended period, which has precluded her from providing adequate psychiatric care.  Since January 2019, this psychiatrist has been temporarily assigned as the sole psychiatrist to two forensic units,

F2 and G2, which require three full-time psychiatrists.  Forensic patients are more difficult to treat than other patients. The present staffing does not meet the minimum standard of care.

41.  Despite this psychiatrist's many pleas for help, the Greystone Administration has ensured that she is not provided any relief, intentionally depriving patients of the appropriate standard of care.  On or around February 19, 2019, Defendant Carter sent this psychiatrist a letter adding additional difficult patients from another unit onto her caseload "until further notice."  In March 2019, this psychiatrist requested four days off for the following month and Defendant Carter denied her request.  Defendant Carter informed her that the only way she could take off is if she found a psychiatrist to cover for those days and complete her court reports.  The Greystone Administration knows this is impossible.   On or around May 23, 2019, Defendant Carter transferred two stable patients from this psychiatrist's unit in exchange for two violent, unstable, and assaultive patients.  Moreover, Defendant Akerele instructed professors from surrounding medical schools not to assign any residents to assist her.

42. When this psychiatrist confronted Defendant Carter about the retaliatory caseload, Defendant Carter stated that she must continue to treat forty-five patients until at least June.  This psychiatrist also addressed Defendant Akerele's management of the Greystone psychiatric department and stated that the staff has raised concerns about the dangerous conditions he has created.  In response, Defendant Carter said that there was nothing she could do because "she had orders from [her superiors] to allow [Defendant] Akerele to perform his job in the manner that he was doing it."  Defendant Carter's superiors are Defendant Elnahal and Defendant Phil Murphy, Governor of the State of New Jersey.  Defendant Murphy has had actual notice regarding the deplorable conditions at Greystone since 2018 and actively omitted taking any corrective action to alleviate the dangerous conditions and restore the standard of care.

43. Defendant Akerele routinely orders psychiatrists to work multiple adjoining shifts at the expense of patient safety. For example, psychiatrists are forced to work night shifts from midnight to 8:00 a.m., and then subsequently mandated to work the consecutive day shift unless they use their leave time. On the other hand, Defendant Akerele allows certain psychiatrists who receive preferential treatment to work consecutive shifts when it is financially beneficial for them, at the taxpayer's expense. For example, Defendant Akerele allowed a part-time psychiatrist to work multiple twenty-four hour shifts and a thirty-two-hour shift in violation of Greystone and Department of Health regulations. These regulations exist to guard against doctors being too overworked or fatigued to provide adequate care to patients. Defendant Akerele routinely acts in conscious disregard of these regulations, putting patient safety and care at risk.

44. Together, the multiple factors described above have prevented Greystone psychiatrists from providing an adequate level of care for their patients. On or around January 3, 2019, Defendant Carter and Defendant Akerele met with multiple psychiatrists and medical doctors to address the staffing crisis at Greystone. At this meeting, Defendant Carter and Defendant Akerele misrepresented the psychiatric staffing numbers in attempt to calm the disgruntled doctors. For example, in an attempt to mislead Greystone doctors to believe that the staffing levels were sufficient, Defendant Carter stated that a particular doctor remained on staff as a full-time psychiatrist and worked from 8:00 a.m. to 4:00 p.m. on Monday through Friday. However, this doctor was no longer working at Greystone at the time of this representation and for months prior. Similarly, it was represented that three part-time doctors (locum tenens) were currently being considered for employment. However, only one application was being reviewed by the Credentials Committee. The psychiatrists and medical doctors at the meeting provided Defendant Carter and Defendant Akerele a signed petition demanding proper psychiatric care. They relayed their

intentions to submit this petition to the judge at the involuntary commitment hearings for patients who have been deprived of appropriate psychiatric care due to the overextension of their treating psychiatrist. Defendant Carter immediately ordered the psychiatrists to refrain from submitting the petition. Instead, she directed them to "wait until" they discussed it with Defendant Elnahal and the Department of Health.

45. The Petition for Proper Psychiatric Care stated:

> "It is my medical opinion that a patient has the right to a proper quality of care from his/her psychiatrist, in order to assure quality of care, safety and preservation of patients' rights, the patient is entitled to a psychiatrist that is intimately involved with said patients' care. A psychiatrist that knows the patient, his mental illness, symptoms, and proper individualized medication management for the patient. Patient has the right to have a psychiatrist that is integrated into his treatment team, involved in his treatment team meetings, discharge meetings and planning, etc. At present time it is my medical opinion that due to work load demands I and [Greystone] as a facility cannot meet these requirements for this patient. Thus I am asking for this patient to be transferred to a facility that can meet these requirements."

46. Another consequence of the Greystone staffing crisis is Defendant Carter and Defendant Akerele forcing the overworked psychiatrists to renew medications, discharge patients, complete discharge summaries, and draft court reports for patients with whom they are unfamiliar. For example, on January 2, 2019, Defendant Carter ordered a psychiatrist to discharge two patients who the psychiatrist was not treating and knew nothing about.

47. Defendant Elnahal, Defendant Carter, and Defendant Akerele hired APNs as a temporary solution to the Greystone staffing crisis. The role of an APN is addressed in the Greystone APN clinical procedure and policy directive, which was issued on May 20, 2019. Per the policy, Greystone APNs are considered members of the Department of Nursing, not the medical staff. Each APN must be paired with a collaborating physician or psychiatrist, a Greystone employee

licensed to practice medicine who agrees to work with the APN.  The APN and collaborating psychiatrist must enter a "joint protocol," a state mandated written agreement.  For an APN to order medications for a patient at Greystone, the collaborating psychiatrist must be present or readily available through electronic communication. The collaborating psychiatrist must also review the charts and records of the patients treated by the APN within a specified period of time. The following documents can be completed by APNs, but must be cosigned by the collaborating psychiatrist: annual psychiatric assessments, discharge summaries, and recovery management plan reviews and updates.  However, only the collaborating psychiatrist can issue discharge orders and orders for admission history and physicals.  Lastly, Greystone APNs must consult with their collaborating psychiatrists for day passes, one-to-one observation decisions, the use of restraint and seclusion, the use of medication without consent, patients with self-injurious or suicidal behavior, and elopements.

48. Defendant Akerele is the collaborating psychiatrist who entered a joint protocol agreement with the three Greystone APNs.  However, in practice, the APNs receive little to no supervision from Defendant Akerele and are not capable of providing sufficient psychiatric treatment on their own.  Defendant Akerele's supervision and collaboration merely includes meeting with each APN for an hour or less a week.  Defendant Akerele is rarely present on the units and cottages he supervises and when he is needed, the psychiatrists and APNs cannot reach him as he does not carry a beeper and rarely answers his cell phone.  To compensate for the APN's limited scope of treatment, Defendant Akerele forces already overworked psychiatrists to complete the discharges, discharge summaries, and court reports for the patients being treated by the APNs.  Defendant Akerele does not take on these responsibilities for the APNs to avoid signing off, thus avoiding legal liability.

49. Currently, Unit G1 and G3 are being covered by APNs. Also, six cottages are being covered by an APN and a psychiatrist.

50. The APN covering Unit G1 does not receive adequate supervision from Defendant Akerele. For example, on or around January 17, 2019, multiple patients on Unit G1 were decompensating from improper medication adjustments. The APN did not know how to appropriately monitor drug levels and did not appear to have the experience to exercise the degree of autonomy that she was given by Defendant Akerele.

51. Additionally, the APN covering the cottages does not receive adequate supervision from Defendant Akerele. Although this APN is working with a psychiatrist, the cottages routinely house over sixty patients. When the psychiatrist is out or off-site for court hearings, the APN is left alone treating these sixty plus patients. As a result of these arrangements, many patients who become psychiatrically stable and move to the cottages quickly decompensate because of the inadequate treatment they receive from the APN.

52. For example, for at least two days in January 2019, a patient in cottage 14 did not receive his lithium because the APN neglected to renew his medication.

53. On or around January 3, 2019, a patient in cottage 14 informed his treatment team that he needed his psychiatric medications adjusted because they were causing paranoia, auditory hallucinations, and anxiety. He relayed that he was decompensating over the last two weeks. However, there was no psychiatrist at the treatment team meeting to address these concerns.

54. On or around February 2, 2019, a psychiatrist responded to a patient threatening staff in cottage 17 and requested medication for the patient. The psychiatrists determined that this patient had never received medication since his admission on or around October 17, 2018.

55. On or around May 28, 2019, another part-time psychiatrist was assigned to cover the cottages. The psychiatric coverage of the cottages currently includes: one full-time psychiatrist assigned to Cottages 17, 18, and 19; and an APN and a part-time collaborating psychiatrist assigned to Cottages 13, 14, and 16. However, this arrangement is in violation of the joint protocol agreement entered into by the APN and Defendant Akerele, which states that Defendant Akerele would serve as the supervising collaborating psychiatrist for the APNs. Furthermore, the APN and this new part-time psychiatrist have little time together to collaboratively treat the cottage patients. The APN works at Greystone from 8:00 a.m. to 4:00 p.m. The part-time psychiatrist is the psychiatric director at another psychiatric hospital and only works at Greystone for four hours a day; 8:00 a.m. to 12:00 p.m. on Mondays and Fridays and 3:30 to 7:30 p.m. on Tuesdays, Wednesdays, and Thursdays. Because of this psychiatrist's schedule, he cannot participate in most treatment team meetings or write his own court reports.

56. Although all examples of inadequate psychiatric coverage are impractical to list, the following are a sampling of the direct consequences of Defendant Elnahal, Defendant Carter, and Defendant Akerele's failure to properly staff the Greystone Psychiatric department:

57. On or around March 19, 2019, approximately between 9:00 a.m. and 1:00 p.m., three all-available calls for help were made in response to a violent patient. All-available calls for help are hospital-wide calls over the loud speaker requesting all-available hands to a specific unit for emergencies, usually of a life-threatening nature that the staff at the scene cannot safely resolve. No psychiatrist responded to any of the calls and the patient was not seen until the psychiatrist working the next shift arrived.

58. On or around March 21, 2019, there was no psychiatric coverage for Unit D2 during the 8:00 a.m. to 4:00 p.m. shift, during which three all-available calls for help were made.  There was also no assigned coverage for Unit E2 during this time.

59. On or around April 1, 2019, there was no psychiatric coverage for units D2 and E2 from 8:00 a.m. to 4:00 p.m.

60. On or around April 8, 2019, the forensic unit had no covering psychiatrist until approximately 12:00 p.m.  A doctor asked Defendant Akerele who was covering the forensic patients during this time and Defendant Akerele responded, "we will find out when we have to."

61. On or around April 15, 2019, a psychiatrist was on vacation and there was no psychiatric coverage for her forty-seven patients.

62. On or around April 16, 2019, one psychiatrist covered Units D2, E2, F2, and G2, a total of eighty-eight patients.

63. On or around April 20, 2019, a patient on Unit F3 reported to a doctor that he was not seen by the unit psychiatrist or medical doctor since his transfer from Cottage 17 three days prior.  The patient was transferred because he was decompensating in Cottage 17, but did not receive any psychiatric treatment or medication.  At the time, the Unit F3 psychiatrist was unavailable because she was only working Monday, Tuesday, and Wednesday.

64. On or around April 21, 2019, a doctor failed to show up for her 12:00 a.m. shift and Defendant Akerele was unreachable during the ensuing emergency.

65. On or around April 26, 2019 and April 28, 2019, the psychiatrist assigned to Units F2 and G2, was offsite handling court hearings, and therefore, her forty-six patients were without psychiatric coverage.

66. On or around May 9, 2019 and May 10, 2019, approximately forty-five patients were without an assigned or covering psychiatrist.

67. On or around May 26, 2019, the forty-two patients on Unit F3 and Unit G3 were without an assigned or covering psychiatrist.

68. These failures by Defendant Elnahal, Defendant Carter, and Defendant Akerele to properly staff the Greystone psychiatric department has deprived patients of appropriate and necessary psychiatric treatment.

## II.    ESCALATING RATE OF ASSAULTS

69. From approximately 2012 to 2017, there were an average of 4.71 assaults per day at Greystone.

70. In 2012, the total number of reported assaults at Greystone was 1,832; of those reported assaults, 549 were with injury.

71. In 2013, 1,966 assaults were reported; of those, 674 were with injury.

72. In 2014, 1,509 assaults were reported; of those, 532 were with injury.

73. In 2015, 1,486 assaults were reported; of those, 530 were with injury.

74. In 2016, 1,816 assaults were reported; of those, 654 were with injury.

75. In or around August 2017, before the Director of Performance Improvement and Utilization Management was suspended for threatening to disclose the actual data, 908 assaults were reported; 322 were with injury.  The number of assaults and injury in 2017 was on track to surpass the highest number of reported assaults and injuries since the opening of the "new" Greystone.

76. Defendant Teresa A. McQuaide (hereinafter "Defendant McQuaide"), former interim CEO of Greystone, intentionally kept multiple sets of books regarding the rate of assaults: one set for

the public, one set for regulatory agencies, and one set for internal use only. The internal set is the only one with an accurate picture of the astronomical rate of violence at Greystone. Multiple whistleblowers have lost their careers and reputations when they attempted to disclose or refused to unlawfully manipulate this information against the direct orders of Defendant McQuaide.

77. On or around February 27, 2014, an Ad Hoc Committee on Safety and Staffing Issues (hereinafter "Ad Hoc Committee") was established by the Medical Staff Organization (hereinafter "MSO"). The MSO is a self-governing body whose primary purpose is to hold physicians collectively accountable for patient safety and clinical performance. The reason for establishing the Ad Hoc Committee was an increasing number of complaints from Greystone staff members related to the escalating safety issues on the units, inappropriate staffing levels, and overcrowding of patients. The Ad Hoc Committee consisted of psychiatrists and medical doctors employed by Greystone. The Ad Hoc Committee presented their findings to the Greystone Administration in a report dated April 25, 2014.

78. The Ad Hoc Committee found that between 2009 and 2013, the number of admissions increased 47% from 393 to 580. From 2010 to 2013, the increase of patient-to-patient assaults increased 40%, with 970 assaults in 2010 to 1,367 in 2013. From 2010 to 2013, the patient-to-staff assaults increased 40%, with 413 assaults in 2011 to 582 in 2013. From 2009 to 2014, the mortality rate increased by 60%, from 5 deaths in 2010 to 8 in 2013. This report and its recommendations were sent to the Division of Mental Health and Addiction Services.

79. The grave conditions are best summarized in this complaint by Greystone's own MSO. On or around October 5, 2017, the MSO met to discuss safety issues, staffing issues, and the collective work environment at Greystone under the mismanagement of Defendant Valerie L. Mielke, M.S.W. (hereinafter "Defendant Mielke"), Assistant Commissioner of the New Jersey Division of

Mental Health and Addiction Services, Defendant McQuaide, Defendant Robert Eilers, M.D.(hereinafter "Defendant Eilers"), Medical Director of the New Jersey Division of Mental Health and Addiction Services, Defendant Harlan M. Mellk, M.D. (hereinafter "Defendant Mellk") , Chief of Medicine at Greystone Park Psychiatric Hospital, and Defendant Akerele. The MSO consisted of the majority of the staff psychiatrists and medical doctors, who were out of options in the face of the growing crisis at Greystone. During the meeting, the doctors discussed Greystone being over census, staff and patients being assaulted on a near-constant basis, and Defendant McQuaide's fraudulent misrepresentation of the level of assaults. The MSO stated that the number of assaults being reported was significantly lower than the number of assaults they reviewed. The MSO also looked at the severity of the assaults. An example they discussed included a patient who assaulted staff members at least twenty times before being transferred to Ann Klein Forensic Center. The doctors also discussed the Greystone Administration's chronic understaffing of Greystone's psychiatric units, thus compounding the dangers to staff and patients. The number of psychiatrists has been below requirements for a very long time because of resignations and retirements as well as Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele's deliberate failure to fill the vacancies. The critical positions of Chief of Psychiatry and Medical Director, which are required for Greystone to remain licensed and properly operate, remained vacant. Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele, to save expenditure, purposefully delayed the hiring of available psychiatrists by prolonging the onboarding process by up to eleven months, despite the dire need for their assistance. The multitude of shortages caused the workload of the remaining psychiatrists to skyrocket, and when coupled with the over census of Greystone, compounded tragic consequences.

80. After the meeting, the MSO unanimously passed a No Confidence Resolution against Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele for their complete failure to address the safety, staffing, and emergency response issues that had been raised repeatedly by dozens of personnel over the past three years.

81. The No Confidence Resolution was necessitated by the rapidly deteriorating conditions that eventually precluded Greystone staff from providing an adequate standard of medical and psychiatric care to the patients. Doctors agree that the baseline medical and psychiatric standard of care cannot currently be met for Greystone's patients.

82. An example of Defendants' disregard of its staff is illustrated by Defendant Akerele, who does not respond to all-available calls for help.

83. In or around February 2018, when a fellow doctor was severely assaulted by a patient, Defendant Akerele did not check on him, though he lay on the ground with a concussion, unconscious while waiting for an ambulance. Virtually every doctor who was on duty that day came to see their injured colleague, who could not get up, and had blood covering his face and torso. When Defendant Akerele was informed of this incident in his office, he refused to check on the injured doctor, and responded that he was "too busy."

84. Virtually every doctor at Greystone has been assaulted. Some examples include:

- Dr. Marek Belz was assaulted on several occasions in the forensic unit, including a time when he was punched in the head. He subsequently resigned in 2016, having only worked at Greystone for fewer than five months.
- Dr. Seung Lee, an evening on-call psychiatrist, was severely assaulted by two patients when responding to an on-call request. Dr. Lee was subsequently hospitalized.
- Dr. Mohammad Ghazi, another evening on-call psychiatrist, was assaulted several times by patients on an evening shift; he elected to retire in 2017.
- Dr. Joselito Domingo was assaulted on several occasions.
- Dr. Aldonia Swamy was assaulted on several occasions.
- Dr. Walter Bakun was assaulted on several occasions.

- Dr. Anthony Gotay was assaulted on several occasions.
- Dr. Ravi Baliga was lifted off the ground, pushed against the wall, and thrown to the floor by a patient and robbed.
- Dr. Michael Stewart was assaulted several times in an Admissions Unit.
- Dr. Gerry Gaviola was assaulted and had his nose broken.
- Dr. Danijela Ivelja-Hill was assaulted and had her Meniscus torn.
- Dr. Robert Becker, the former Chief of Psychiatry, was assaulted.

85. From approximately August 1, 2017, to August 13, 2017, one patient assaulted six staff members and three other patients.

86. The level of assaults has caused significant problems with staff retention. For example:

- Dr. Grogan resigned from Greystone due to concerns regarding the assaults.
- Dr. Verdi did not accept a full-time position, citing safety concerns regarding the assaults.
- Dr. Drew Tepper, who subsequently accepted a position in the New Jersey prison system, did not accept a full-time position at Greystone, citing safety concerns regarding the assaults.
- Dr. Marvin was advised by her medical doctor to no longer work at Greystone after she sustained her third concussion.
- Dr. Hill resigned, citing the level of violence, danger, and lack of security.

87. Doctors and staff are afraid that they will lose their jobs if they disclose the extent and nature of the violence. Therefore, many incidents go unreported.

88. Due to the mismanagement of staff, Greystone is short of nurses, necessitating circumstances where nurses are forced to work sixteen-hour shifts in an attempt to cover the shortages. On multiple occasions, nurses were told they were not allowed to go home at the end of their shift, even when they had been assaulted.

89. In or around September 2017, two nurses were crying at their work station after having huge clumps of their hair ripped from their scalps. Despite their visible injuries, they were not sent home because there were no nurses available to replace them. As a result of this incident, the responding Medical Officer of the Day asked Defendant McQuaide if she considered these incidents to be assaults. Defendant McQuaide responded "no." When asked what Defendant

McQuaide considered an assault, she responded "broken bones."  The Medical Officer of the Day is the medical doctor responsible for overseeing the safety of all patients and responding to all medical incidents for any designated day.  Defendant McQuaide and Defendant Mellk do not consider having a large clump of hair ripped from one's scalp as constituting an "assault with injury" and therefore take no measures to protect patients or staff from such occurrences.

90. On or around December 21, 2017, the New Jersey Department of Labor and Workforce Development Office of Public Employees and Occupational Safety and Health (hereinafter "PEOSH") served Pamela Tye-Harlan, the then Assistant Director at Greystone, a Notice of Order to Comply.  PEOSH inspected Greystone from July 14, 2017, to November 30, 2017.  Resulting from its investigation, PEOSH issued a "serious violation" under N.J.S.A. 36:6A-33(A), asserting that Greystone did not "provide each employee with employment and a place of employment, which is free from recognized hazards, which cause serious injury, physical harm, or death to the employee."  PEOSH also determined that Greystone's Violence Prevention Program, which is required by the Violence Prevention in Healthcare Facilities Act and was produced for PEOSH during the inspection, showed the year 2017 on the title cover page.  However, a review of the plan's details and supporting information reflect that the employer's violence prevention plan was not an active, living document that was being maintained, updated, and assessed annually.  PEOSH further determined during the inspection that the elements of the Violence Prevention in Healthcare Facilities Act were not being adhered to by Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele, thus exposing employees to serious workplace hazards.  This finding was supported through a review of the injury and illness OSHA forms 300 and 300A data from the previous three years, 2014, 2015, and 2016, which established a consistent, substantial number of incidents on a rising pattern of patient-inflicted violent acts against

employees.  Greystone was required to abate the violation by March 26, 2018, or suffer a per diem penalty of $7,000.

91. On or about February 5, 2019, a meeting was held between Human Resources, Defendant Akerele, and the medical staff.  Human Resources gave a presentation highlighting the escalating rate of violence at Greystone, which increased from January 2018 to January 2019, a period in which the psychiatric department was severely understaffed.

92. According to a quality management nurse, the escalating rate of violence at Greystone as of February 2019 increased 12% from the prior quarter.

93. Defendant Shereef M. Elnahal, M.D., M.B.A. (hereinafter "Defendant Elnahal"), the Commissioner of the New Jersey Department of Health, and Defendant Carter have recently misrepresented to the public that the rate of violence at Greystone has decreased.  However, the rate of violence has not decreased per capita.  In fact, the rate of violence has increased when considered in the context of the decreasing Greystone census, diversion of admissions, and the closing of one unit and one cottage.

### III.     INABILITY OF DEFENDANTS TO PROTECT PATIENTS AND STAFF

94. The Greystone Violence Prevention Committee is ineffective.  Although all examples of patient-on-staff assaults are impractical to list, the following are a sampling of the patient-on-staff assaults that occurred between August 2017 and June 2019.

95. In or around August 2017, a patient in Unit B1 jumped over the Patient Information Center (hereinafter "PIC") and assaulted a nurse.  The PIC is a centralized area on every unit that cordons off the patients from the staff.  It also serves as the central location where the staff and patients can interact through a partition that includes a waist-high counter and a lower counter that is staff-facing only.

96. On or around August 16, 2017, one unit made three all-available calls for help when a patient climbed over the PIC and assaulted two nurses. Both nurses subsequently sought medical treatment for their injuries.

97. In or around August 2017, a patient on Unit A1 jumped over the PIC and threw a chair at the pay phone.

98. On or around December 29, 2017, a doctor was assaulted on Unit F3 when a patient punched her in the face.

99. In or around January 2018, a patient punched a staff member in the eye thereby requiring emergency medical attention, and a different patient bit a nursing supervisor, who also required emergency medical attention.

100. In or around January 2018, a psychiatrist was chased down the hall by a patient who then cornered her and punched her in the face.

101. In or around January 2018, four calls for all-available help were made on Unit G3 in quick succession in response to a violent patient, but no adequate help arrived. Frequently, doctors have witnessed other staff members responding to all-available calls not as if someone's life or well-being depended on it, but as if they were "out for a stroll."

102. On or around January 16, 2018, a patient on Unit G3 assaulted three different staff members, one of whom subsequently required a wheelchair for transportation to receive treatment. An all-available call for help had to be sounded four times before help arrived. On that same date, the same patient also assaulted three other nurses.

103. On or around January 16, 2018, a patient on Unit F3 repeatedly assaulted a female psychologist by pushing her to the floor and subsequently picking her up and throwing her back down to the floor. The patient then climbed on a table, jumped on the psychologist, and proceeded

to stomp on her, despite the presence of other staff members.  The patient then pushed multiple staff members out of his way.  A fellow patient was the only person who tried to stop him as he attempted to hurt more people, but the interceding patient was thrown to the floor and also stomped on.  Other patients and staff members then tried to control the aggressor, but he picked up the nursing supervisor and threw her against the wall and picked up another patient and started to choke him.  At the end of the assault, three staff members lay injured on the floor.  A doctor, along with other staff, was among the first to witness the three staff members lying injured on the floor, severely beaten, with help arriving too late.

104. On or around the evening of January 19, 2018, a patient on Unit B1 repeatedly punched a nurse in the head.

105. In or around February 2018, a patient on Unit F3 assaulted approximately twenty employees while waiting for transfer to Ann Klein Forensic Center.

106. In or around February 2018, the then-Chief of Psychiatry, Dr. Hilary Hanchuk, was assaulted.  When he went to Employee Health Services for his injury, he was denied treatment by the Employee Health Services Nurse.

107. On or around February 7, 2018, a patient punched a psychiatrist and knocked him to the floor.  He then repeatedly punched him in the head while the psychiatrist lay on the floor unconscious.  The psychiatrist suffered a broken nose, massive swelling, and a large hematoma over his right temple.  At least three all-available calls for help were made in response to the attack.  The assaulted psychiatrist was eventually taken to Morristown Medical Center after waiting for an ambulance for forty-five minutes.

108. On or around February 21, 2018, a patient on Unit A3 struck a doctor in the face and knocked his eyeglasses to the ground, breaking them.

109. On or around February 22, 2018, a patient on Unit F1 punched a social worker in the face.

110. On or around June 9, 2018, a nurse on Unit B1 was severely beaten by a patient and was subsequently rushed to Morristown Medical Center.  On the same day, another nurse was assaulted on Unit G2 but remained on duty.

111. From approximately January 2018 through August of 2018, around 105 employees were assaulted by patients and injured significantly enough to necessitate a report to Greystone's human resources.  Of those 105 staff members who filed with human resources, at least one-quarter required multiple days off because of their injury.

112. In or around September 2018, a patient on Unit G3, who had been stable for months, decompensated because he did not have an assigned psychiatrist.  Due to the frequent change of covering psychiatrists, his prescribed medications were repeatedly changed, which caused his decompensation.  As a result, he became agitated and paranoid, and struck his psychiatrist in the face.

113. In or around November 2018, a patient struck two employees in the back of their heads.  Both employees required medical treatment.

114. In or around December 2018, a patient on Unit B3 jumped over the PIC and punched the program coordinator in the face and knocked his eyeglasses off.  The program coordinator yelled for help, but the staff did not intervene due to the potential of personal injury and fear of discipline.

115. In or around January 2019, a patient on Unit A3 punched a doctor in the face and broke his eyeglasses.  This patient assaulted the same doctor on five prior occasions.  Despite this history of assaults, the Greystone Administration blocked the doctor from transferring this patient to another unit and instead, allowed the assaults to persist.

116. On or around January 10, 2019, a patient on Unit A1 assaulted a doctor by crushing the doctor's eyeglasses into her face and pushing her into a wall, which caused the doctor to fall to the ground.  The doctor received no intervention and was forced to use a nearby garbage can as a shield to protect herself.  During the assault, staff were waving each other to run away.

117. On or around January 11, 2019, a patient on Unit A1 climbed over the PIC and sat on the floor in front of the chart room.  The patient refused to move and an all-available call for help was made.  Shortly thereafter, the patient punched a staff member in the face.  The staff member required medical attention.  When another doctor came to assess the patient, the patient assaulted that doctor as well.  The patient was then placed in four-point restraints.

118. On or around January 11, 2019, a patient on Unit G2 jumped over the PIC and assaulted a nurse by striking her three times. On or around January 14, 2019, the same patient severely attacked a female social worker.  During the attack, the staff present ran away, leaving other patients on the unit and a psychologist to intervene.  The social worker sustained a large forehead hematoma, nausea, and a laceration that required six sutures.  The social worker missed approximately seven days of work.  The social worker was saved by another patient, rather than staff.  The psychiatrist on the unit attempted to transfer this patient to Ann Klein Forensic Center because of these violent attacks.  However, Defendant Akerele rejected the transfer without interacting with the psychiatrist, interviewing the patient, or reviewing his chart.

119. On or around March 28, 2019, a patient on Unit B2 began spitting on employees and chasing other patients, necessitating an all-available call for help.  The patient then knocked a responding employee to the ground, hit him in the face, and knocked his tooth out.  Later that day, employees responded to screaming and found the mental health technician assigned to this patient for one-to-one observations on the floor screaming and unable to get up.

120. On or around April 6, 2019, two patients on Unit G2 assaulted a staff member escorting them to the Park Place Café located in Greystone.  The patients tried to steal the staff member's identification badge and elope from the unit.  One of the patients struck the staff member in the forehead with a set of keys and inflicted a mid-forehead hematoma and multiple lacerations.  The staff member was rushed to Morristown Medical Center.

121. On or around April 20, 2019, four staff members were assaulted by patients from 8:00 a.m. to 4:00 p.m.  A staff member required immediate medical attention.

122. On or around May 11, 2019, a patient on Unit B2 punched a staff member in the face.

123. Because of the high frequency of patient-on-staff assaults, Greystone doctors and staff are afraid to interact with their patients.  They are unable to effectuate an adequate standard of care because Defendants' policies and procedures make it impossible for staff to feel safe in engaging in basic patient treatment.

## IV.    DEFENDANTS' FAILURE TO HIRE AND MAINTAIN CAPABLE STAFF

124. Patients who are violent and assaultive and who require intramuscular injections for sedation are routinely allowed to continue their violent rampages because Defendants do not provide sufficient capable staff to physically intervene.

125. Patients live in a constant state of fear, knowing that staff cannot protect them.  Patients report that they cannot sleep at night due to the increase in patient-on-patient assaults that occur in the evening when there are fewer staff members on duty.

126. Doctors and patients report that patients have psychiatrically decompensated due to the constant stress from knowing that staff cannot protect them.

127. Doctors cannot treat violent patients because Greystone has inadequate security measures and individuals capable of protecting Greystone staff and patients.

128. In or around October 2016, a physician in his sixties came to the aid of a Health Services Technician physically struggling with a violent patient on the outside of a third-floor unit while many staff members stood by and did nothing. When this physician intervened, the patient gouged out the flesh from the physician's face, causing blood to stream on the floor. He required subsequent medical treatment.

129. On or around August 29, 2017, a patient in Unit D3 jumped over the PIC and threatened the staff members present, who were forced to barricade themselves in the chart room and make an all-available call for help.

130. In or around October 2017, an assault occurred between two patients where one sustained a four-inch left forehead hematoma, and the other had her hair ripped from her scalp. Prior to the Medical Officer of the Day's arrival, the staff who were present did not physically intervene to stop the assault.

131. On or around October 22, 2017, the Medical Officer of the Day responded to three separate all-available calls for help regarding a patient inflicting physical harm to self. The doctor had to physically restrain the significantly younger male patient, who weighed well over two-hundred pounds, because he was banging his head on the floor. Prior to the doctor's arrival, the staff on the scene did very little, if anything, to stop these repeated episodes of self-harm. The patient now suffers from a non-healing abrasion on his forehead because the staff continues to be unable to stop these episodes.

132. On or around November 4, 2017, a patient in Unit B2 became violent, broke off a three-foot long piece of a wooden bed frame, and attempted to assault staff. The initial response by staff members was unsuccessful, and staff resorted to calling the police because they were either unable or unwilling to subdue the violent patient.

133. On or around December 17, 2017, a patient on Unit E2 smashed a wooden chair in half and carried one half in each hand, using them as clubs to bat down parts of the ceiling and an exit sign while yelling and screaming. This volatile situation drove all the other patients into their rooms out of terror. The staff could not control the patient's behavior, and the only option they were left with was to allow the patient to de-escalate on his own without staff intervention. The other patients and the staff were seemingly helpless, as they cowered away from him.

134. On or around January 2, 2019, Defendant Carter and Defendant Akerele met with two doctors to discuss the conditions at Greystone. When the topic shifted to violence at Greystone, Defendant Carter stated that medical security officers would not be hired to address the escalating rate of violence. Instead, Defendant Carter stated that the staff is required to de-escalate patients. She also said that the State did not want Human Services police officers physically intervening during episodes of imminent violence to prevent injuries and instead, they were only to physically intervene after someone got hurt. Greystone Administration also implemented the SISU team. The SISU team is an emergency response team whose purpose is to reduce violence at Greystone through de-escalation and negotiating techniques. The SISU team is ineffective at reducing incidents of violence.

135. On or around January 28, 2019 a female employee was punched in the right eye by a patient on Unit B2 and taken to Morristown Medical Center. As a result of this attack, three calls for all-available help was sounded on three different units, demonstrating that staff on those units were unable to handle the violence on their own.

136. Similar assaults continue to occur on Unit B2, despite the SISU team's increased presence on the unit. Additionally, there is currently no assigned full-time psychiatrist to Unit B2, which has contributed to the increasing levels of violence.

137. On one occasion, the Assistant Director of Nursing confronted Defendant Akerele about the unacceptable amount of violence on Unit B2 and Defendant Akerele responded that "these patients need more Depakote."

138. On or around February 5, 2019, at a meeting between the medical staff, Defendant Akerele and human resources, it was established that the SISU team is not responding to all-available help calls, probably because it is understaffed.  For example, On May 18, 2019, a doctor responded to an all-available call for help on Unit F3.  The doctor was the first responder although he traveled from the opposite side of the hospital.  The SISU team didn't respond to the incident until after the responding doctor completed his assessment, progress note, and incident report. Only one member of the team arrived.

## V.    DANGEROUS OVERCROWDING

139. Units at Greystone have been chronically and unlawfully overcrowded.  Due to this dangerous overcrowding, geriatric patients have been forced to sleep on thin mattresses on the floor outside the designated sleeping areas, often in common areas.  Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele, in an effort to conceal these unlawful accommodations, have created "rooms" that do not exist and which violate the fire and building codes.  To conceal this practice, these Defendants order their staff to attach fake room numbers to common areas during the evening, and remove them every morning.

140. An investigator with Disability Rights New Jersey witnessed and documented patients who were sleeping on the floor despite the Greystone Administration's denial that patients were without beds and that the units were overcrowded.

141. The Fire Chief at Greystone has repeatedly advised the Greystone Administration that they are in violation of the fire code, but this practice has continued unabated.

142. On or around July 19, 2017, a census for overcrowding was conducted and found that numerous units were over census.  Fire plans and building codes allow for twenty-five patients per unit.  Units E1, F1, E2, F2, A3, D3, G3, A2, and B1 were all over census at twenty-seven patients.  Some units have had as many as thirty patients.

143. Some cottages, meant to hold eight patients, in practice housed up to fourteen patients.  Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele repeatedly ignored the pleas of the doctors and the staff for a response to rectify the overcrowding situation.

144. As of June 1, 2019, cottages 13, 14, 17, 18, and 19 each house more than eight patients and are in violation of the fire code.

145. On or around June 23, 2017, the Center for Medicare and Medicaid Services completed a sixty-one-page report titled "Summary Statement of Deficiencies."  The Center for Medicare and Medicaid Services is an agency under the Federal Department of Health and Human Services that oversees state hospitals to ensure the delivery of quality healthcare to patients.

146. The Center for Medicare and Medicaid Services found that Greystone failed to ensure each of its patients' right to personal privacy.  When Greystone receives a new patient and no bed is available, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele use the units' study rooms to house patients.  To accommodate overflow patients in the study rooms, staff merely provide them with a privacy divider from 8:00 p.m. to 8:00 a.m.  To hide this practice, Greystone covers its security cameras while overflow patients are sleeping in the study rooms.  The study rooms do not have accessible bathrooms, and these patients are required to use bathrooms in the hallways.  Overflow patients who sleep in the study rooms store their belongings in storage rooms.

147. The Center for Medicare and Medicaid Services found that Greystone "failed to provide all patients with a wardrobe, bedside table, and plastic storage container to secure their belongings." Greystone also "failed to maintain the comfort and dignity of all patients by ensuring that all patients receive and have access to personal care items." These findings were based on the Center for Medicare and Medicaid Services' observations at Greystone, review of Greystone policies and procedures, review of Greystone documents, and staff interviews.

148. On or around June 21, 2017, the Center for Medicare and Medicaid Services surveyed Greystone and observed overflow patients in various units. In Unit A2, an overflow patient was observed sleeping on a sofa in the study room with two pillowcases filled with personal belongings next to her. This patient's personal belongings did not include toiletries or personal care items. This patient was not provided a toothbrush or toothpaste. The Center for Medicare and Medicaid Services interviewed another patient who slept in a study room in Unit F3. This patient's belongings were also kept in the storage room, but he was not provided a plastic storage container or wooden dresser to house them. The Center for Medicare and Medicaid Services also observed a patient lying on a bed in the study room on Unit D2 with a privacy divider and the security camera covered. A search of this patient's belongings revealed clothing, but no personal care items. When asked, staff could not confirm whether this patient received personal care items, specifically a toothbrush or toothpaste. Additionally, this patient was not provided a plastic storage container or wooden dresser for use. Unlike other units, a staff member indicated that the beds and privacy dividers remain set up in the study room on Unit D2 at all times.

149. Per Greystone's "Locked Storage Areas for Patient Belongings" policy, patients, including overflow patients, are supposed to be provided a locked storage area for their personal belongings. This locked storage area should include a wardrobe, bedside table, and up to one

plastic storage container.  The nursing staff is responsible for educating patients on retaining their locker keys and accessing their lockers.  Unlike patients with designated bedrooms, overflow patients do not have access to their personal belongings, wardrobes, or lockers from 8:00 a.m. to 8:00 p.m.  To retrieve any personal items during these hours, they must request them from the staff.  The Center for Medicare and Medicaid Services toured the storage rooms in Units A1 and D2.  The Center for Medicare and Medicaid Services categorized the shared patient storage areas in these units as locked closets.  Both storage rooms were cluttered with patient belongings and were not sanitary.  Some of the belongings in these storage rooms were not labeled with the owner's identification.  Lastly, contrary to Greystone's storage policy, patient belongings were stored in bags on the floor.

150. There are myriad studies that show that overcrowding at inpatient psychiatric hospitals dramatically increases the rate of falls, assaults, and suicides.

151. Because of overcrowding, Defendant Mielke, Defendant Carter, Defendant Eilers, Defendant Mellk, and Defendant Akerele pressure doctors to prematurely discharge patients. These patients do not receive appropriate care and treatment.

## VI.    FAILURE OF THE ONE-TO-ONE OBSERVATION SYSTEM

152. One-to-one observation is implemented when a mental health technician is ordered by a doctor to continuously observe an individual patient for a period of time during acute physical or mental illness, such as during periods of severe aggression, physical violence, or suicidal ideation. The mental health technician performing one-to-one observation duty is mandated to de-escalate and intervene when the assigned patient becomes aggressive or suicidal.  One-to-one observation is standard operating procedure across virtually all psychiatric facilities in the country.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

153. Greystone's policy is to keep as many patients off one-to-one observation as possible, even if they are an imminent danger to themselves, others, or property.  Staff psychiatrists are constantly pressured by Defendant Carter and Defendant Akerele to ignore the requirement for one-to-one observation and forced to terminate one-to-one observation for imminently dangerous patients

154. Greystone's policy is to keep the number of patients on one-to-one below twenty, rather than provide one-to-one observation for patients who require it.  This number is entirely arbitrary and motivated by fiscal concerns and rather than based on clinical assessments.  On or around October 30, 2018, Defendant Akerele held a meeting where he instructed the psychiatrists to reduce the number of patients on one-to-one observation below twenty.

155. On or around February 5, 2019, Defendant Carter called a meeting with the Greystone psychiatrists to address the then twenty-six patients who were on one-to-one observation.  At this meeting, Defendant Carter, Defendant Elnahal, Defendant Mellk, and Defendant Akerele, reiterated the Greystone policy of keeping no more than twenty patients on one-to-one observation. All psychiatrists were required to attend the meeting, even if they did not have patients on one-to-one observation. Defendants then proceeded to interrogate each psychiatrist, one by one, and ordered them to justify their reasons for keeping each patient on one-to-one observation.

156. Defendant Akerele customarily orders that patients be taken off one-to-one observation prematurely, with no regard for patient safety.  He routinely requires staff psychiatrists to justify their positions of keeping patients on one-to-one observation in a calculated and systematic attempt to pressure the doctors to take patients off.  The motivation of this is to advance Defendants' agenda to reduce the costs involved with one-to-one observation care at the expense of employee

and patient safety.  Defendant Akerele burdens already-overworked doctors with an additional average of five hours a week to defend their position of keeping patients safe.

157. Defendants' policy and practice of keeping no more than twenty patients on one-to-one observation is arbitrary and has a profoundly negative impact on patient treatment and safety.

158. In order to effectuate the aforementioned one-to-one observation policy, Defendant Carter and Defendant Akerele increase the burden that a psychiatrist must meet to place a patient on one-to-one observation.  As a result of this practice, some patients do not receive one-to-one observation until they fully decompensate, even if they assault multiple staff members, necessitate calls for all-available help, and require the use of physical restraints.

159. For example, on or around May 17, 2019, a patient on Unit A3 threatened to kill himself at approximately 1:00 a.m. and the morning shift psychiatrist was immediately notified.  At approximately 10:00 a.m. on the same day, the patient began yelling, screaming, spitting on staff members, and jumped on the PIC.  Because he could not be redirected, an all-available call for help was made at approximately 10:35 a.m. and the patient was placed on four-point chair restraints. At approximately 10:40 a.m. another doctor administered an intramuscular injection. At this point, this patient still was not placed on one-to-one observation, Instead, the patient was kept in restraints until approximately 12:40 p.m.  Approximately one hour after being released from the restraints, the patient returned to yelling, spitting, and screaming at the staff, jumping on the PIC, and attempting to hit staff members.  The patient could not be redirected, but still wasn't placed on one-to-one observation.  Instead, another all-available help was called and the patient was placed in four-point restraints again.  Another doctor administered yet another intramuscular injection and the patient was released from the restraints approximately one hour later.  Later that night, the patient was seen on the balcony with a T-shirt around his neck while verbalizing, "I want

to kill myself." The patient was redirected to his room where he began wrapping other pieces of clothing around his neck. Another all-available help was called and the patient was again placed in four-point restraints. Another doctor administered an intramuscular injection and the patient was released from restraints an hour later. It was not until approximately 10:00 p.m. that the patient was placed on one-to-one observation "for protection of self and others." Over the course of almost twenty hours, it took one suicide threat, three all-available calls for help, three instances of four-point restraints, three emergency intramuscular injections, spitting and hitting staff, one suicide attempt, and four doctors for this patient to be placed on one-to-one observation.

160. Conversely, to keep the number of patients on one-to-one observation below twenty, this patient was later prematurely taken off on-to-one observation and quickly resumed his violent behavior. On or around May 20, 2019, this patient was discontinued from one-to-one observation and was placed on "intermittent observation." That afternoon, the patient resumed assaulting other patients, and when staff intervened, he yelled, screamed, and jumped over the PIC. He was not redirectable and an all-available call for help was made, and an intramuscular injection was administered. Despite this patient's quick regression to violent behavior and clear need for continued one-to-one observation, it was not implemented.

161. Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele are aware of the dangerous consequences of prematurely taking violent patients off one-to-one observation. For example, on or around August 30, 2013, an order came "from Trenton" to stop all one-to-one observation and treatment for all patients on a holiday weekend, citing cost. Immediately, on the implementation of this order, a patient, who was scheduled for transfer to Ann Klein Forensic Center for previously assaulting seven other patients and multiple staff members, severely assaulted another patient.

This assault prompted the then-CEO to implement an emergency order restoring one-to-one observations.  Just prior to that incident, another patient whose one-to-one status was discontinued exposed himself to another patient by waving his penis in front of her face as she lay on the transferring ambulance stretcher.  He then ran over to two other patients and danced in circles around them with his penis exposed.

162. In or around September 2018, Defendant Akerele ordered a patient who has history of pica (a condition of chronically ingesting foreign bodies that are often indigestible) and assaultive behavior off one-to-one observation, despite the repeated protest of the treating psychiatrist.  Defendant Akerele, in a cavalier fashion, dismissed the treating psychiatrist's professional judgement that the patient was far too unstable to be off one-to-one.  Defendant Akerele wrote an order discontinuing the patient from one-to-one observation.  This patient then subsequently ingested a dangerous substance, necessitating her admission to the emergency room and surgery. The dangerous substance remains in the patient's body to this day.

163. Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele are also aware of numerous incidents where a patient, rather than staff, saved an individual from death or disability.  In circumstances where a mental health technician was assigned to one-to-one observation, oftentimes the technician's lack of training and ability rendered the technician ineffective. On or around November 18, 2017, a patient attacked his mother while on one-to-one observation.  He punched her in the mouth, lacerating her lower lip, and impaling it on her lower incisors.  Then he tossed her to the floor and repeatedly stomped on her chest, fracturing multiple ribs.  Fortunately, a patient came to her rescue by physically intervening, thus saving this elderly woman's life.  The staff present at the scene, including the assigned one-to-one mental health technician, stood by and

watched.  This victim was admitted to ICU for an intracranial hemorrhage, chest trauma with multiple fractured ribs, as well as other injuries.  She suffered permanent brain damage as a result of this assault.  Just earlier that week, that same patient severely assaulted a developmentally disabled patient.  This victim was rushed to Morristown Medical Center, having suffered massive soft tissue damage.  A physician who treated him observed that after the assault, it was impossible to part the patient's eyelid to examine the eyeball underneath.

164. On or around January 8, 2018, two patients were about to engage in a physical altercation in Unit B1.  One of the patients had a one-to-one mental health technician who never called for help or tried to separate or assist in the de-escalation of the altercation, but merely watched as a doctor in his sixties with a fractured wrist attempted to separate the participants.

165. On or around February 21, 2018, on Unit B3, a patient assaulted a nurse, fracturing her thumb and inflicting extensive soft tissue injuries that mandated surgery.  The patient was on one-to-one observation, but the assigned one-to-one mental health technician did not stop the assault.

166. On or around February 24, 2018, an employee was punched in the head by a patient after the patient was taken off one-to-one observation that day.  Later that same day, another employee was punched in the right temple by another patient after that patient was also prematurely taken off one-to-one observation.  That staff member was taken to Morristown Medical Center because of the assault.

167. On or around March 2, 2018, on Unit G1, a seventy-one-year-old geriatric patient with a deformed spine from osteoporosis was pushed to the ground by another patient, who subsequently began to stomp on the patient's head as he lay on the floor.  The staff who witnessed the attack indicated that the assailant stomped on the patient's head six times.  The patient was then unresponsive, and staff called a code blue (an emergency situation in which a patient is in cardio

pulmonary arrest, requiring a team of providers to begin immediate resuscitative efforts).  The patient was taken to Morristown Medical Center and was diagnosed with a subdural hematoma (intracranial bleeding).  In the days leading up to the assault, the assailant was throwing chairs at staff, slamming doors, throwing trash cans and food trays at people, and breaking the toilet in his room.  Defendants' systemic pressuring of doctors to keep patients off one-to-one observation for fiscal reasons directly contributed to this violence, as the assailant should have been on one-to-one observation.

168. On or around March 2, 2018, the then-President of the MSO approached Defendant Akerele concerning the need to stop taking patients off one-to-one observation prematurely. Defendant Akerele's response was that one-to-one staff are largely "incapable, accomplish nothing, get bored on the job, and sometimes sleep while on duty."  Doctors have repeatedly complained throughout the years that many of the staff members are physically incapable of assisting or are too afraid to assist with all-available calls to restrain and de-escalate violent patients.  This has been confirmed via testimony in the Greystone Park Psychiatric Hospital - Board of Trustees Public meetings, where doctors, staff, members of the Greystone Administration, and the public discuss issues surrounding the hospital.  The Board of Trustees is a voluntary advisory board whose members are appointed by the governor.

169. On or around December 6, 2018, a patient who previously assaulted two employees was placed on two-to-one observation.  However, the assigned mental health technicians were frightened of the patient.  They stayed away from him, frustrating the purpose of two-to-one observation.

170. On or around January 9, 2019, a patient on Unit B3 who was on one-to-one observation assaulted a total of three patients and four staff members.  The unit psychologist was head-butted

by the patient.  The unit psychologist, instead of the one-to-one mental health technician, tried to prevent the patient from assaulting another doctor.  Although seven people were assaulted, Defendant Carter stated that the hospital "handled the situation well."

171. On or around February 6, 2019, a doctor responded to a suicide attempt on Unit G3 where the patient cut himself with a sharp instrument. This patient was previously on one-to-one observation, but it was discontinued by Defendant Akerele.  Doctors believe that the one-to-one observation was discontinued prematurely and without proper review.

172. On or around March 8, 2019, a patient on Unit A3 attempted to hang herself by jumping onto the PIC to wrap the computer wires suspended from the ceiling around her neck.  The treating psychiatrist was advised by the nursing supervisor not to put this patient on one-to-one observation. The nursing supervisor claimed that the hospital was trying to keep patients off one-to-one observation for budgetary reasons.

173. On or around March 12, 2019, Defendant Akerele unilaterally discontinued a patient from one-to-one observation without interacting with the patient's treating psychiatrist or treatment team.  After the fact, Defendant Akerele attempted to justify his decision in a progress note, but his assessment was contradicted by the observations of staff that interacted with the patient daily. After being removed from one-to-one observation, the patient wrote a letter in which she stated that she felt pressured by Defendant Akerele to agree that she was ready to be discontinued from one-to-one observation.  Upon being discontinued, she engaged in self injurious behavior by repeatedly cutting herself with a sharp object.

174. On or around March 28, 2019, a patient on Unit G3 choked her roommate.  When the responding doctor appeared at the scene of the assault, the patient placed the doctor in a choke hold and attempted to pull out the doctor's hair.  The patient was then placed on one-to-one

observation for this assaultive behavior.   The one-to-one observation was prematurely discontinued by Defendant Akerele on April 3, 2019.  On that same day, the patient walked into another patient's room, pushed the patient on the floor and began to choke her.

175. On or around April 9, 2019, a patient on Unit G2 started a fire by using matches to light his socks and bed on fire.  Because of Greystone's one-to-one policy and Defendants continued pressure to keep patients off of one-to-one observation, this patient was not on one-to-one observation at the time of the arson.  According to his doctor, this patient was terrorizing the unit and awaiting transfer to Ann Klein Forensic Center and should have been on one-to-on observation. This would have prevented him from fire-setting.

176. On or around April 7, 2019, a patient on Unit D3 swallowed a zipper while on one-to-one observation and was sent to the emergency room for possible scoping and removal.  During this incident, a doctor on the unit observed the one-to-one mental health technician at least fifteen feet away from the patient, which is too far to prevent such an incident from occurring.

177. On or around April 20, 2019, a patient on Unit B3 assaulted four staff members while on one-to-one observation.  Two of these employees had to leave work due to their injuries.

178. On or around May 3, 2019, a patient on Unit G3 attacked her one-to-one mental health technician by punching her, pulling her hair, and choking her.  The patient then repeatedly punched the nurse that came to the aid of the mental health technician.

179. On or around May 8, 2019, a patient in Unit B3 was placed on intermittent observation rather than one-to-one observation despite a series of events displaying dangerous behavior.  Even after throwing chairs, climbing the PIC three times, spitting on staff, and placing a broken hanger around her neck, the patient was not placed on one-to-one observation.

180. On or around May 18, 2019, on Unit A3, a doctor responded to an all-available call for help and observed a patient on one-to-one observation banging her head on a bathroom door. The doctor observed the patient's assigned one-to-one mental health technician charting the incident rather than de-escalating the patient, who was in the process of causing serious bodily harm. The responding doctor traveled from the first to the third floor.

181. Despite Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele being placed on notice of the assaults, they have not amended their policies or procedures to effectively address the dangerous conditions.

## VII.    THE INFLUX OF ILLEGAL DRUGS

182. One of the long-standing concerns at Greystone has been the influx of illegal drugs. There have been multiple cases of drug overdoses from 2015 to the present. On an alarming number of occasions, physicians had to resuscitate patients using Narcan, a medication used in life-or-death situations to combat narcotics overdoses. Numerous patients have overdosed and died. There is suspicion that Greystone staff are involved in this drug trade.

183. Doctors have stated that Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele purposefully ignore the drug trafficking, including possible staff involvement because of fear regarding what may be uncovered.

184. To give historical context, in or around 2007, a patient at Greystone was involved in major drug trafficking on the hospital campus. He was caught on camera making large hand-to-hand transactions in the cafeteria during visits with an ex-patient, a convicted drug trafficker. When one doctor was finally able to convince the then Greystone Administration of the illegal activity, the patient was scheduled to be transferred to Ann Klein Forensic Center. Unfortunately for this

patient, he died of a heroin overdose the night Greystone approved the transfer.  Since, the illegal drug trade continues to expand.

185. On or around June 2, 2018, a patient on Unit E2 overdosed on heroin and required two doses of Narcan and was rushed to the emergency room at Morristown Medical Center.

186. On or around February 13, 2019, a patient reported that a "circle" of patients were using prescription drugs, possibly klonopin, and an illegal drug known as "molly."  These drugs were available to patients on the cottage grounds.

187. On or around April 4, 2019, a patient on Unit G2 left a treatment team meeting, went back to his room, and returned with a substance in a small wrapping paper containing cocaine.  The patient then sniffed the substance in front of a Human Service Police Officer.  Immediately after, the patients on the unit were evacuated to their sister unit and a search was conducted.  As a result of the search, two doctors found straws and a rock-shaped substance in a patient's room.  However, a search worksheet documenting which patients' rooms were searched was not completed as required.

188. On or around April 8, 2019, a patient reported to the administration that drugs were being sold to cottage patients at the bus stop by Partnership clients, the group home adjacent to the cottages.  He also reported that two cottage patients were ordering cough syrup for distribution through an application on their cell phones.

189. Defendants' knowing disregard of drug trafficking at Greystone has compromised patient safety and treatment.

## VIII.    INADEQUATE MEDICAL CARE TO MONITOR DANGEROUS MEDICATIONS

190. In addition to the influx of illegal drugs, patients have died at Greystone and at emergency rooms from the cardiotoxic effects of psychiatric medications administered at Greystone.  Multiple

deaths and life-threatening emergencies at Greystone have been attributed to antipsychotic toxicity by an authorized medical examiner, but such conclusions are routinely discounted by the Chief of Medicine, Defendant Harlan Mellk.

191. In or around 2015, a doctor at Greystone responded to a twenty-seven-year-old female patient in cardiac arrest.  The responding doctor suspected that the cardiac arrest was related to antipsychotic medications, but the Morbidity and Mortality Committee at Greystone determined the cardiac arrest resulted from congenitally abnormal coronary arteries.  However, doctors maintain that congenitally abnormal coronary arteries can be caused by antipsychotic medications.

192. There were sudden unexpected deaths in at least four other patients aged twenty-seven to forty-five.  Two of these deaths occurred in the presence of the physician, who was delayed in offering aid because the "code cart" did not arrive in a timely fashion.  The code cart is a set of trays/drawers/shelves on wheels used for transportation and dispensing of emergency medication and equipment at the site of an emergency for life support protocols.  These deaths were never reported to the Food and Drug Administration as possible antipsychotic-related deaths.  Despite doctors' suspicions and the Medical Examiner's conclusions, Defendant Mellk and Defendant Akerele ignored the dangers of antipsychotic medications and effectively prohibited the Food and Drug Administration from further investigation into potential antipsychotic-related cardiac arrests.

193. In or around the time of this filing, Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant Eilers, Defendant Mellk, and Defendant Akerele enforced a policy of total cessation in prescribing critical antipsychotic medications to patients in several units because there are not enough physicians to monitor the side effects or perform the necessary lab work. Greystone no longer proscribes certain effective psychiatric medication to many of its patients who desperately need it, thereby failing to treat its patients.

194. As of approximately December 29, 2018, a patient on an antipsychotic medication that required blood toxicity monitoring in Cottage 18 did not receive essential blood monitoring for more than two months.

195. From approximately January 1, 2019 to January 3, 2019, a patient in Cottage 14 did not receive his medication because the APN forgot to renew his prescription and does not receive appropriate supervision from Defendant Akerele.

196. On or around January 3, 2019, a patient in Cottage 14 informed his treatment team that he needed his psychiatric medication adjusted because his current medication was causing paranoia, auditory hallucinations, and anxiety.  He relayed that he was decompensating over the last two weeks.  However, there was no psychiatrist or Advanced Practice Nurse at the treatment team meeting to address these concerns.

## IX.    PREVENTABLE DEATHS AND SUICIDE ATTEMPTS

197. Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele have failed to remedy the inherent dangers and the physical infrastructure, which have contributed to the increasingly dangerous conditions at Greystone.

198. For example, in or around Spring 2017, a patient on Unit D2 dove off the PIC head first and fractured his neck in what was apparently a suicide attempt.

199. In or around October 2017, a patient attempted to hang herself.  In full view of staff, she sat on the counter of the PIC, popped a ceiling tile from the ceiling, reached a computer cable wire and twirled it six times around her neck.  Her suicide attempt was nearly successful until a staff member inserted his fingers within the noose to relieve pressure, and a police officer used a utility knife to cut the cable.  The officer's knife inadvertently cut a hand tendon of that staff member,

necessitating surgery.  Three weeks later, the same patient attempted to commit suicide in the same manner.  This was the fourth time that this patient attempted the same act.  Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele did not prevent or remedy this dangerous condition.

200. A few weeks later, another patient jumped on the counter to attempt suicide in the same way.

201. On or around February 10, 2018, a patient on Unit A3 knocked out two ceiling tiles to use the cables located above the tiles to hang herself.

202. Doctors have informed Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele that the computer cables near the ceiling should be suspended out of reach of patients to prevent suicide attempts by hanging.  Doctors also suggested that the PIC be elevated or fixed with Plexiglas to protect patients and staff from harm.  Defendants did not implement any solution.  These foreseeable suicide attempts due to unsafe conditions continue to the present.

203. On or around March 31, 2018 an employee suffered cardiac arrest and subsequently died while on duty at Greystone.  Critical lifesaving equipment had been removed from the code carts, and as a result, no Advanced Cardiac Life Support could be administered.  The psychiatrist first on the scene stated that the emergency response rendered to this employee was "a complete travesty."

204. Defendant Mellk repeatedly stated to the staff doctors that the code cart was of no value, contrary to this being the universal standard of care for emergency rooms, hospitals, and paramedics responding to out-of-hospital cardiac arrests in this country.  Despite widespread

condemnation and disapproval, Defendant Mellk eliminated the Advanced Cardiac Life Support course after being in place since at least 2008 as a part of Defendants' agenda to avoid liability.

205. All the cardiac medications, including epinephrine, had been removed.  Epinephrine is used intravenously to restore blood pressure, make the heart more amenable to defibrillation during cardiac arrest, or when severe hypotension is present.

206. Many Greystone patients are on medications that can cause sudden cardiac arrests from lethal arrhythmias, and the means of which to increase their chance of survival are being systematically dismantled by Defendant Carter, Defendant Eilers, Defendant Mellk, and Defendant Akerele.

207. For example, in or around 2017, a patient suffered from cardiac arrest, and there was no epinephrine in the code cart.  The patient may have been saved if epinephrine were available during the narrow window of opportunity as the patient's blood pressure could have been restored.  Furthermore, equipment for advanced airway management, such as the King tube, which can be inserted safely within seconds, had been removed from the code cart.  The Kelly clamp and scalpel that would have allowed an emergency procedure in the event of a respiratory arrest from complete airway obstruction had been removed.  For the purpose of saving only $60 per code cart, Defendants forfeited the opportunity to save someone who is choking, a common and foreseeable hazard at Greystone.

208. In or around May 2016, a patient on Unit F2 smuggled a razor into Greystone and slit her wrist during the night.  When she was discovered in the morning by staff, she was unresponsive, completely pale from blood loss, and her blood had seeped through her mattress and formed a pool on the floor.  She was dying.  Defendant Mellk, first on the scene in response to the code blue, did nothing but wait for the paramedics to arrive and continued to allow the patient to die.  When

another doctor arrived and attempted to give life-saving aid, Defendant Mellk initially physically obstructed that doctor to advance his own agenda of non-intervention.  Defendant Mellk wanted to wait for the paramedics in order to avoid liability.  The other doctor, fortunately, elected to push past Defendant Mellk and saved this patient's life.

209. In or around September 2017, a geriatric patient on Unit E1 had a code blue as he was diaphoretic, was confused, and had a blood pressure of 200/90 and a heart rate of 160.  This life-threatening event was interpreted by the responding physician as supraventricular tachycardia.  Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele eliminated intravenous adenosine from the code cart, which may have prevented the patient from going into full-blown cardiac arrest.

210. On or around January 22, 2018, a code blue was called on Unit E1 wherein an elderly diabetic patient was having severe symptomatic hypoglycemia.  She was unresponsive.  When the responding medical doctor attempted to administer life-saving intravenous medication, he discovered that the code cart had no intravenous catheters, and one had to be brought from a different unit.

211. On or around March 4, 2018, a patient on the second floor of Greystone was suffering from symptomatic bradycardia (a heart rate of about thirty).  The responding medical doctor discovered that the code cart did not have intravenous atropine as it did in the past, which would have allowed the physician to bring the heart rate up to normal.  The patient's life was in jeopardy, and he had to be rushed to Morristown Medical Center.

212. In or around May 2018, Defendant McQuaide attempted to decrease the evening medical staffing from two Medical Officers of the Day to one, who would be responsible for an excess of five hundred patients.  The plan required covering doctors to work sixteen-hour weekend days as

a part of their regular work week, in a cost-saving measure.  The practice of requiring doctors to work sixteen-hour shifts is a strategy to preclude them from earning overtime hours, thus saving in overhead costs.  This reckless practice disregarded the quality of care and created an untenable schedule for most staff doctors.

213. On or around November 19, 2018, a patient on Unit F3 died of an apparent pulmonary embolus with a deep vein thrombosis.

214. On or around November 20, 2018, Defendant Mellk announced at the Department of Medicine meeting that he would seek to block a Root Cause Analysis of the patient's death. According to one physician present at the Department of Medicine meeting, the Root Cause Analysis would serve to fully investigate the patient's death, the quality control of the hospital, and the failure of the standard of care provided by Basic Life Support only.

215.  This patient's death should have been prevented with timely transfer to an emergency room or with stabilization with Advanced Cardiac Life Support.  The patient should have been put on the cardiac monitor for rhythm analysis and monitoring.

216. Following a proper emergency room evaluation, the patient should have been admitted for observation, placed in a 24-hour observation unit in the emergency room, or even discharged with an ambulatory heart monitor.  In this case, however, the responding doctors used only Basic Life Support, never placed the patient on a cardiac monitor, and never considered transfer to an emergency room until it was too late.

217. On or around December 5, 2018, Defendant Mellk, unsuccessful in blocking the Root Cause Analysis, announced that the Analysis had taken place and determined that all life-saving measures were taken to save this patient's life. The Analysis also concluded that the patient did not need transfer to the emergency room because his vital signs were stable despite documentation

showing that the patient presented with anxiety, agitation, dizziness, light headedness, altered mental status, and near syncope. These symptoms are characteristic of pulmonary emboli, and the physicians would have recognized them as such had Greystone continued use of Advanced Cardiac Life Support.

218. On arrival to this patient, the attending paramedics intubated him, gave intravenous epinephrine, performed CPR at a higher compression and ventilation rate, and performed Advanced Cardiac Life Support.  These interventions should have taken place by Greystone staff had the hospital still mandated Advanced Cardiac Life Support over Basic Life Support and had the code cart been supplied with the necessary materials.

219. The measures taken by the attending paramedics demonstrate the standard of care for emergency response.  Greystone's failure to provide the appropriate standard of care deprived this patient of a meaningful opportunity to live.  Defendants' policies and procedures of intentionally and systematically downgrading the standard of emergency response at Greystone continues to place the health and safety of patients at risk.

220. On or around January 24, 2019, a patient on Unit E1 died.  Defendant Mellk subsequently engaged in a cover-up to conceal that Greystone's policy of limiting emergency medical response to Basic Life Support is a deficient standard of care.

221. The patient was found in his room vomiting while lying on his back.   The patient did not receive the appropriate medical response due to Greystone's destruction of its emergency response capability.  Approximately forty minutes after being found, paramedics intubated the patient and administered epinephrine. The patient was pronounced dead.

222. The medical doctor who responded to this code blue represented to the Medical Staff Organization President that the patient had no vitals upon her arrival, and that her resuscitative

1   efforts were not successful.  The patient never recovered a pulse or blood pressure.  The doctor
2   also stated that the patient had already expired when the paramedics arrived approximately thirty
3   minutes after he was found in his room.

4   223. However, the Greystone twenty-four-hour Nursing Report documented the patient's
5   vitals as if he were still alive when the doctor responded.  When the doctor relayed this error to
6   Defendant Mellk and asked to correct the nursing report to accurately reflect that the patient never
7   recovered a pulse or blood pressure, Defendant Mellk instructed the doctor to not discuss this
8   matter with the MSO president.   As part of his cover-up, Defendant Mellk knowingly
9   misrepresented that the patient was still alive and that the measures taken were medically
10  sufficient.

11  224. Defendant Mellk later instructed the MSO president to refrain from "writing anything on
12  this code," from "looking at the patient's chart," and from "looking any further into this code."
13  However, according to the MSO bylaws, the president is responsible for the quality assurance of
14  all services provided by Greystone medical doctors.

15  225. In the morbidity and mortality review for this patient, which took place on March 2, 2019,
16  concerns were raised that this death was preventable.  This pressure prompted Dr. Mellk to concede
17  for the first time that the patient had expired at Greystone, and that basic life support was
18  ineffective in resuscitating this patient.

19  226. On or around March 6, 2019, a patient tried to hang herself by climbing over the PIC and
20  using the computer and telephone wires beneath the PIC.  The patient also climbed over the PIC
21  and tried to hang herself with the telephone wires beneath the counter in the nursing chart room.

227. On or around March 7, 2019, another patient climbed on top of the PIC and tried to hang herself, but staff was able to intervene.  However, merely climbing on top of the PIC poses a risk for suicidal patients as they may opt to dive off it onto their heads, which has previously occurred.

228. On or around March 8, 2019, a patient on Unit A3 climbed on the PIC and attempted to hang herself.  The cables and wires appeared to be within reach but the staff intervened before they could be used.  A doctor at the scene confirmed that there did not appear to be any plywood securing the ceiling tiles and that the wires were not elevated above reach.  This is in direct contradiction to Defendants' representations to its staff and the public that this danger had been fixed.

229. On or around April 1, 2019, a patient on Unit E3 climbed on the PIC, lifted the ceiling, and attempted to grab the wires to hang herself.

230. On or around April 7, 2019, a patient on Unit D3 climbed on top of the PIC, popped open the ceiling tiles, and tried to hang herself with the computer wires.

231. On or around May 22, 2019, a patient on Unit D3 jumped over the PIC, grabbed the computer monitor wire, and wrapped it around her neck.  When staff intervened, she refused to let the wire go and attempted to kick staff, necessitating an all-available call for help.

232. Despite these continued instances of attempted suicides and preventable deaths, Defendants act and continue to act in conscious disregard of patient safety and have taken no appropriate corrective action.

X.    **FAILURE TO PROVIDE NECESSARY MEDICAL CARE AND SECURITY**

233. At the cost of safety and human life, Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele have altered Greystone's practices and policies in the interest of limiting their own liability.   For

example, they have sought to avoid liability by removing life-saving equipment from the code carts.  Defendants also failed to provide critical life-saving training for staff.  Further, Defendants implemented new policies below the standard of care and recklessly endangered the patients and staff.  Defendants ordered the dismantling of Greystone's Emergency Medical Response to reduce medical liability.  Since the opening of the "new" Greystone in 2008, the emergency medical response protocol has paralleled the paramedic's standard of care.  This is no more.

234. As of December 2016, the policy on Recognition and Response to Patients' Condition was altered to prohibit doctors from using IV infusions and invasive or physical interventions at Greystone.  This policy diminishes the emergency response protocol by preventing doctors from using IVs for patients in cardiac arrest, which is a common risk at Greystone due to the medications prescribed.  Defendant Eilers and Defendant Mellk mandated that all IVs be eliminated from the state psychiatric hospitals.

235. As of 2017, Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele formally implemented a policy requiring the use of basic CPR rather than Advanced Cardiac Life Support, despite the obvious risk to patient safety.  On or around March 17, 2017, Defendant Mielke issued Administrative Bulletin 3:42 requiring that all staff be certified in Basic Life Support and stating that Advanced Cardiac Life Support would no longer be required.  After eight years of Advanced Cardiac Life Support training, this protocol and educational support for doctors and nurses was eliminated.  Per Defendant Eilers, his higher-ups in Trenton wanted to reduce their potential liability in life-threatening scenarios.  Defendant Eilers also expressed a lack of confidence in Greystone doctors and nurses to adequately perform Advanced Cardiac Life Support and noted that Basic Life Support is more accessible to a layperson.

236. As of 2017, Defendants implemented the policy, which required delaying the deployment of the code cart for a code blue. The code cart is only deployed if the doctor responding to code blue determines that the code cart is needed and then requests it. The policy prevents doctors from performing life-saving interventions. On April 30, 2019, Defendant Mellk reiterated this policy at a meeting with the medical department.

237. On or around January 4, 2019, a code blue was called when a patient collapsed in front of the court room and was found to be poorly responsive and drooling. The patient was prescribed an antipsychotic medication that can cause a sudden death, heart rhythm disturbances, seizures, and loss of consciousness. Per the code cart policy designed, implemented, and enforced by Defendants, the responding doctor requested the code cart upon arrival. Without consulting the responding doctor, Defendant Mellk called off the code blue because the responding doctor found a pulse. He ignored that the patient was verbally unresponsive, had to be lifted into a wheelchair, and may have still been at risk of cardio-respiratory arrest.

238. On or around January 30, 2019, a code blue was called for a patient on Unit B3 who was found unresponsive. The responding doctor asked for a code cart upon arrival to the scene. The responding doctor stayed with the patient from approximately 11:25 a.m. to 12:20 p.m. and the code cart never arrived. According to the computerized summary of this code blue, the patient had a two-minute period of unresponsiveness and his blood pressure was charted as 90/60 which is the lower limit of normal. The patient was on Keppra, an anticonvulsant for seizures, Lopressor for cardiac arrhythmias, and sodium chloride tablets to prevent hyponatremia and seizures. The doctor who responded to the code required the code cart so he could monitor the patient with the manual defibrillator-monitor for possible cardiac arrhythmias. This patient required care at Morristown Medical Center for approximately four days.

239. Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele have never provided adequate life-saving training to its staff.  Prior, when the Greystone Administration provided an in-house Advanced Cardiac Life Support and CPR Course that all nurses and doctors were required to take, the instructor provided the answers to the examination questions by projecting them on the screen.  Everyone received a perfect score.  On or around November 24, 2013, the then Greystone Administration did not provide the requisite CPR course.  Rather, the participants merely watched a video, and the instructor gave a demonstration.  No written material was provided.  Participants received an American Heart Association CPR card without performing CPR.

240. On or around February 11, 2019, Defendant Carter and Defendant Akerele directed staff members to sign an attendance sheet and attest that they received a code blue training session knowing that the staff members had not received any training whatsoever.

241. On or around March 18, 2019, a patient at Ancora Psychiatric Hospital, another state hospital under the direction of Defendant Elnahal and the Department of Health, collapsed face down and eventually died.  The responding doctors failed to appropriately log roll the patient and merely attempted to perform basic CPR upon their arrival.  A log roll is the maneuver or flipping over of a patient without flexing the spinal column.  The Center for Medicare and Medicaid Services investigated this incident and mandated proof of log rolling training from the administrations of all state hospitals.  In response to this, Defendant Mellk required Greystone doctors to sign an attendance sheet and attest that they have completed a log rolling course.  However, at the time that Defendant Mellk required doctors to make this false attestation, Greystone did not administer a log rolling course or any type of training on the immobilization and safe transfer of patients with suspended spinal injuries.  Instead, Dr. Mellk falsified an

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

attendance sheet for such a course to misrepresent that the staff received this training.  A log rolling course was eventually held.  Five doctors attended the course and nine doctors were required by Defendant Mellk to sign the attendance sheet although they did not attend.

242. Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant Mellk, and Defendant Akerele have also failed to remedy security issues that have resulted in multiple patient escapes.  For example, in or around Spring 2017, a patient kicked open the unit exit door and subsequently kicked open the rear exit door and fled. The person who chased him down an eighth of a mile was a physician in his sixties and not security personnel.  The patient was returned to the same exact hazard in the same unit and room.

243. The security flaw that security doors, if kicked hard enough, will open was not addressed. Subsequently, a few months later, the same patient once again kicked open his unit exit doors and two more security doors before exiting the building.  He then left Greystone, took a bus to Morris Plains, and then a train to his mother's home in Hudson County.  He was returned to Greystone two days later when the patient's mother called for him to be picked up.

244. On or around September 3, 2018, a patient on Unit G3 managed to push his way out of the unit and all the way to the lobby.  He was bought back to his unit by the police, but there was no doctor to treat him or to write an order for emergency medication.  Staff on Unit G3, prior to his escape, called a psychiatrist for medication, but no doctor was available.

245. On or around June 23, 2017, the Center for Medicare and Medicaid Services issued a sixty-one-page "Summary Statement of Deficiencies," which concluded that Greystone was out of compliance in the following areas:

- Structure of its Governing Body: "The Governing Body failed to demonstrate it is effective in carrying out the responsibilities for the operation and management of the Hospital."

- Patient Rights: "It was determined that the facility failed to protect and promote the rights of each patient" including "fail[ing] to ensure the safety for all patients."

- Medical Staff: "The facility failed to ensure that adequate Medical Staff is provided."

- Food and Dietetic Services: "The governing authority failed to ensure the daily management of Food and Dietetic Services.  Also, the governing authority failed to ensure that the nutritional needs of the patients are met in accordance with practitioners' orders" and that the food service equipment was cleaned and sanitized in accordance with New Jersey state sanitary codes.

- Physical Environment: "The facility failed to ensure the overall hospital environment is maintained for the safety and wellbeing [of] patients," including proper storage and removal of trash, proper water drainage and adherence to proper structural guidelines.

- Infection Control: "Based on staff interview and document review conducted on 6/22/17 and 6/23/17, it was determined that the facility failed to ensure that staff are screened for tuberculosis (TB) annually according to the CDC guidelines," "ensure that it follows the manufacturer's instructions for the germicidal wipes," and "ensure an Infection Control program for identifying, reporting, investigating, and controlling infections and communicable diseases of patients and personnel."

## XI.    INTENTIONAL MISDIAGNOSES OF THE DEVELOPMENTALLY DISABLED

246. Developmentally disabled patients at Greystone are not receiving the appropriate treatment or standard of care due to intentional misdiagnoses and the removal of their Division of Developmental Disability (hereinafter "DDD") eligibility and services.

247. Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, Defendant Akerele, and Defendant Lisa Ciaston, Legal Liaison for the Department of Human Services, Division of Mental Health and Addiction Services, have a policy and practice of removing DDD eligibility and services for Greystone patients.

248. Defendant Mielke, Defendant McQuaide, Defendant Eilers, Defendant Mellk, Defendant Akerele, and Defendant Ciaston have implemented a scheme to eliminate DDD eligibility for Greystone patients to decrease DDD's fiscal responsibility.

249. Prior to February 2014, Defendant Ciaston refused to approve a patient for DDD services even though that patient: (1) met the criteria to be DDD-eligible; (2) had been previously deemed DDD-eligible; (3) had an IQ of 48, which is the lowest score on the IQ scale; (4) was to found to meet the criteria for application for DDD services by various treating clinicians; and (5) was determined to be DDD-eligible by a court.

250. On or around February 26, 2014, Defendants were apprised that eleven of the twelve DDD-eligible patients remained involuntarily committed in the highly restrictive environment of Greystone after being clinically deemed no longer needing inpatient hospitalization. These individuals remained committed for a time frame ranging from 163 days to 1,948 days, with an average of 505 days.

251. Another example occurred when a patient who was committed at Greystone and who already had an apartment through her DDD benefits lost her apartment during the course of her commitment. After the civil commitment court confirmed that she was eligible for release, the loss of her housing caused her to remain at Greystone for a year longer than necessary.

252. Defendant Ciaston advanced a policy and practice to falsely diagnose patients with mental illness to preclude DDD eligibility, notwithstanding the fact that patients had previously been receiving DDD services.

253. On or around July 20, 2017, Defendant Ciaston was informed that DDD patients were being inappropriately diagnosed with mental illness so that those patients could be controlled through medication, even though they did not suffer from mental illness.

254. On or around August 11, 2017, Defendants were placed on notice that DDD patients were subjected to unconstitutional conditions during their long civil commitments at Greystone. These

1   conditions included DDD patients being targeted and "taken advantage of," both sexually and to

2   transport contraband, including drugs.

3   255. On or around August 21, 2017, Defendants were placed on notice regarding the failure of

4   Greystone to properly insulate DDD patients from harm at the hands of aggressive patients.

5

6   **XII.    EMPLOYEE RETALIATION RATHER THAN REMEDIATION**

7   256. Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide,

8   Defendant Eilers, Defendant Mellk, and Defendant Akerele have engaged in a plan to eliminate

9   all voices of dissent within Greystone and have proactively sought out vocal employees to

10  eliminate them from the workforce.  High-ranking officials have been removed as part of

11  Defendant McQuaide's effort to purge anyone who spoke out against her conduct. Defendant

12  Elnahal, Defendant Mielke, Defendant Carter, Defendant McQuaide, Defendant Eilers, Defendant

13  Mellk, and Defendant Akerele misrepresent the psychiatric staffing levels to give the false

14  impression that they complied with the report of the Center for Medicare and Medicaid Services

15  and to silence concerns expressed by advocacy groups.

16  257. In or around August 2017, the Acting Medical Director and the Medical Staff

17  Organization President, who were both outspoken about the conditions at Greystone, were forced

18  off the Executive Management Committee by Defendant McQuaide and Defendant Mellk.

19  Simultaneously, the Committee was expanded with non-physicians, leaving Defendant Mellk as

20  the only physician on the Committee.  Despite being a psychiatric facility, no psychiatrists

21  remained on the Committee.

22  258. In or around March 2018, a high-ranking doctor voiced opposition and was suspended.

23  On or around April 11, 2018, an Ad Hoc Committee appointed to review the doctor's suspension

24

25

26

27

28

found that there was no justification for the suspension, characterizing it as pretextual and retaliatory.

259. In or around 2017, Defendant McQuaide requested Greystone's Director of Performance Improvement and Utilization Management to compile the Greystone assaults since 2013. The director accessed the internal Unusual Incident Reporting and Management System and was alarmed by the number of assaults he found. He subsequently provided those figures to Defendants and his direct supervisor, Dr. Dorothea Josephs-Spaulding, Director of Quality Management. Defendant McQuaide instructed the director, "do not share these numbers with anyone, especially the doctors and the public." When the director continued to express his concerns regarding the high rate of assault, he was suspended by Defendant McQuaide and accused of falsifying data.

260. On or around February 12, 2018, the Director of Safety and Fire Department refused Defendant McQuaide's orders to modify the data with regard to assaults. He was subsequently reassigned to be supervised by Dr. Dorothea Josephs-Spaulding, the same individual who suspended the Director of Performance Improvement and Utilization Management. The Director of Safety and Fire Department was thereafter relieved of duties that had been specific to his role for eight years.

261. Less than two weeks later, this director was suspended and escorted out of the building for refusing another order to falsify data from Defendant McQuaide.

262. In or around March 2018, the Acting President of MSO filed a request for a meeting with Defendant Mielke regarding a doctor being unjustly removed from duty. Members of the medical staff viewed this as retaliation against the doctor for reporting the malfeasance of Defendant Elnahal, Defendant Mielke, Defendant Carter, Defendant Mellk, and Defendant Akerele and the "No Confidence" vote in the current hospital leadership.

263. More specifically, in the MSO's grievance, staff psychiatrists are requesting the closure of units and cessation of new admissions as a solution to the current crisis, the epidemic of violence, and the failure of the medical system. The psychiatrists also state that "there is compromised patient care which could easily lead to increased morbidity and mortality for the patients . . . and [the current understaffing of psychiatrists at Greystone] precludes the ability to provide adequate quality of care and thus leads to unnecessarily unstable patients and an unsafety [sic] work environment."

264. On or around May 29, 2019, the MSO's grievance hearing was held at the Department of Health headquarters in Trenton. Three Greystone doctors attended on behalf of the doctors who signed the grievance. Defendant James Frey (hereinafter "Defendant Frey"), Employee Relations Officer at Greystone, was present at the hearing. The doctors were sequestered and questioned individually. Each doctor addressed the problems listed in the grievance, reiterated the groups' No Confidence Resolution, and stated that the conditions at Greystone continue to worsen. In response, Defendant Frey, on behalf of Greystone and the Department of Health, grossly misrepresented that all the problems in the grievance were resolved. For example, he misrepresented that the ceiling tiles above the PICs were fixed to prevent suicide attempts and that violence at Greystone was reduced. He also stated that according to Defendant Elnahal, the total available psychiatric positions were lowered from twenty-nine to twenty-four, a different number from what Defendant Elnahal and Defendant Carter represented a few weeks prior at a Greystone Board of Trustees meeting. The purpose of lowering the number of available psychiatric positions was to forward Defendants' agenda of eliminating whistleblowing psychiatrists with more easily controllable APNs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XIII.    INTENTIONAL MISREPRESENTATION OF MATERIAL INFORMATION TO THE COURTS

265. Defendant Carter, Defendant Mellk, and Defendant Akerele instruct and pressure psychiatrists testifying at civil commitment hearings to materially misrepresent their testimony to the court and its officers.

266. Virtually every patient is committed to Greystone Hospital pursuant to a court order.

267. Civil commitment hearings are formal court proceedings held by a judge at psychiatric institutions to determine whether a patient requires involuntary commitment, or whether a less restrictive alternative is appropriate.  Pursuant to each patient's liberty and due process rights, the law mandates the State to ensure that patients are in the least restrictive environment where they can live safely.  All civil commitment proceedings require the sworn testimony of the treating psychiatrist.

268. On or around December 4, 2017, the Chair of the Board of Trustees provided Defendant Elizabeth Connolly, Acting Commissioner of the Department of Human Services, with a report and recommendations of the Board of Trustees, stating, "it has become apparent that the current administration is failing the patients and staff, requiring the board, and all unpaid volunteers to raise these issues." The detailed report concluded, *inter alia,* the intentional misinformation provided to the courts.

269. Due to the mass departure of psychiatrists at Greystone, the remaining psychiatrists have been forced by Defendant Carter, Defendant Mellk, Defendant Akerele, Defendant Ciaston, and Defendant Oo to "cover" civil commitment hearings for dozens of patients the psychiatrists had never previously evaluated. These psychiatrists are not members of the patients' treatment team. Many times, psychiatrists have examined the patient for a mere matter of minutes, yet are required by Defendant Carter, Defendant Akerele, Defendant Ciaston, and Defendant Oo to testify as an

expert and proffer an expert report.  These brief examinations often take place the night before or even the morning of the court hearing.  Staff psychiatrists find this practice, which continues to this day, to be reckless, dangerous, and unethical.  Staff psychiatrists have repeatedly and openly protested Defendants' unreasonable demands.

270. Since 2017, Defendant Akerele, Defendant Ciaston, and Defendant Oo have instructed "covering" psychiatrists that they are prohibited from testifying that they are unfamiliar with the patients, patients' medical history, and the specific facts of the patient's case.  The psychiatrists are also instructed to conceal the fact that they are "temporarily covering" these patients, that they are in fact not part of the patient's treatment team, and that they were overextended.

271. Defendants justify their unlawful instructions by stating that the psychiatrists would "make the hospital look bad" if they informed the court about their insufficient basis of knowledge to testify.

272. Defendant Akerele, Defendant Ciaston, and Defendant Oo are systematically engaged in the practice of pressuring doctors to conceal material information from the civil commitment court, and punishing doctors who refuse to lie.

273. For instance, in or around August 2018, a psychiatrist testified in court regarding his lack of knowledge of a patient and how little time he had to prepare.  Defendant Oo, who was present during the sealed hearing, informed Defendant Akerele, who subsequently summoned the psychiatrist into his office.  Defendant Akerele threatened the psychiatrist and instructed him to never offer that kind of information to the court again.

274. In or around September 2018, Defendant Akerele again required a psychiatrist to testify regarding a patient who the psychiatrist had never evaluated until the morning of the hearing. When the psychiatrist told Defendant Akerele that he had no basis of knowledge to testify and that

he had not seen the patient or reviewed the chart, Defendant Akerele stated, "I don't care," and implied that there would be disciplinary action if his order was not adhered to.

275. On or around September 12, 2018, in a court calendar of nineteen patients, five cases had no assigned psychiatrists, and the State could not proceed, thus violating the due process rights of the patients.  On one court calendar alone, at least five out of nineteen patients were committed to Greystone for an extended period without an assigned psychiatrist or due process of law.

276. Since January 2017, most court calendars have had multiple adjournment requests from the State due to the unavailability of a statutorily required treating psychiatrist.  Further, at virtually every hearing, psychiatrists either testify in court or report that they have little basis of knowledge to testify about their respective patients.  Numerous cases cannot proceed for months because of the unavailability of a treating psychiatrist.

277. Defendant Ciaston and Defendant Oo have attempted to control the outcome of involuntary commitment hearings by tampering with testifying psychiatrists' court reports. Defendant Akerele routinely humiliates and threatens psychiatrists with repercussions if they don't submit court reports the way he suggests.

278. Additionally, Defendant Akerele and Defendant Oo have changed psychiatrists' expert reports and on multiple occasions, Defendant Oo drafted the testifying psychiatrists' report herself.

279. For example, Defendant Oo repeatedly pressured a psychiatrist to change her court report for a high-profile patient to misrepresent that he was clinically dangerous and psychotic.  The psychiatrist refused because it was against her professional judgement.  Department of Health Medical Director Feibusch and Defendant Ciaston, along with others, systematically attempted to pressure and intimidate the psychiatrist into perjuring herself.  Dr. Feibusch, who hadn't interviewed the patient, pressured the psychiatrist to change her clinical opinion.  The psychiatrist

refused.  Eric Madurki, the then acting deputy CEO of Greystone, also asked the psychiatrist to allow Defendant Oo to change her report.  The psychiatrist continued to refuse.  Despite her continued effort to obey the law and not succumb to Defendants' pressure to falsify her professional opinion, Defendant Oo eventually altered the psychiatrist's report over her objection.

280. In response to Defendants' practice of forcing psychiatrists to misrepresent information to the courts and testify without adequate preparation, the psychiatrists drafted and signed a petition regarding Defendants' actions.  The petition was submitted to Defendants.

281. The petition titled "Petition for Unpressured Court Testimony" states:

> The undersigned physicians and psychiatrists are of the persuasion that the Greystone psychiatrists' courtroom testimony on behalf of their civilly committed patients is being unduly pressured by the administration to reach a predetermined conclusion. This pressure, in particular from attorney Swang Oo and medical director Evaristo Akerele could be constructed as witness tampering and adversely impacting the patients. Doctors are being told that you can't say this or that with the implication of repercussions. Doctors are told that they can't tell the court that they aren't properly prepared for their cases due to over extension from an unreasonable patient caseload. Such pressure tactics cannot continue with the expectation that the psychiatrist will testify honestly.

282. The Petition for Unpressured Court Testimony was hand delivered to Defendant Carter on January 14, 2019. The psychiatrists informed Defendant Carter that they would attach the petition to court reports.  Defendant Carter ordered that psychiatrists refrain from doing so.

283. The policy and practice of pressuring psychiatrists to testify on behalf of civilly committed patients with whom they have little to no interaction or treatment experience continues unabated at Greystone.

**NAMED PLAINTIFF J.M.**

284. On or around September 3, 2014, J.M. was admitted to Greystone.  She was seventy-five years old at the time.

285. J.M. resided on an overcrowded unit.

286. J.M.'s psychiatric diagnosis included bipolar disorder, post-traumatic stress disorder, and obsessive-compulsive disorder.  J.M. has a medical diagnosis of Celiac disease.

287. While at Greystone, due to the lack of proper medical and psychiatric care, J.M.'s health deteriorated significantly.  She lost a dangerous amount of weight.  Her medical condition worsened.  Her psychiatric condition deteriorated to the worst it had been in her life, eventually causing her to become selectively deaf and self-isolative.

288. J.M. was subject to multiple unprovoked assaults.  In or around November 2014, while residing in Unit E1, J.M. was punched in her face by another patient and suffered bruising on her eye and cheekbone.

289. Between 2015 to December of 2017, J.M. was assaulted on multiple other occasions by aggressive patients.  On or around March 20, 2018, J.M. was forced to shower, and then she was kicked in the head by a Greystone employee.

290. On or around December 13, 2017, a patient violently kicked J.M. in her back.  Defendants did not respond to her family's pleas to transfer this assaultive patient.  J.M.'s family requested that J.M.'s attacker to be transferred to a different unit, but Defendants denied their requests and stated that it was too difficult to transfer a violent patient.  One Greystone employee even went as far as stating, "this is a mental ward after all, what do you expect?"

291. It was only when a private attorney retained on J.M.'s behalf submitted a Notice of Intent to Sue to the Greystone Administration demanding the immediate transfer of J.M.'s attacker and

asking what measures Greystone would take to ensure J.M.'s safety that she was transferred on December 14, 2017, after the 4:00 p.m. shift change.

292. Defendants do not have any effective policies or procedures to keep patients safe from other assaultive patients. A member of the administration even conceded to J.M.'s family that they do not have any implemented policies and procedures to combat patient-to-patient violence.

293. On or around December 18, 2017, J.M.'s private attorney sent a letter to Greystone requesting a copy of their policies and procedures for addressing attacks on patients by fellow patients and all security procedures implemented to prevent attacks. He also requested a copy of the incident reports prepared because of prior attacks on J.M. Defendants did not respond or provide any of the requested documentation.

294. On or around January 13 and 14, 2018, J.M. was sexually assaulted by a male patient, who grabbed her genitalia. J.M.'s family was informed that when an incident such as this occurs, the attacker is usually transferred to another unit. However, Defendants indicated that because Unit E1 discharged so many patients, they were comparable to an admissions unit and their patients were more likely to be agitated and act out. Defendants also stated that they were hesitant to transfer J.M.'s attacker because there was a possibility that they would receive another patient who would also put the patients at risk. Instead, J.M. was transferred to Unit F1.

295. Defendants do not make the appropriate efforts to find community placement for patients who are no longer clinically dangerous and who have been ordered by a court to be discharged or placed on Continued Extension Pending Placement (hereinafter "CEPP") status. Due to their failure to seek new placements, CEPP patients are often subject to being recommitted when they decompensate due to the poor quality of care and unnecessarily long hospital stays. For example, a Greystone employee threatened J.M.'s family and stated that if the family did not find a new

residence by J.M.'s release date, Defendants would find a facility for J.M. that the staff "guarantee the family would not like." During this time, Defendants purposefully refused to provide critical requested paperwork to potential discharge facilities, almost precluding her discharge entirely. Further, Defendants' policy and gross negligence regarding something as simple as completing basic paperwork for its patients forced J.M. to miss out on available discharge placements. J.M.'s family was extremely involved and provided a list of at least five potential placements and deposited thousands of dollars to the various facilities to secure placement. Even with the family's proactive efforts, Defendants continued to hinder placement by failing to provide the facilities with the necessary admissions documents to assess J.M. When a facility was finally secured, Defendants failed in their duty to J.M. by refusing to complete paperwork necessary to obtain Veterans Affairs benefits.

296. On or around March 28, 2018, J.M. was finally discharged to the community. Almost immediately, her psychiatric conditions improved, and she began to communicate again. The lasting damage and the toll on her physical condition from years of chronic, abusive treatment at Greystone, however, will forever remain.

### NAMED PLAINTIFF S.C.

297. On or around April 20, 2018, S.C. was admitted to Greystone. At the time of admission, S.C. was 57 years old; her date of birth is May 26, 1960. S.C. was diagnosed with bipolar disorder, post-traumatic stress disorder, and anorexia.

298. S.C. was initially treated on Unit B1, an admissions unit, under the care of psychiatrist Dr. Young.

299. Upon admission, a medical doctor examined S.C. and found that her musculoskeletal system was "all normal," with no abnormal gait. S.C. was initially treated with Abilify 5 mg for depression, Depakote 500 mg for mood, Ativan, Zoloft 200 mg, and a nicotine patch.

300. In or around June 2018, S.C.'s lithium levels were tested at Greystone.

301. On or around June 22, 2018, S.C. was transferred to Unit E3. Around that same time, Dr. Young informed her that he could remain as her treating psychiatrist. However, on or around June 24, 2018, S.C. met with a different psychiatrist.

302. On or around June 29, 2018, Dr. Ravi Baliga's Psychiatric Progress Note indicates that S.C. was given Depakote 500 mg bid for mood, lithium carbonate 450 mg bid for mood, Zoloft 200 mg daily for depression, Geodon 40 mg bid for augmentation of antidepressants, and Vistaril 100 mg bid for anxiety. This same note ordered, "check serum lithium and Depakote levels."

303. Prescribing Depakote requires monitoring blood levels for valproic acid after one week of treatment, again one to two months later, and then every six to twelve months. The reason for this monitoring is that there is a therapeutic range at which Depakote operates optimally. Additionally, failure to monitor Depakote levels can induce Depakote toxicity, symptoms of which can include coma, confusion, dizziness, hallucinations, and irritability.

304. Prescribing lithium also requires monitoring blood levels to establish therapeutic effectiveness and to avoid lithium toxicity. A safe blood level of lithium is between 0.6 and 1.2 milliequivalents per liter. The toxic concentrations for lithium ($\geq 1.5$ mEq/L) are close to the therapeutic range. Some patients abnormally sensitive to lithium may exhibit toxic signs at serum concentrations that are considered within the therapeutic range, therefore close monitoring of a patient prescribed lithium is the community standard. Lithium toxicity can cause coma, delirium, confusion, seizures, muscle weakness, agitation, and low blood pressure.

305. Despite Dr. Baliga's June 29, 2018, progress note ordering the "check serum lithium and Depakote levels," her levels were not tested again until September 12, 2018, although S.C. made repeated requests for the same.  S.C.'s levels were not tested for seventy-five days, which amounts to malpractice.  In that amount of time, a fatal amount of blood toxicity could have accumulated.

306. S.C. also made repeated requests to see a psychiatrist but was not seen by a psychiatrist until a brief meeting in preparation of the July 17, 2018, court hearing and a short interview on July 25, 2018.

307. S.C. was eventually assigned to psychiatrist Dr. Stewart, who saw her approximately once per month.

308. On or around July 24, 2018, medical physician Dr. Amy Steinhardt ordered physical therapy and an evaluation for S.C. due to "generalized weakness" related to "prolonged bed rest," "poor eating habits," and "medication sedation."

309. On numerous occasions, such as on or around July 25, 2018, and July 26, 2018, S.C. complained of dizziness when ambulating.  On or around July 25, 2018, Dr. Steinhardt was made aware of the complaint**.**  Despite concerns regarding S.C.'s equilibrium, no lumbar tests were ordered.

310. On or around August 15, 2018, S.C. lost her balance, fell, and suffered an injury to her right wrist.  Dr. Steinhardt ordered an X-ray.

311. On or around August 20, 2018, Orthopedic Surgeon Dr. Christian J. Zaino of the Orthopedic Institute of New Jersey examined S.C. for the wrist injury.  On or around September 4, 2018, Dr. Zaino again examined S.C. for pain in her right wrist and determined the cause as "most likely an old distal radius fracture" that was "exacerbated" by the fall on August 15, 2018. On or around September 5, 2018, a "marked balance deficit" was noted, yet still, S.C. did not

receive testing to determine whether lithium and Depakote might have been the cause of her loss of equilibrium.

312. The cause of S.C.'s fall is likely due to the side effects from her prescribed psychiatric medications.  Greystone did not test S.C.'s blood levels until on or around September 12, 2018, despite numerous pleadings with staff to see a doctor, S.C.'s own request for blood testing, and a doctor's order to test her blood levels.    Further, S.C. complained of dizziness on numerous occasions during this time, but they were all ignored.  S.C. was not placed on a "fall precaution," a protocol that is standard operating procedure for staff to undergo when patients are at risk for falling due to physical condition or medication side effects.

313. Moreover, in or around the months of August and September 2018, S.C. was physically assaulted by the same patient on Unit E3 on four separate occasions.  Staff failed to keep her safe from the cycle of continuing assaults.

314. On or around September 6, 2018, S.C. reported that she was physically restrained and assaulted by her one-to-one observation Mental Health Technician.

### NAMED PLAINTIFF A.N.

315. A.N. was born on August 15, 1993.

316. On or around July 26, 2007, the Hackensack University Medical Center Institute for Child Development Interdisciplinary Evaluation Team diagnosed A.N. with Autism Spectrum Disorder.

317. On or around March 23, 2017, A.N. was admitted to Greystone.

318. On or around March 14, 2018, A.N. was diagnosed with schizoaffective disorder, bipolar type.

319. On or around April 11, 2017, and again, on or around May 11, 2017, DDD Intake Worker Trevor Wilson (hereinafter, "Mr. Wilson") sent letters to A.N. at his home requesting documentation to complete A.N.'s application for eligibility.

320. On or around September 13, 2017, a patient assaulted A.N by kicking him in the head.

321. On or around September 18, 2017, Dr. Maria E. Xiques, Psy.D. (hereinafter "Dr. Xiques") completed a psychological assessment to determine whether A.N. has Autism Spectrum Disorder. Dr. Xiques' report includes a review of an EEG Report dated January 12, 2013, from the Neuroscience Institute in Guayaquil, Ecuador, which noted epileptic activity.

322. On or around September 22, 2017, A.N.'s treating psychiatrist, Dr. Aleksandar Micevski, (hereinafter "Dr. Micevski") included "Autistic Disorder" as a primary diagnosis in the Psychiatric Commitment Hearing Report.

323. On or around September 26, 2017, the civil commitment court entered an Order requiring a report from the Division of Developmental Disabilities (Hereinafter "DDD") regarding A.N.'s eligibility for services to be presented to the Court by November 14, 2017.

324. On or around November 17, 2017, Dr. Micevski's hearing report again listed "Autistic Disorder" as a primary diagnosis.

325. On or around November 21, 2017, the court entered another Order referring to the September 26, 2017, Court Order for a DDD eligibility determination.

326. On or about January 6, 2018, January 7, 2018, and January 8, 2018, A.N. was medicated for agitation with PRN lorazepam and haloperidol, at times more than twice per day. Haloperidol, like many antipsychotic medications, is associated with a risk of epileptic seizure provocation. PRN medication was routinely administered to A.N. for the duration of his hospitalization, often leaving A.N. overmedicated, as evidenced by drooling and inability to maintain eye contact.

327. On or around January 12, 2018, Dr. Micevski included Autistic Disorder as a primary diagnosis for A.N.

328. On or around January 16, 2018, the court entered an Order instructing Greystone to notify DDD of the prior orders for a report regarding A.N.'s eligibility for DDD services.

329. On or around January 30, 2018, Dr. Yaser Daramna stated in a transcriptions report that A.N. had a medical history of autism and that he suffered a seizure, tonoclonic, at Greystone.

330. On or around February 23, 2018, Autistic Disorder was not included as a primary diagnosis in the hearing report for A.N.  The Autistic Disorder diagnosis was excluded from all Dr. Micevski's subsequent hearing reports.

331. On or around March 27, 2018, the court entered an order approving A.N. for Conditional Extension Pending Placement status.

332. On or around April 23, 2018, a Greystone social worker submitted a hearing report stating that A.N.'s application for DDD services was incomplete and no placement efforts were made, despite the September 27, 2017 Order, and the March 27, 2018 Order.

333. On or around May 4, 2018, the social worker indicated that he completed the DDD application for A.N., almost eight months after the original Order.

334. On or around May 17, 2018, the social worker's hearing report stated that the DDD application was submitted to DDD on May 7, 2018.

335. On or around May 22, 2018, the court entered an order of Conditional Discharge, as A.N. was still not linked with DDD services.

336. On or around June 4, 2018, A.N. was recommitted to Greystone.

337. On or around June 19, 2018, A.N.'s commitment hearing at Greystone could not be held due to the lack of treating psychiatrist.  A.N.'s commitment hearing was adjourned to July 3, 2018,

a date beyond 20 days from the June 4, 2018, commitment.  On that date, A.N. was still without DDD services.

## NAMED PLAINTIFF P.T.

338. P.T. was born on October 1, 1959.

339. In or around March 1988, P.T. was admitted to Camden County Health Service Center and transferred to the West Borough State Hospital in Massachusetts.

340. On or around August 8, 1991, P.T. was admitted to Camden County Hospital as a transfer from West Borough State Hospital in Massachusetts.

341. On or around January 14, 1992, P.T. was admitted to Greystone as a transfer from Camden County Hospital.

342. P.T. has been hospitalized continuously since 1988.

343. From 1982 to 1984, P.T. was hospitalized at Ancora Hospital.

344. P.T. is deaf and mute.

345. P.T. uses American Sign Language to communicate.

346. P.T. is diagnosed with schizoaffective disorder-bipolar type and borderline intellectual functioning.

347. P.T. resides on Unit A2, which is designated as a statewide specialized in-patient program for deaf and speech-impaired patients, and P.T. receives accommodation services.

348. In or around 2017, P.T. was attacked by a staff member at Greystone Cottage 14.  That staff member kicked P.T. in the shin.  P.T. was severely injured and required the assistance of a cane to walk after the attack.

349. On or around May 1, 2018, July 27, 2018, August 15, 2018, and August 17, 2018, P.T. was a victim of four separate physical attacks by the same patient on Unit A2.  The August 15, 2018, attack caused a scrape and bleeding from his mouth and nose.

350. On or around August 28, 2018, the civil commitment hearing for P.T. was adjourned to September 25, 2018, due to the treating psychiatrist's absence.  On or around September 25, 2018, P.T.'s hearing was adjourned again, due to the failure to secure an American Sign Language interpreter for the hearing.  At the time of this filing, P.T.'s hearing remains adjourned.

**NAMED PLAINTIFF J.L**

351. In or around September 2018, Defendant Akerele prematurely ordered J.L., who has a history of pica (a condition of chronically ingesting foreign bodies that are often indigestible) and assaultive behavior, off one-to-one observation.  Defendant Akerele took J.L. off of one-to-one without discussing the discontinuation in advance with the treating psychiatrist or treatment team.  When he took her off one-to-one, he did not document whether she had any thoughts of hurting herself or suicidal ideations.  Defendant Akerele disregarded the treating psychiatrist's concern that she was far too unstable and unpredictable to be off one-to-one.  Hours after Defendant Akerele discontinued the one-to-one observation, J.L. ingested an antenna, necessitating her admission to the emergency room and surgery.

352. J.L. has a history of climbing the PIC and other self-injurious behaviors.  On or around March 7, 2019, J.L. climbed onto the PIC and tried to hang herself.  Staff eventually intervened and brought her down from the PIC.  On another occasion, J.L. climbed the PIC and attempted to punch out the ceiling light fixtures.

**NAMED PLAINTIFF R.H.**

353. R.H. was born on November 29, 1958.

- 83 -

354. On or around July 18, 2015, R.H. was admitted to Greystone.

355. Since his admission, R.H. has frequently been the victim of assaults by other patients and by staff.

356. On July 3, 2018, R.H. punched another patient in the nose in self-defense.

357. On July 10, 2018, R.H. was scheduled for a civil commitment hearing. His hearing was adjourned because no psychiatrist was available to testify. The July 10, 2018 signed Court Order stated "adjournment to 11/27/18 at request of GP."

358. On or around September 26, 2019, R.H. reported that he had been beaten by staff. R.H. reported that the second toe on his left foot was bruised and that he sustained scratches on the right shoulder and right side of his neck. The scratches on his neck were visible. An x-ray of R.H.'s left foot was ordered and later revealed a fracture of the second toe of his left foot.

359. On October 30, 2018, R.H. was scheduled for a civil commitment hearing. This hearing was adjourned because no psychiatrist was available to testify.

360. R.H. was transferred to Unit E1 on November 8, 2018.

361. While on Unit E1, R.H. was frequently given additional psychotropic medication. These medications compounded R.H.'s regular medication regimen.

362. On February 26, 2019, R.H. complained regarding symptoms of over medication.

### NAMED PLAINTIFF "JOHN DOE"

363. "John Doe" is a patient at Greystone Park Psychiatric Hospital. His identity is known to counsel, but will not be disclosed for his own protection.

364. "John Doe" reported that alcohol, cigarettes, and a variety of illegal drugs are available to patients at Greystone.

365. He has procured cigarettes, alcohol, and marijuana at Greystone in exchange for money and by bartering other prohibited/illegal substances.

366. Per "John Doe", other illegal drugs, including cocaine, heroin, and ecstasy are also trafficked at Greystone.

367. Illegal drugs and other prohibited items can be obtained from other patients, staff, and residents of group homes that are on the Greystone campus.

368. "John Doe" has reported this to Greystone staff.  No action was taken by Defendants to curtail the influx of illegal drugs.

## NAMED PLAINTIFF "ROBERT DOE"

369. "Robert Doe" is a patient at Greystone.  His identity is known to counsel, but will not be disclosed for his own protection.

370.  "Pretty much any illegal drug" is readily available at Greystone.

371. "Robert Doe" has obtained illegal drugs from other patients at Greystone.

372. "Robert Doe" reports that staff smuggle prohibited substances, such as cigarettes or alcohol, into the hospital. Greystone staff also enlist their own family members to bring illegal drugs into the facility.

373. "Robert Doe" has obtained contraband from Greystone staff.

374. "Robert Doe" and other patients have brought contraband and illegal drugs between the main hospital building and the cottages.

375. "Robert Doe" has obtained and used marijuana and ecstasy at Greystone.  He used marijuana daily for approximately three months while committed at Greystone.

**<u>NAMED PLAINTIFF T.W.</u>**

376. T.W. was born on August 18, 1993.

377. On or around September 17, 2016, T.W. was admitted to Greystone.

378. T.W. is frequently on one-to-one observation.

379. On or around March 11, 2017, T.W. broke a chair and used a piece of it to attempt suicide by cutting herself.

380. On or around March 13, 2017, T.W. jumped on the PIC, tore down ceiling tiles, and wrapped cords from the ceiling around her neck.

381. On or around July 7, 2017, T.W. jumped on the PIC, removed ceiling tiles and tried to grab the wires in the ceiling. She was on one-to-one observation at the time.

382. On or around February 12, 2018, T.W. climbed on the PIC, tried to hit staff, picked up a piece of metal from the exit sign, put that piece of metal in her mouth and tried to push it down her throat. T.W.'s one-to-one observation was ineffective at de-escalating her and preventing her from harming herself.

383. On or around February 13, 2018, T.W. climbed on the PIC, pulled out the exit sign and ceiling tiles. T.W.'s one-to-one mental health technician was again ineffective.

384. On or around February 15, 2018, T.W. was aggressive and agitated. She punched staff, wrapped a telephone cord around her neck, and was then placed in restraints. T.W.'s one-to-one mental health technician was again ineffective.

385. On or around July 12, 2018, an application for services from the Division of Developmental Disabilities was submitted. By this time, T.W. was a patient at Greystone Park Psychiatric Hospital for approximately two years.

386. On or around November 10, 2018, T.W. tore down the exit sign and wrapped a sheet around her neck in an attempt to strangle herself. T.W.'s one-to-one mental health technician was again ineffective.

387. On or around April 1, 2019, T.W. climbed on the PIC, destroyed ceiling tiles, and reached for cables in the ceiling. T.W.'s one-to-one mental health technician was again ineffective.

388. On or around April 3, 2019, Defendant Akerele reduced T.W.'s one-to-one observation to be done only during the hours of 8:00 PM to 8:00 AM.

389. On or around April 7, 2019, T.W. swallowed a zipper and was sent to the emergency room. This resulted in a hospital stay of seven days.

390. On or around May 13, 2019, T.W. climbed on the PIC, and removed ceiling tiles. T.W.'s one-to-one mental health technician was again ineffective.

## NAMED PLAINTIFF M.K.

391. Plaintiff M.K. was born on May 6, 1992.

392. On or around May 17, 2018, M.K. was admitted to Greystone.

393. M.K. is diagnosed with obsessive compulsive disorder and schizophrenia.

394. Upon his admission to Greystone, M.K. was prescribed the following medications: Clozapine, 225 mg twice a day; Lanolin, 0.5 mg twice a day; Zoloft, 150 mg twice a day; Anafranil, 25 mg at bedtime.

395. These medications caused M.K. to lose his balance and fall on numerous occasions.

396. On or around December 16, 2018, M.K. told his doctor that he had fallen approximately one month earlier and had hit both knees.

397. On or around January 3, 2019, M.K. fell on his knees in front of his room.

398. On or around January 6, 2019, M.K. fell while getting out of bed.

399. On or around March 9, 2019, M.K. fell in the bathroom, which caused his foot to swell.

400. On or around March 15, 2019, a CT scan performed at Mountainside Medical Center revealed that M.K.'s foot was fractured.  However, on a prior occasion, a Greystone doctor concluded that M.K.'s foot was merely sprained, not fractured.

401. Although M.K. has reported his falls to staff, and some staff and patients had seen M.K. fall, he was at first denied medical treatment.  When medical treatment was sought, the Greystone doctor failed to diagnose the fractured bones in his foot.

402. M.K. sustained the fracture as a result of the fall which took place on March 9, 2019.  At the time, he was living in the cottages and receiving medication from APN Peter Ako, who is under the supervision of Defendant Akerele.

403. The falls were caused by overmedication.

404. M.K. has consistently complained to his treatment team that his medication, specifically Clozapine, caused him to be extremely tired and to feel lightheaded while standing.  A well-known side effect of Clozapine is orthostatic hypotension, also known as postural hypotension, which is a serious medical condition causing a severe decrease in blood pressure when standing or sitting up from a prone position. Orthostatic hypotension can lead to fainting, which may cause injury. Another very common side effect of Clozapine is somnolence, in which a person feels extremely sleepy and tired even after sleeping.  M.K. had no history of orthostatic hypotension prior to being medicated with Clozapine.

405. A January 8, 2019, comprehensive treatment plan note states that M.K. reports his medication causes "brain fog and forgetfulness that causes him stress."

406. A special treatment team note from February 25, 2019, states that M.K. said psychotropic medication aimed at treating his schizophrenia is not working and makes him sleep more and feel

agitated.  On February 25, 2019, M.K. also told APN Peter Ako that he is drowsy in the morning and attributes it to the medications.

407. On or around May 22, 2019, a psychiatrist lowered M.K.'s dose of Clozapine to 100 mg in the morning and 250 mg at bedtime.  Since being on this dosing schedule and a decreased dosage, M.K. has not experienced falls or lightheadedness, and is less tired.

## NAMED PLAINTIFF E.A.

408. E.A. was born on June 1, 1994.

409. On or around September 27, 2018, E.A. was admitted to Greystone.

410. On or around December 3, 2018, E.A. told the nurse on her unit, "I feel suicidal, I am hearing voices, I am having flashbacks."  Minutes later, E.A. received medication, went back to her room, and tried to tie her pillow case around her neck.  Staff intervened and removed the pillow case.

411. On or around January 16, 2019, E.A. climbed on the PIC and removed the ceiling tiles.

412. On or around January 25, 2019, E.A. climbed on the PIC, removed ceiling tiles, and pulled down wires to asphyxiate herself.

413. On or around March 12, 2019, Defendant Akerele discontinued E.A. from one-to-one observation, without consulting the treating psychiatrist, the treatment team, or the staff on duty. Shortly thereafter, E.A. wrote a note to her psychologist stating that although she did not feel safe being discontinued from one-to-one observation, she thought that "[Defendant Akerele] will be mad at me" if she did not agree.  Later that day, E.A. engaged in self-injuring behavior by cutting herself multiple times.

414. On or around March 13, 2019, her psychiatrist placed her back on one-to-one observation.

415. On March 13, 2019, a search of E.A.'s room was conducted to find the object she used to cut herself.

416. On March 19, 2019, E.A. stated that she would not feel safe if she were taken off one-to-one observation.

417. On or around May 15, 2019, E.A. tied a t-shirt and pillow case together to form a noose and tied it tightly around her neck in attempt to asphyxiate herself. When the unit nurse arrived and removed the noose, E.A.'s lips and face were blue and she was gasping for air.

418. On or around May 18, 2019, an all-available call for help was called in response to E.A. banging her head against the bathroom wall. At the time, she was on one-to-one observation, but the one-to-one mental health technician was charting the behavior rather than de-escalating her. E.A. did not stop until the responding doctor intervened.

## **FIRST CLAIM FOR RELIEF**

### **(AGAINST ALL DEFENDANTS)**

**VIOLATION OF THE DUE PROCESS AND EQUAL PROTECTION CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENT AND THE VIOLATION OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

419. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

420. At all relevant times herein, the conduct of all Defendants was subject to 42 U.S.C. Sections 1983 and 1985.

421. The action and inaction of Defendants complained of herein, individually and collectively, constitute policies and practices maintained by Defendants as set forth at Paragraphs 27-283; 285-295; 302-314; 320-337; 358-352; 355-362; 364-368; 370-375; 378-384; 398-411; and 414-422.

422. Defendants have violated the rights of the Plaintiffs and all other similarly situated Greystone patients, directed others to violated them, or had knowledge of and acquiesced in the violations of subordinates, secured by the Due Process Clause and Equal Protection Clause of the Fifth and Fourteenth Amendment of the United States Constitution.

423. Defendants have a relationship with Plaintiffs and all others similarly situated such that it is foreseeable that Defendants' conduct would cause direct harm to Plaintiffs and all others similarly situated.

424. Defendants conduct as alleged herein demonstrates a degree of culpability that shocks the conscience.

425. Defendants have engaged in the affirmative acts alleged at Paragraphs 27-283; 285-295; 302-314; 320-337; 358-352; 355-362; 364-368; 370-375; 378-384; 398-411; and 414-422 that have created a danger to Plaintiffs and those similarly situated and/or has left Plaintiffs and those similarly situated more vulnerable than had Defendants not engaged in those affirmative acts alleged.

426. The policies and practices set forth herein and specifically referenced at Paragraph 421 caused harm to Plaintiffs and all others similarly situated that was foreseeable and direct.

427. Defendants have purposefully discriminated against and caused cognizable harm to the Plaintiffs and all other similarly situated patients at Greystone based on their disabilities.

428. Defendants have violated the rights of the Plaintiffs and all other similarly situated Greystone patients, directed others to violated them, or had knowledge of and acquiesced in the violations of subordinates, secured by the Eighth Amendment of the United States Constitution.

429. Plaintiffs and all other similarly situated Greystone patients, have seriously medical needs, including but not limited adequate care and treatment, safety, freedom of movement, and habilitation, which Defendants are tasked with providing.

430. Defendants have failed to exercise appropriate professional judgment in providing these needs, as set forth at Paragraphs 27-283; 285-295; 302-314; 320-337; 358-352; 355-362; 364-368; 370-375; 378-384; 398-411; and 414-422.

431. Defendants have demonstrated a deliberate indifference to those medical needs, as set forth at Paragraphs 27-283; 285-295; 302-314; 320-337; 358-352; 355-362; 364-368; 370-375; 378-384; 398-411; and 414-422

432. As a result of Defendants' indifference and lack of appropriate professional judgment, Plaintiffs and those similarly situated have suffered harm.

433. The violations alleged herein include, but are not limited to, the denial of the right to a safe and humane physical and psychological environment, the right to be free from State-created danger and from the deliberate indifference to medical needs, and the right to be protected from patient-on-patient assaults through proper patient supervision and staff training addressed to reducing the incidence of hospital violence.

434. Plaintiffs and all other similarly situated Greystone patients have been harmed and continue to suffer harm as a result of the conduct of Defendants complained of herein.

**SECOND CLAIM FOR RELIEF**

**(AGAINST ALL DEFENDANTS)**

**VIOLATIONS OF THE NEW JERSEY CONSTITUTION, ARTICLE 1, PARAGRAPHS 1 AND 14**

435. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

436. Defendants' actions and inactions complained of herein individually and collectively constitute policies and practices maintained by Defendants as set forth at Paragraphs 27-283; 285-295; 302-314; 320-337; 358-352; 355-362; 364-368; 370-375; 378-384; 398-411; and 414-422

437. Defendants have violated the rights of the Plaintiffs and all other similarly situated Greystone patients secured by the New Jersey Constitution, Article 1, Paragraphs 1 and 14.

438. Such violations include, but are not limited to, the denial of the right to a safe and humane physical and psychological environment, the right to be free from State-created danger and from the deliberate indifference to medical needs, and the right to be protected from patient-on-patient assaults through proper patient supervision and staff training addressed to reducing the incidence of hospital violence.

439. As a result of the conduct of Defendants complained of herein, Plaintiffs and all others similarly situated have been harmed and continue to suffer harm.

**THIRD CLAIM FOR RELIEF**

**(AGAINST ALL DEFENDANTS)**

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

440. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

441. Title II of the Americans With Disabilities Act prohibits discrimination against people with disabilities by "public entities."  For the purpose of Title II of the ADA, the term public entity includes "(A) any state or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a state or states or local government ...." 42 U.S.C. 12131 (1) (A) and (B) (1990).

442. Greystone Park Psychiatric Hospital is a public entity within the meaning of 42 U.S.C 12131 (1) (A) and (B).

443. The Plaintiffs and all other similarly situated Greystone patients have mental disabilities within the meaning of 42 U.S.C. 12102(2) and are qualified individuals with disabilities within the meaning of 42 U.S. C. 12131(2).

444. Plaintiffs and all other similarly situated Greystone patients have been excluded from participation in, or denied the benefits of the services, programs, or activities which Greystone is required to provide.

445. Plaintiffs and all other similarly situated Greystone patients have been subject to discrimination by Greystone Park Psychiatric Hospital.

446. Defendants have violated the rights of the Plaintiffs and all other similarly situated Greystone patients secured by Title II of the Americans with Disabilities Act, 42 U.S.C 12132 and the regulations promulgated thereto, 28 C.F.R. Part 35., by but not limited to, the failure to administer services programs and activities in the most integrated settings appropriate and by needlessly placing them in institutional settings, and by failing to monitor such programs, services and activities so that Greystone patients can enjoy these services free from harm from other recipients, as set forth at Paragraphs 28-81; 89; 91; 93; 103; 112; 119; 124-127; 130-131; 133-134; 136; 139-255; 259-260; 263-283; 285-295  28 C.F.R. 35. 130(b)(iv).

447. As a result of the conduct of Defendants complained of herein, Plaintiffs and all others similarly situated have been harmed and continue to suffer harm.

## FOURTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

### VIOLATIONS OF THE REHABILITATION ACT

448. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

449. Section 504 of the Rehabilitation Act of 1973 provides, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. 794(a)(2002).

450. A "program or activity" is defined, in pertinent part as "a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other…local government entity) to which the assistance is extended, in the case of assistance to a State or local government; [or] an entire corporation, partnership, or other private organization… which is principally engaged in the business of providing…heath care." 29 U.S.C. 794(b)(1)(A), 794(b)(3)(A)(ii).

451. Greystone Park Psychiatric Hospital is a "program or activity" as defined by 29 U.S.C. 794(b)(1).

452. Plaintiffs and all similarly situated Greystone patients have mental disabilities within the meaning of 29 U.S.C. 705(20).

453. Plaintiffs and all other similarly situated Greystone patients have been excluded from participation in, or denied the benefits of the services, programs, or activities which Greystone is required to provide.

454. Plaintiffs and all other similarly situated Greystone patients have been subject to discrimination by Greystone Park Psychiatric Hospital.

455. Defendants receive federal financial assistance.

456. Defendants, by their actions and inactions complained of herein, have violated and continue to violate the rights of Plaintiffs secured by the Rehabilitation Act, 29 U.S.C. 794 and the regulations promulgated thereto, 28 C.F.R. Pt. 41.51 and 45 C.F.R. Pt. 84, by limiting and continuing to limit their enjoyment in the rights, privileges, advantages, and opportunities that are enjoyed by other recipients of public programs when receiving aid, benefit or service as set forth at Paragraphs 28-81; 89; 91; 93; 103; 112; 119; 124-127; 130-131; 133-134; 136; 139-255; 259-260; 263-283; 285-295

457. As a result of the conduct of Defendants complained of herein, Plaintiffs and all others similarly situated have been harmed and continue to suffer harm.

**FIFTH CLAIM FOR RELIEF**

**(AGAINST ALL DEFENDANTS)**

**VIOLATION OF THE PATIENT'S BILL OF RIGHTS**

458. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

459. Pursuant to N.J.S.A. 30:4-24.2 every patient in treatment has the following rights, which cannot be denied under any circumstances: 1) to be free from unnecessary or excessive medication; and 2) to be free from physical restraint and isolation except for emergency situations.  Every

patient in treatment also is entitled to the following rights, which may only be denied for "good cause": 1) The right to privacy and dignity; 2) the right to the least restrictive conditions necessary to achieve the purposes of treatment; and 3) the right to receive prompt and adequate medical treatment for any physical ailment.

460. The Plaintiffs and all other similarly situated Greystone patients are "patients" or "patients in treatment" for the purposes of N.J.S.A. 30:4-24.2.

461. Defendants have violated the rights of the Plaintiffs and all other similarly situated Greystone patients secured by the Patient's Bill of Rights, which violations include, but are not limited to: denial of the right to privacy and dignity; denial of the right to keep and use personal possessions; denial of the right to receive prompt and adequate medical treatment for any physical ailment; and denial of the right to have individual storage space for private use, as set forth at Paragraphs 27-68; 24; 139; 141-149; 153-154; 192-196; 204-212; 215-221; 233-241; 245; 285; 287; 302-312; 405; 408; 410-411.

462. As a result of the conduct of Defendants complained of herein, Plaintiffs and all others similarly situated have been harmed and continue to suffer harm.

## SIXTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

**VIOLATIONS OF NEW JERSEY INVOLUNTARY PSYCHIATRIC COMMITMENT LAWS, N.J.S.A. 30:4-27.1 TO 27.23 AND R. 4:74-7.**

463. Plaintiffs repeat and reallege the allegations in all preceding paragraphs as if set forth herein.

464. Pursuant to N.J.S.A. 30:4-27.1 to 27.23, the State of New Jersey is responsible for providing care, treatment and rehabilitation to mentally ill persons who are disabled and cannot

provide basic care for themselves or who are dangerous to themselves, others, or property. N.J.S.A. 30:4-27.1 (a).  It is the policy of the State that persons in the public mental health system are required to receive inpatient treatment and rehabilitation services in the least restrictive environment in accordance with the highest professional standards and which will enable those in committed to treatment to return to full autonomy in their community as soon as it is clinically appropriate.

465. The Plaintiffs and all other similarly situated Greystone patients are persons subject to civil commitment pursuant to N.J.S.A. 30:4-27(m) and therefore entitled to certain statutory rights, including the right to a hearing within 20 days from initial commitment.  See N.J.S.A. 30:4-27.12. Further, patients have the right to periodic court review hearings regarding the need for involuntary commitment to treatment and to the least restrictive environment for that treatment See N.J.S.A. 30:4-27.16.  In all instances, a psychiatrist on the patient's treatment team who has conducted a personal examination as close to the court hearing as possible but in no event more than five calendar days prior to the court hearing shall testify at the hearing. N.J.S.A. 30:4-27-13(b).

466. Defendants have violated the statutory rights of the Plaintiffs and all other similarly situated Greystone patients by failing to provide sufficient staffing of psychiatrists to testify at scheduled court review hearings and actively tampering with material testimony therein, thereby resulting in prolonged hospital stays of the right to constitutionally sufficient and periodic review hearings, as set forth at Paragraphs 27-68; 265-283; 330-337; 350; 359.

467. As a result of the conduct of Defendants complained of herein, Plaintiffs and all others similarly situated have been harmed and continue to suffer harm.

## **REQUEST FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

A.  Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.  Appoint the undersigned as Class Counsel on behalf of the Class;

C.  Declare that Defendants' failures to comply with the mandates of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, Title II of the American's With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, New Jersey Constitution Article 1, Paragraphs 1 and 14, Patient Bill of Rights, and New Jersey involuntary psychiatric commitment laws are unlawful.

D.  Enter a permanent injunction enjoining Defendants from subjecting the named individual Plaintiffs and members of the Plaintiff class to policies and practices that violate their rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, Title II of the American's With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, New Jersey Constitution Article 1, Paragraphs 1 and 14, Patient Bill of Rights, and New Jersey involuntary psychiatric commitment laws.

E.  Award Plaintiffs their reasonable costs and attorney's fees incurred in the prosecution of this action; and

F.  Award such other equitable and further relief as the Court deems just and proper.

1  RESPECTFULLY SUBMITTED this 10th day of June, 2019.

2

3

   Joseph E. Krakora (N.J. Bar No. 035891983)
4  Office of The Public Defender - State of New Jersey
   Hughes Justice Complex
5  25 Market Street
   Trenton, NJ 08625
6

7  By: s/ Carl J. Herman, Director, Division of Mental Health Advocacy
   (N.J. Bar No. 016901)
8  carl.herman@opd.nj.gov

9
   By: s/ Nora R. Locke, Deputy Public Defender
10 (N.J. Bar No. 016411997)
   nora.locke@opd.nj.gov
11

12 By: s/ Rihua Xu, Asst. Deputy Public Defender
   (N.J. Bar No. 122232014)
13 rihua.xu@opd.nj.gov

14 By: s/ Eric J. Sarraga, Asst. Deputy Public Defender
   (N.J. Bar No. 245642017)
15 eric.sarraga@opd.nj.gov

16
   The Wolf Law Firm, LLC
17 1520 U.S. Highway 130, Suite 101
   North Brunswick, NJ 08902
18 (732) 545-7900

19
   By: s/ Andrew R. Wolf, Esq.
20 (N.J. Bar No. 018621995)
   awolf@wolflawfirm.net
21

22 By: s/ David J. DiSabato, Esq.
    (NJ Bar No.: 012641997)
23 ddisabato@wolflawfirm.net

24
   By: s/ Lisa R. Bouckenooghe, Esq.
25 (NJ Bar No. 015172004)
   lbouckenooghe@wolflawfirm.net
26

27 *Attorneys for Plaintiffs*

28